DCHUBALF

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                          12 CR 196 (PAC)

5    MICHAEL BALBOA,

6                    Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          December 17, 2013
9                                         9:00 a.m.

10

11   Before:

                          HON. PAUL A. CROTTY
12
                                          District Judge
13                                          and a Jury

14
                              APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   JASON H. COWLEY
     WILLIAM T. CONWAY III
18   DAVID I. MILLER
          Assistant United States Attorneys
19
     TACOPINA SEIGEL & TURANO, PC
20        Attorneys for Defendant
     JOSEPH TACOPINA
21   CHAD D. SEIGEL
     JOSHUA E. DUBIN
22   DINA NESHEIWAT
     JASON LAMPERT
23   KEVIN SCHNEIDER

24   ALSO PRESENT
          Spencer Hattendorf, Paralegal
25             United States Attorney's Office

DCHUBALF

1              (In open court, jury not present).

2              THE COURT:  The jury is here, so call in the jury.

3              MR. COWLEY:  Your Honor, there is a transcript

4    disagreement that I understand might arise, something that I

5    wanted to flag and I understand they will be putting the quote

6    on a slide and we think there is a substantial typo that

7    changes the meaning of what a witness said.

8              THE COURT:  What does the transcript say?

9              MR. COWLEY:  It is on page 1070, and it is during Dr.

10   Muhtar's cross-examination.

11             THE COURT:  His most recent cross-examination?

12             MR. COWLEY:  No, I think the first time around, and I

13   will start with line 13 for context and then show you where the

14   issue is.  So on 13:

15   "Q  You would agree, sir, that this document doesn't say what

16   is going to happen to the warrant itself.  I think you

17   testified on direct that the warrant, you word was extinguishes

18   upon maturity, correct?

19   "A   Yes.

20   "Q   That language doesn't appear in this document, doe it?

21   "A   Well --

22   "Q  I am just asking you, yes or no, if the language appears in

23   the document?

24   "A   Extinguishes doesn't but I believe there is a reference

25   some to" -- it says "consideration."  Our recollection -- and

DCHUBALF

1    this is something I raised with Mr. Dubin I think the day after

2    the testimony -- was that it should read "cancellation" rather

3    than "consideration."  We think that is clear and consistent

4    with his testimony and not --

5                THE COURT:  Now, I am going with the transcript.  That

6    is what all that we can rely on.  You are supposed to be

7    reading the transcript.  If there is a discrepancy --

8                MR. COWLEY:  We raised it with them the day after his

9    testimony.

10               THE COURT:  You didn't raise it with me and he came

11   back, so I am going with the transcript.

12

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  We are going to have closing arguments

3    now.  The government goes first and Mr. Tacopina on behalf of

4    Mr. Balboa and the government has an opportunity for rebuttal

5    argument.  That will take us most of the morning.  We will have

6    a luncheon break, and I will charge the jury.

7          Mr. Cowley.

8          MR. COWLEY:  Thank you, your Honor.

9          If it please the Court, counsel.

10          Ladies and gentlemen, Michael Balboa committed fraud.

11    How did he commit fraud?  He committed it by manipulating and

12    undermining the independent valuation process that was in place

13    for his fund, and he used that particular security that you

14    have heard so much about -- the Nigerian Oil warrant -- to

15    drastically inflate the fund's net asset value and the fund's

16    performance numbers.  By doing this, Mr. Balboa lied to

17    investors.  He lied about how the fund's independent valuation

18    process was going to work, and he lied about how the fund was

19    actually performing and these issues were of critical

20    importance to investors.  You heard several investors talk

21    about that.  And as a result of these lies, investors put more

22    money into Mr. Balboa's fund or decided to keep their money in

23    Mr. Balboa's fund and that is fraud.  By doing so, Mr. Balboa

24    broke the law.

25          We submit to you that the evidence that you have heard

DCHUBALF                    Summation – Mr. Cowley

1    in this case, the evidence of the false promises and the false

2    representations that Mr. Balboa made, the evidence of the

3    secret communications between Mr. Balboa and Mr. Pratt and

4    Mr. De Charsonville, and the evidence of Mr. Balboa's

5    overwhelming efforts to lie and hide what he had done from

6    Millennium and regulators started looking into his conduct.

7    All of that evidence leads to one conclusion –– that Mr. Balboa

8    is guilty of the charges that are set forth in the indictment.

9           Now, today during my summation, I am going to explain

10   how the evidence that you have heard points to that inescapable

11   conclusion.

12          I am going to talk about three broad categories of

13   evidence.

14          Here is the first category:  The misrepresentations

15   that were made to investors.  These are the promises that were

16   made to investors about how the fund was going to be valued.

17   And as part of that, I am going to talk to you about

18   Mr. Balboa's direct involvement in these lies that were being

19   told to investors.  I am also going to talk with you about how

20   these representations about the valuation process were critical

21   to investors' decisions to invest in Mr. Balboa's fund.

22          The next thing that I am going to talk with you about

23   is the overwhelming evidence that shows that Mr. Balboa

24   secretly and fraudulently manipulated that independent

25   valuation process in direct contradiction to the

DCHUBALF                    Summation - Mr. Cowley

1    representations that were made to investors.  This includes the

2    impact that these misrepresentations had on the fund's

3    valuation and fund's performance numbers that were reported to

4    investors month in and month out.

5          The third category I am going to talk to you about is

6    the overwhelming evidence that shows that Mr. Balboa was

7    intentionally committing fraud.

8          This last one in particular, one of the things you are

9    going to hear talk about is Mr. Balboa's repeated efforts to

10   cover up his scheme after Millennium and regulators started

11   looking into it.

12         Let's talk about the first category,

13   misrepresentations to investors.  You have looked at a lot of

14   documents in this case.  You have looked at DDQs, offering

15   memorandums ad nauseam.  What I am going to do now is walk

16   through some of the important parts of the DDQ's and some of

17   the important parts of the offering memorandums to flesh out

18   the representations that were made to investors about the

19   valuation process.

20         Let's start with DDQs.  If you recall, these are the

21   due diligence questionnaires.  They were a series of questions

22   that investors had, they would send to the fund or send to

23   GlobeOp and they would provide answers back.  Let's look at

24   some of those.

25         For example, here is Government Exhibit 55.1.  This is

DCHUBALF                    Summation - Mr. Cowley

1    as DDQ from January 10, 2008.  And what is happening here is a

2    potential investor based right here in Manhattan, Citi

3    Alternative Investments, sent a DDQ to GlobeOp asked them how

4    is the investment process going to work for Mr. Balboa's fund.

5    Well, there is a back-and-forth between GlobeOp and Millennium

6    where Millennium says, it is OK for you to fill this out, but

7    we want to review and approve it.

8         Here is the email reviewing it.  Michael Balboa is on

9    it, and they are giving GlobeOp the green light to send this

10   out.  Look at the representations that are made about how the

11   fund going to be valued in this DDQ.  They ask, what are

12   sources for pricing and what is the representation that is

13   made?  Well, for listed securities, GlobeOp used Reuters or

14   Bloomberg for things like Apple, IBM, whatever.  For thinly

15   traded securities, what are used?  Counterparty marks are

16   used -- not manager marks, not what Mr. Balboa thinks --

17   counterparty marks are used.

18        What are some other representations that are made?

19   How are pricing disputes between the back office and the

20   portfolio manager, Mr. Balboa, how are they resolved and

21   documented?  Again, what is the representation that is made?

22   Counterparty marks are considered final.

23        What else?  What is the involvement of the

24   administrator in the evaluation process?  Does it independently

25   value 100 percent of the portfolio at month end using prices

DCHUBALF                    Summation - Mr. Cowley

1    obtained directly from brokers or vendors?  Again, how are

2    pricing disputes between the manager and the administrator

3    resolved?  What is the takeaway here?  The manager is involved

4    with following up with counterparties to provide statements in

5    case there is some sort of dispute, but at the end of the day,

6    manager marks are not used to price the portfolio.  That is a

7    representation that is made over and over and over again.

8            Let's look at some other DDQs, Government Exhibit 9.

9    This is a DDQ that is sent out March 7, 2008 to a potential

10   investor named Jeff Holland on behalf of this company.  What

11   were the representations made here:  Where assets are valued

12   in-house, please provide a summary of the controls in place to

13   insure accuracy.

14           What is the representation made?  There are no assets

15   valued in-house, no assets valued by Mr. Balboa, the portfolio

16   manager.

17           And, again, what else do they ask?  Are at least three

18   independent prices available for non-exchange traded

19   investments?  The answer:  At month's end, the fund's valuation

20   agent, GlobeOp, receives counterparty marks on all of the

21   positions and are able to compare these to their own valuations

22   that have been made.  They are asking specific questions about

23   obtaining independent marks.  They are being told time and time

24   again, there are no assets being valued in-house.

25           Let's look at another DDQ -- actually, here is a

DCHUBALF                    Summation - Mr. Cowley

1   reference to the fund appointing independent valuation agent.

2           All right.  This is a DDQ.  It was sent to Matt Daniel

3   in April of 2008.  Again, the same representation appears:

4   There are no assets valued in-house.

5           Then we come to Government Exhibit 2, and this is an

6   exhibit you have seen a lot of.  This is the DDQ that was

7   issued -- it was June 30, 2008.  And what language is included

8   in here?  Now, there is an addition that the portfolio manager

9   for MGEC retains oversight capacity.  We will talk a little bit

10  later about what oversight capacity it means and what it

11  doesn't mean, but what is the representation that still being

12  made to investors -- that there are no assets valued in-house.

13          In addition, you know that Mr. Balboa is signing off

14  on these representations.  Ms. Gibson-Starks said that?

15          Was he involved in reviewing and approving these DDQs?

16  The answer is yes.  You know that from the documents.  In

17  September 2008, you see an email.  This involves

18  Ms. Gibson-Starks CC'ed showing that Michael Balboa is signing

19  off on that exact language that you just saw on the DDQ.  The

20  oversight language but, again, the specific representation that

21  no assets are valued in-house -- even specific inquiries from

22  specific investors about the independence of the fund's

23  valuation procedures.

24          Let's take a look at another email communication

25  involving Mr. Daniels.  So in January 2008, Mr. Daniels emails

DCHUBALF                    Summation - Mr. Cowley

1  specific questions about the valuation procedures, the pricing

2  procedures that are being used by the funds.

3        Ms. Molberg is reaching out to Michael Balboa to

4  review and approve a particular response.  One of the things he

5  is asking about is pricing procedures, what percentage of

6  portfolio is marked by the dealers internally.  He wants to

7  know is Mr. Balboa going to be providing values for any of the

8  securities in this fund.

9        What is the answer, the report back?  That prices is

10 externally marked, i.e., not marked by the portfolio manager,

11 but by the valuation agent and that they use counterparty

12 marks.

13       What is the response?  Mr. Balboa wants to change

14 about some other topic that is in the email, but in terms of

15 these representation about valuations, all of the rest are OK.

16 And, sure enough, that is the representation made to Mr.

17 Daniels.  You see it right there.

18       So as early as January 2008, Mr. Balboa is personally

19 involved in approving representations about the independence of

20 the fund's valuation process.

21       Now, in addition to these DDQs, you also saw offering

22 memorandums.  These are sort of the information documentation

23 that Millennium sends out saying this is how our funds works.

24 And there are representations in there about how the funds

25 valuation process is going to work, for example, Government

1   Exhibit 1A.  This is an offering memorandum from March of '08.

2   And it says, in the absence of an OTC market price -- it means

3   over-the-counter market price -- the directors or their

4   delegate will seek to obtain a quotation from at least two

5   independent, recognized investment banks and the average of

6   such quotations will be taken.

7           These are the representations made time and time again

8   about the independence of the valuation process, the sort of

9   checks and balances that are in place so that investors have

10  comfort that they are getting accurate numbers about the fund's

11  value and the fund's performance month in and month out.  And

12  investors relied on these representations.

13          For example, you heard from Mr. Daniel.  He invested

14  about $13 million of his client's money.  He met with

15  Mr. Balboa right here in Manhattan.  You heard him on the

16  witness stand say this:

17  "Q   And as a current or preexisting investor in the Millennium

18  Fund, at the time of this email why were you interested in

19  knowing whether or not any of the fund's assets were being

20  internally marked?

21  "A   Because it's an area of risk from our perspective.  As we

22  talked about earlier, it is a conflict of interest and we

23  wanted to know if any of that is going on, and I asked it to

24  see if there is any change, to see if we invested previously."

25          You heard this also from Raj Keswani and Charles

DCHUBALF                    Summation - Mr. Cowley

McNally, two other investor witnesses.  Mr. Keswani invested

between 10 or 20 million of clients' money in the fund and they

all sent their money to a bank account right here in Manhattan.

Here's what Mr. Keswani said.  He used the metaphor of sort of

separation of church and state, checks and balances to make

sure that he is getting an accurate number and he is asked to

explain this and why it is important to him.  He says that

because at times in investing, the interest of the portfolio

manager may not be in line with the interests of the investor

and somebody has to keep those things in balance, and

independent valuation is one of those things. "It would be like

me having a bank account at Chase and then the way Chase

determines that what's in my bank account, they call me each

month and ask me what my balance is and I tell them and they

say good, that's your balance.  Good for me, not good for

Chase.  That's why you've got that independent valuation

function."

        Again, investors want comfort that they are getting

reliable, truthful, correct numbers in terms of performance and

how their investment is doing.

        You heard Mr. McNally talk about this as well.  What

did he say?

"Q   Mr. McNally, did your understanding that the fund would be

using external sources for valuation purposes factor into your

decision to have Lyster Watson invest in the Millennium Fund?

1    "A    Yes.  As I said, we would not have invested in that fund,

2    or any other fund if it used internal sources for valuating

3    positions."

4            So you know that these representations were important

5    to investors.

6            I want to move on and talk about the second category

7    of evidence that we mentioned, which is the overwhelming

8    evidence that shows that Balboa secretly and fraudulently

9    manipulated this valuation process, that he broke the promises

10   that were being made to investors.

11           Now, you have heard evidence during this trial

12   including witness testimony, a paper trail of multiple emails

13   and audio recordings between Mr. Balboa and Mr. De

14   Charsonville.  They all point to that same conclusion that

15   working behind the scenes, Mr. Balboa manipulated this process.

16           Let's begin with the testimony of Sam Pratt and Gilles

17   De Charsonville.  They both testified that they agreed to do a

18   favor for Mr. Balboa at his request, that is, to provide

19   counterparty marks to GlobeOp.  They both agreed to do this

20   favor, because as they readily admitted, they were sales guys

21   and they were interested in cultivating more business with Mr.

22   Balboa.

23           Beginning in January 2008, there is a pattern that

24   quickly emerges.  Balboa simply uses Pratt and DeCharsonville

25   as essentially mouthpieces to pass on his own valuation, his

DCHUBALF                    Summation - Mr. Cowley

1   own mark to GlobeOp.  And this happens month in and month out.

2           As my colleague Mr. Miller told you at the beginning

3   of this trial, you should analyze the testimony of Mr. Pratt

4   and Mr. De Charsonville carefully.  You should use your reason

5   and your common sense to figure out whether or not you think

6   they are being honest.

7           And what is one way to assess the accuracy of their

8   testimony?  Check that against the multitude of documents in

9   this case.  Check that against the emails that you have seen

10  and the audio calls that you have heard.

11          Now, I am not going to waste your time by walking

12  through each and every month of the valuations that you have

13  seen here.  I am going to walk you through a few so that you

14  get a sense of Mr. Balboa's fraud at play.

15          Let's start in January 2008 when GlobeOp reaches out

16  to Mr. De Charsonville and Mr. Pratt to obtain marks.  You

17  recall the testimony of Pratt and De Charsonville.  Let's see

18  if their email communications back up that testimony.

19          One representation that Mr. Tacopina made to you in

20  the opening is what this evidence will look like.  Here's what

21  he said:  "When those emails are looked at in full context, you

22  are going to see that nothing criminal is going on at all,

23  nothing criminal.  This wasn't like valuing IBM stock.  One of

24  the ways that you know nothing criminal was going on is that

25  everything was open.  Every single thing was out in the open,

DCHUBALF                    Summation - Mr. Cowley

1    on the emails, the phone calls, recorded lines.  Nothing was

2    hidden."

3              Let's go to the emails.  Let's break it down between

4    what GlobeOp saw and what they didn't see.

5              So, first, Ambika Banerjee on January 11th reaches out

6    to Gilles De Charsonville for a mark on the warrant.  It is

7    about 6:38 a.m.  What happens then?  Mr. De Charsonville

8    forwards that on to Mr. Balboa -- of course not copying

9    GlobeOp, saying, "Mike, what do you know?"  This is the sort of

10   language that evidence the kind of agreement that is developing

11   between Mr. Balboa and Mr. De Charsonville.  This shows

12   Mr. Balboa that Mr. De Charsonville has no idea what a price

13   is.  He is not going to be some sort of independent source.

14             How does Mr. Balboa respond?  "525" -- He just gives

15   him a number to pass on.  Again, GlobeOp is not privy to these

16   communications.  And what happens?  Mr. De Charsonville sends

17   it right back.  Now, GlobeOp thinks they have obtained an

18   independent mark from Gilles De Charsonville when really it is

19   coming from the portfolio manager.

20             What happens with Mr. Pratt?  That same day they

21   reached out to him for a counterparty mark on the warrant.

22   What happens?  Within about 10 minutes, Mr. Balboa reaches out

23   to Mr. Pratt and said, if GlobeOp asks, here is the price, 525.

24   And what does Mr. Pratt say?  "OK.  Will do."  Again, a clear

25   indication to both parties in this communication that Mr. Pratt

1    is just going to pass on Mr. Balboa's number, and sure enough

2    he does.  No debate.  No discussion.  Just Mr. Balboa directing

3    what the number should be in complete contradiction to reps

4    made to investors.  The pattern plays out month after month.

5          Government Exhibit 6009.  This is a summary chart and

6    it shows the numbers that Mr. Balboa is passing on to De

7    Charsonville and Pratt, month in and month out.  Look at this

8    see this escalation.  This is him secretly feeding higher and

9    higher numbers every month to GlobeOp through Gilles De

10   Charsonville and Sam Pratt while everybody thinks these are

11   independent counterparty sources.  Make no mistake, these

12   numbers that Mr. Balboa passes on are, as Mr. Knapp said, in no

13   way linked to reality.

14         Take a look at Government Exhibit 6000.  This is a

15   summary of the actual known trade prices.  These were trades

16   that were actually known to have taken place, that actually

17   took place.  What do you see?  That in all of 2008, the highest

18   trade price is $239.  Now, let's compare this reality to

19   Mr. Balboa's lies.

20         Take a look at Government Exhibit 6002.  This chart is

21   very powerful.  On the blue line on the bottom is the actual

22   trades, where the warrant is actually trading at what its

23   actual value is.  The red line is the number that Mr. Balboa is

24   causing GlobeOp to mark the warrant at.  Look how reality and

25   Mr. Balboa's lies begin to separate and separate drastically.

1           Now, by August of '08, the warrant was actually

2     trading at around 200 bucks.  Mr. Balboa is causing it to be

3     marked by GlobeOp at 3,600.  That is around 18 times higher

4     than what this thing is actually trading at.

5           Let's walk through the valuation for that month

6     August, sort of see how Mr. Balboa pulls off this fraud and

7     some other things that are going on at the time.  We will break

8     it up again between the emails that GlobeOp was on, email

9     communications involving Balboa behind the scenes that GlobeOp

10    didn't get the benefit of.

11          So, first, Gilles De Charsonville reaches out to

12    Balboa and says, when are you free to mark-to-market.  Here is

13    Mr. Balboa's response:  "Can we do it tomorrow?  Like to see

14    where everything else comes in first."

15          This is an important email because here is Mr. Balboa

16    saying he wants to see where all of the other securities come

17    in first.  That shouldn't have anything at all to with where he

18    is marking the Nigerian warrant.  The month is over but he

19    wants to see if he needs to jack up that price to get the

20    numbers that he needs.  This ladies and gentlemen, is what the

21    conspiratorial agreement looks like.  It is an understanding

22    that Mr. Balboa is waiting to pass on whatever numbers he wants

23    to Mr. De Charsonville and he will pass it on.

24          How does Mr. De Charsonville respond?

25          "Sounds good.  No worries.  I'm going to story it for

1   GlobeOps."

2           What happens after that?  So on September 1, that same

3   day, Mr. Balboa actually gets an offer to purchase the Nigerian

4   warrants where?  It is around 214 to 219 on screen.  This is

5   Patrick Willis from Exotix, so the security is being offered

6   September 1st 214 to 219, 219 being the offer price.  Let's see

7   the number that he gives to Mr. DeCharsonville the very next

8   day.  Here is the second offer and then let's go to the

9   September 2nd call.

10          (Audio recording played)

11          MR. COWLEY:  Multiple amounts from an offer he is

12  receiving the very day before.

13          What happens after that?  True to form, Mr. De

14  Charsonville, pursuant to the understanding they have reached,

15  passes that number right on to GlobeOp.  Again, GlobeOp doesn't

16  get to see that interaction between Mr. De Charsonville and

17  Mr. Balboa; they just think that they are getting an

18  independent counterparty price, consistent with representations

19  that have been made to investors.

20          Where do we go after that?

21          On September 2, there is Mr. De Charsonville

22  forwarding the price two minutes later after he passes on to

23  let Mr. Balboa know that he has passed on the exact price that

24  he has given to GlobeOp.

25          What else is happening around this time period?

DCHUBALF                    Summation - Mr. Cowley

1              On September 5, so right about three days after this,

2      Mr. Balboa is approving language to be sent to investors that

3      no assets are valued in-house.  What you have just seen, three

4      days earlier is Mr. Balboa secretly valuing his own assets in a

5      fund while at the same time he is approving representations to

6      investors that no assets are valued in-house.

7              What else happens?

8              Here, September 12, Mr. Balboa goes back to GlobeOp

9      and he says, please query BCP again.  What that means is, BCP

10     that's where Gilles De Charsonville works, so he is asking

11     GlobeOp to go back to De Charsonville for another number for

12     the Nigerian warrant.

13             September 12th, what has happened between the last

14     time where Mr. De Charsonville provided the original mark and

15     this?  Mr. Balboa is getting the initial numbers.  He has seen

16     the initial math that GlobeOp is coming up with in terms of

17     what the net asset value is going to be, what performance is

18     going to look like and he wants to raise the number of the

19     Nigerian warrant to help him out.  So this is what he does.  He

20     has them go back to BCP and sure enough GlobeOp does, pursuant

21     to Mr. Balboa's request -- nothing inappropriate about this

22     part of things, but let's look at what happens next.

23             So he is queried and Mr. De Charsonville reaches out

24     to Mr. Balboa, what should I send now?  Again, it is crystal

25     clear that these number are coming from Mr. Balboa, not Gilles

DCHUBALF                    Summation - Mr. Cowley

1    De Charsonville.  Mr. Balboa knows that.  He is getting a

2    communication from Gilles De Charsonville saying, what should I

3    send now?

4          What does Mr. Balboa send back?  He jacks it up a

5    little bit 3275 to 3875.  Then he passes that right along.

6          Again, GlobeOp thinks they have obtained an

7    independent counterparty mark.  In reality, Mr. Balboa, the

8    portfolio manager, is the one behind these prices.  This is not

9    open and transparent.  All of these communications between

10   Mr. Pratt and De Charsonville -- and Mr. De Charsonville in

11   this particular instance -- are hidden from GlobeOp.

12         Now, you have seen a lot of other bits and pieces of

13   the DDQs and the offering memorandums, and I anticipate you

14   will hear a lot from Mr. Tacopina in his closing.  For example,

15   he showed you this section of Government Exhibit 1A, the

16   offering memorandum, about the directors or the delegates -- it

17   will be valued at fair value, taking into account actual market

18   prices and market prices of comparable investments and other

19   such factors as reasonably determined by the directors or their

20   delegates.

21         He talked with you a little bit about this language in

22   his opening.  This is what the evidence will show.  Those very

23   same documents, ladies and gentlemen, specifically say that

24   Mr. Balboa and other directors at this Millennium fund had

25   complete authority to make adjustments to valuations that they

1   got from the independent valuation agent, the complete

2   authority.

3           Well, Mr. Balboa was not a director of the fund.  The

4   directors of the fund were these three individuals -- Michael

5   Collins, Debbie Sebire and James Keyes.

6           Nor was Mr. Balboa a delegate.  Here is what the

7   compliance officer, Maria Gibson-Starks told you.  She was

8   asked exactly that:

9   "Q   Is Mr. Balboa or has he ever been a director of Millennium

10  Global?

11  "A   No.

12  "Q   Was he ever delegated any authority by the directors of

13  Millennium Global" -- and it says "valuations"?

14  "A   No.

15  "Q   If that had been done, would that have been disclosed to

16  investors?

17  "A   Yes.

18  "Q   Why?

19  "A   Because that's a material issue, a material matter."

20          What are some of the other things that you have seen?

21          Here's another representation of the offering

22  memorandum that says that the valuation agent can, of course,

23  consult with the investment manager.

24          Finally, the third thing that you have seen,

25  Government Exhibit 2 is this reference to oversight capacity.

1          Now, ladies and gentlemen, what are the most important

2    things that you all bring to this trial process is your reason

3    and your common sense.

4          Now, in looking at this language, this is all -- the

5    three provisions that we just showed you -- a red herring.  In

6    no instance did Mr. Balboa stand up, talk to GlobeOp and say,

7    you know what, there are no counterparty prices, nobody can

8    find a mark.  Nor does say, you know what, I disagree with

9    these counterparty prices.  Let me show you why I think these

10   numbers should be marked higher.  Let me consult with you.  In

11   no instance is any sort of discussion like that being had.

12   What is going on instead is Mr. Balboa is secretly being the

13   source of counterparty marks.  So every month GlobeOp thinks

14   they are getting independent counterparty prices, and they are

15   using those prices.  Oversight capacity does not mean hiding

16   behind Gilles De Charsonville and Sam Pratt.  Consulting with

17   GlobeOp, again, does not mean secretly feeding prices to Sam

18   Pratt and Gilles De Charsonville.  Do not believe for a moment

19   that any of the language you just looked at authorizes that

20   kind of conduct.  It is a red herring.

21         You know else who gets the difference between

22   oversight capacity, raising objections and concerns on one hand

23   and secretly being your own source of marks?  GlobeOp.  Eammon

24   Greaves talks about this.  What does he say?

25   "Q   If Mr. Balboa had sent you any marks for any of the

DCHUBALF                    Summation - Mr. Cowley

1    securities in his own fund, could GlobeOp have utilized that to

2    value the fund?

3    "A    No.

4    "Q    Why not?

5    "A    Because they are not coming from an independent party.

6    "Q    Can you raise objections and concerns if GlobeOp, in the

7    midst of crunching its numbers and determining appropriate

8    values?

9    "A    Absolutely.

10   "Q    Can he be the source that GlobeOp relies upon to value any

11   securities in the funds?

12   "A    No.  This is the difference between oversight capacity and

13   raising objections and concerns openly and transparently on one

14   hand and secretly being the source of counterparty marks that

15   everybody thinks is coming from independent sources.

16          There are a lot of defense exhibits that were actually

17   entered that draw this contrast quite well.  Let's look at

18   Defense Exhibit F.  Here is an example.  Mr. Balboa is

19   interacting with UBS and GlobeOp, fully transparently, GlobeOp

20   on this email, raising objections or concerns about how a

21   particular security should be marked.  Here he is saying "wrong

22   CD," you marked the wrong security.  This is oversight

23   capacity.  This is consultation.

24          Let's look at Defense Exhibit L.  Again, he is

25   interacting with Andrew Howe, a counterparty, a number of

DCHUBALF                    Summation - Mr. Cowley

1    people at GlobeOp.  He is raising objections and concerns about

2    an evaluation that an independent counterparty has provided in

3    full view of GlobeOp.  This is what those representations in

4    those documents are talking about.

5           Defense Exhibit V.  Again, he is chasing down a

6    counterparty mark because he knows that a source has to come

7    from a counterparty.  He can't just say, I think it is X, Y, Z.

8           Defense Exhibit BB.  He is telling GlobeOp, I plan on

9    querying this counterparty about this.  I have an objection.  I

10   have a question.  He even says, I will copy you on my query.

11   So that is what oversight capacity is, consultation is.

12          Let's compare that to his communications involving the

13   Nigerian warrant.  Let's look at Government Exhibit 507, a

14   communication not in view of GlobeOp between Pratt and Balboa

15   where it says that if GlobeOp asks, it is 525.

16          703, again, just giving him a range to pass on.  No

17   sort of open discussion, nothing transparent about that.

18          1009.  "Please revise up, 2240 to 2440."

19          Again, this is Mr. Balboa secretly serving as the

20   source, hidden from GlobeOp, just directing Mr. De Charsonville

21   what to put.

22          Government Exhibit 1104, again:  "Do it very wide,

23   2650 to 3680."  Hidden from GlobeOp.  This is what is going on

24   with the Nigerian warrant.

25          Government Exhibit 1155:  "Tell them it was 3275 to

DCHUBALF                    Summation - Mr. Cowley

1    3875."  A clear direction.  This is not raising concerns or

2    objections to GlobeOp.  This isn't consulting with the

3    valuation agent.  This is lying.  This is giving everyone the

4    impression that the numbers are coming from independent

5    counterparties when in fact Mr. Balboa himself, the portfolio

6    manager is the source.

7             You know who else gets this distinction?  Several of

8    the defense witnesses you heard from.  Let's look at a few

9    quotes from them.

10            Here's what Anthony Warnaars said -- that was the

11   readback where Mr. Seigel sat in the witness box.

12   "Q   Would it be appropriate for a portfolio manager to have his

13   counterparties pretend that those are independent prices that

14   did not come from the portfolio manager himself?

15   "A   I find that inappropriate."

16            Here is what Ms. Molberg said:

17   "Q   It's true Millennium couldn't dictate or direct

18   counterparties to provide specific marks to GlobeOp no

19   questions asked?

20   "A   That's correct.

21   "Q   So the portfolio manager at Millennium, right, couldn't

22   direct the counterparties to give GlobeOp a particular mark?

23   "A    No, he couldn't.

24   "Q   It is fair to say that the counterparties could take

25   Mr. Balboa's views into account and exercise their own

DCHUBALF                    Summation - Mr. Cowley

1   independent judgment to make a final determination?

2   "A   I would hope they would do that, yes.

3   "Q   Millennium can't create the appearance that the marks were

4   coming from counterparties' independent analysis when in fact

5   those marks were coming from Millennium itself, true?  Can't

6   disguise the source of information, right?

7   "A   No.  Sources have to be open and transparent."

8           Even Mr. Charlesworth during his testimony said

9   something similar.  He said all sorts of things in the

10  abstract.  When he was asked particular questions about

11  representations that his own fund of funds makes in his

12  process:

13  "Q   It is described that the valuation would obtain prices

14  independently from you, correct?

15  "A   Yes.  That's a fund of funds.

16  "Q   Let's talk about that.  So that is the representation that

17  you made to investors in your documents, correct?

18  "A   Yes.

19  "Q   What that means is that when your fund is being marked,

20  every month that people independent from you come up with

21  prices for those marks, correct?

22  "A   Correct.

23  "Q   All right.  Then they give them to the valuation agent?

24  "A   Correct.

25  "Q   Under that scenario, you certainly never directed any of

DCHUBALF                      Summation - Mr. Cowley

1    these counterparties to provide certain numbers to the

2    valuation agent, have you?

3    "A     No.

4    "Q     You would agree that would be contrary to the

5    representations made to the investors, right?

6    "A     Yes.

7    "Q     Right?

8    "A     But I was dealing with different instruments.

9    "Q     Sure.  Different instruments, but bottom line is

10   representation was made?

11   "A     The answer is yes."

12          Even the defense witnesses get this distinction

13   between secretly providing counterparty marks through Gilles De

14   Charsonville and Sam Pratt versus oversight capacity in full

15   view of GlobeOp.  It is crystal clear even for the defense

16   witnesses.

17          I want to talk to you now about the impact that these

18   lies had on the overall net asset value of the fund and the

19   representations that were being made to investors.

20          Let's look at Government Exhibit 6004.  This shows

21   Mr. Balboa buying up the Nigerian warrants, accumulating

22   position in early 2007.  So by March 8, 2007, he is holding

23   23,500 Nigerian warrants in his fund.  That is the number of

24   Nigerian warrants that he is holding in his fund.

25          Also, look at the reference in the bottom right.  He

1    is buying these.  They are clearing through Exotix -- that is

2    Federico Sequeira's company; BCP -- that's where Gilles De

3    Charsonville works -- and UBS.  Keep that in mind.  We will

4    talk about that a little later.

5            Now take a look at Government Exhibit 6005.  This

6    shows that the impact on the overvaluation of the Nigerian

7    warrant had on the overall position in these warrants that the

8    fund held.  So bottom line is, number of warrants, 23,500 times

9    what the price of the value of each of these warrants is.  So

10   what the blue represents is that number 23,500 times the

11   highest known trading price for all of 2007, 2008 -- that is

12   $258.  That means the fund's position in these warrants would

13   be about $6 million in value.

14           Now, when you take that same number, 23,500 and

15   multiply it by the marks that Balboa is secretly passing on

16   through Pratt and De Charsonville, that's where you get the

17   red.  That's where you get the fraud.  So let's look starting

18   in May.  There is a $26 million difference between Balboa's

19   lies and reality.  By June, there is a $48 million difference

20   between Balboa's lies and reality.  By July, a $74 million

21   difference.  By August, a $78 million difference.  And the

22   inflation of the warrants affected the net asset value of the

23   fund.  This is Government Exhibit 6006.

24           So bottom line, by August '08 the net asset value, the

25   number that is important for tracking performance of the fund

DCHUBALF                    Summation – Mr. Cowley

1   is 80 million in total, but 10 percent of that, about $80

2   million, where is that coming from?  Through Mr. Balboa's

3   fraudulent inflation of the Nigerian Oil warrant.

4          You heard Mr. Charlesworth talk about, oh, the gross

5   exposure is very important.  That is all well and good, it is

6   true.  That is an important number for risk, but in terms of

7   tracking performance of the fund, how your investment is doing,

8   the NAV is critical.  And these documents show you the impact

9   that the Nigerian warrant had on the net asset value.  $80

10  million is an important number.  It is a big number.  Don't

11  believe it is miniscule for a minute.

12         Here are some of the investors talking about the

13  importance of the NAV.  Raj Keswani, nothing is more important.

14  And I think even Mr. Charlesworth admitted that in terms of

15  tracking performance, that the NAV is critical.

16  "Q   We are talking about performance percentages.  Those

17  numbers are pretty closely related to the net asset value,

18  right?

19  "A   They are the net asset value."

20         So this is how Mr. Balboa continued to escalate those

21  prices month in, month out to affect performance.

22         Mr. Keswani said something actually very interesting

23  about the concept of smoothing the numbers.  I want to go into

24  that for a moment.  He is asked what is the incentive that a

25  portfolio manager has to inflate the numbers to smooth out the

DCHUBALF                    Summation - Mr. Cowley

1   numbers.  The bottom line is, if you are going to have a

2   negative one.  You can just sort of bump up the security a

3   little bit to get to a positive one, that is going to be

4   helpful because investors are going to look how long your

5   positive performance is.  Let's say you have an awful month and

6   you want to cushion the blow a little bit, then you can

7   manipulate the process a little bit to make it seem not quite

8   as bad.  That's exactly what Mr. Balboa did.

9          Let's take a look at Government Exhibit 6003.  So

10  notice the difference, how the value from the Nigerian warrant

11  is jacked up from May to June.  It is about a $1,000 escalation

12  there.  Look again from June to July, another $1,000

13  escalation.  Let's look at how that escalation affected the

14  performance numbers.

15         Let's go to 6007.  So what this says, the red dot for

16  June is the fund's reported performance, .17 percent positive.

17  Had Mr. Balboa just left the number for the Nigerian warrant

18  the same, had he not escalated it by $1,000, just left it the

19  same as the previous month, the fund would have had a reported

20  performance of negative 2.61 percent.  That is smoothing the

21  numbers.

22         You will recall from June to July, he raises it

23  another $1,000.  And what is the impact of that?  He avoids

24  reporting the worst performance in the fund's history.  He

25  would have to report a negative 6.2 percent.  Instead, he is

 1    able to cut that in half so, instead, investors see a swing

 2    from .17 positive to negative 6.2 percent, they see a much

 3    smaller swing to negative 3.16 percent.  That is smoothing the

 4    numbers.  That is exactly the kind of thing Mr. Keswani said

 5    that you need to look out for as an investor.

 6           Here is what Mr. McNally, investor, said about the

 7    impact of performance on his decision to invest, that based on

 8    how the fund is looking in 2008, that's how they made their

 9    decision in August 2008 to invest.

10           You can go on.  Mr. Daniel also talked about the

11    importance of performance.

12           Government Exhibit 6006, please.  Now you see, you

13    have gone behind the scenes.  You now know how Mr. Balboa

14    pulled that off, that pillar of fraud based on the Nigerian

15    warrants.  That's how he was able to get the numbers he needed

16    to smooth things out a little bit in a very volatile time.

17           Why did Mr. Balboa do this, ladies and gentlemen?

18    Greed, plain and simple, for money.

19           Let's take a look at Government Exhibit 1A.  Now,

20    there are two aspects.  He gets a salary, but most of his

21    compensation comes from a bonus.  There are two components to

22    that.  There is the performance fee and there is the management

23    fee.

24           I want to talk about the management fee first.  You

25    don't have to hit some kind of high water mark to get the

1    management fee.  It is based on the NAV and that is accumulated

2    month in and month out.  So the way it works is the manager

3    receives a management fee paid quarterly in arrears, about

4    one-fourth to 2 percent of the net asset value.

5            So the number that you are talking about, for example,

6    for a NAV of $800 million, 2 percent of that is $16 million.

7    Paid in quarters, that is $4 million.  Now, to be clear, not

8    all of that money goes to Mr. Balboa.  It is used to pay for

9    other salaries, things like that, but that is definitely a part

10   of Mr. Balboa's compensation and incentivizes him to keep the

11   NAV as high as possible.  Indeed, after the fund is liquidated,

12   what did Mr. Balboa tell Sam Pratt?  That Millennium still owes

13   him millions of dollars.  This is the type of millions that can

14   come from a manager fee.

15           Now, performance fee is paid if you hit that high

16   water mark.  You have a good quarter and you're positive.

17           Let's look at Government Exhibit 12.8.  He gets a

18   performance fee for the first quarter.  See the three positive

19   marks.  He doesn't get one for the second quarter -- April, May

20   and June.  He lost some money in April.  Now, July and August,

21   he is starting to come back.  Look at August, he positive by

22   over 4 percent.  Now, the fund goes into liquidation in

23   October.  But it is not as if he knows that.  He is still

24   incentivized until the day the fund went out of business to

25   push for that performance fee.

DCHUBALF                    Summation - Mr. Cowley

1            Mr. Greaves talked about that.  Here is what he said:

2    "Q   Is it fair to say that the incentive to obtain a

3    performance fee continued up to the very last day the fund went

4    into liquidation?

5    "A   Yes."

6            So up to the very last day that the fund was in

7    existence, he is incentivized to try to get that performance

8    fee.

9            Now, ladies and gentlemen, I am going to shift and

10   talk with you about the third category of evidence.  That's the

11   evidence that Mr. Balboa knew what he was doing was wrong.

12           First, make no mistake, Mr. Balboa knew that Mr. Pratt

13   and Mr. De Charsonville were just passing on his prices.  He

14   didn't think that Mr. Pratt and Mr. De Charsonville were out

15   there conducting their own diligence and coming up with these

16   numbers by themselves.  Here's what Mr. Pratt had to say on

17   this:

18   "Q   Between January and April of 2008, did you tell Mr. Balboa

19   that you cannot find a price indication for the Nigerian

20   warrant?

21   "A   Yes, I did.

22   "Q   Was that in one conversation or was that in multiple

23   conversations?

24   "A   Multiple conversations.

25   "Q   After you informed Mr. Balboa that you could not find a

1   price for the Nigerian warrant, what did he continue to ask you

2   to do?

3   "A   Pass on the prices that he was giving me."

4         This is the understanding.  This is the conspiratorial

5   agreement.  It doesn't have to be in a written contract.  It

6   doesn't have to be Mr. Balboa saying, Sam I would like you to

7   help me undermine the independent valuation process.  This is

8   Mr. Pratt telling Mr. Balboa, I can't come up with prices.  I

9   don't know what the prices are.  And Mr. Balboa, month in and

10  month out, just asking Mr. Pratt to continue to pass on his

11  numbers.

12        You don't have to just take Mr. Pratt's word for it.

13  Let's look at some exchanges between Mr. De Charsonville and

14  Mr. Balboa that document that exact same understanding.

15        Here is an email, Government Exhibit 863:  "Mike,

16  GlobeOp is asking for a justification of the Nigerian warrant

17  move from 500 to 1300 to 1500."

18        There was a big jump that took place between March and

19  April that Mr. Balboa caused through the numbers that he was

20  passing on to Mr. De Charsonville.

21        What does he say?  He is telling Mr. Balboa, "I have

22  no idea how I can justify these numbers that you had me pass

23  on.

24        What does Mr. Balboa say?  We will get to that later

25  but here is another example of Gilles De Charsonville in

DCHUBALF                    Summation - Mr. Cowley

1    September: "Mike, last I sent was this number.  What should I

2    send now?"  He is not saying, oh, let me do some research.  Let

3    me go check on this.  He is asking Mr. Balboa, give me a

4    number, tell me what number that I should send.

5          On many cases, Mr. Balboa would learn, literally

6    within minutes, that the exact value that he passed on to

7    Mr. De Charsonville was sent on to GlobeOp.  Let's take a look

8    at an example of this.

9          This is the April 2008 valuation.  Let's just walk

10   through this.

11         First, Government Exhibit 861.  So it is May 5, 2008,

12   9:10 a.m.  Mr. Balboa says:  "On a train.  Call in 10 minutes."

13         What happens next?

14         One minute later, Mr. De Charsonville rings back, he

15   says OK.

16         Then eight minutes after that, consistent with that

17   sort of 10-minute estimate, a phone call takes place.  Here is

18   the phone call.

19         (Audiotape played)

20         MR. COWLEY:  So Mr. De Charsonville, sort of sarcastic

21   response to that.

22         So what happens after this phone call?  One minute

23   later, Gilles De Charsonville send that number on to GlobeOp.

24   And after that, four minutes later -- so within about five

25   minutes of getting off the phone with Mr. Balboa, Mr. De

1   Charsonville forwards to Mr. Balboa the email that he sent to

2   GlobeOp, letting him know that he passed on the exact numbers.

3   Mr. Balboa is under no delusion that Gilles De Charsonville is

4   out there trying to come up with an independent price.

5          Also, Mr. Balboa knew the numbers were wrong.  Some of

6   the strongest evidence that you know about that is the offer

7   email that he gets.  He gets offer after offer to purchase

8   these Nigerian warrants.

9          Government Exhibit 6008, this is a summary chart that

10  shows all of the email communications, all of the

11  communications that he is getting with offers for Mr. Balboa to

12  purchase the Nigerian warrant.  What do you notice?  The

13  highest warrant for all of 2008 is $252.

14         The exhibits, all of these references are down at the

15  bottom left-hand corner and you can look at them during your

16  deliberations, but he is getting communication after

17  communication with offers to purchase these Nigerian warrants.

18         Take a look at Government Exhibit 6011.  This is a

19  comparison of the known trade prices for the Nigerian warrant

20  with the offers that Mr. Balboa is getting.  What do you

21  notice?  They are very much in line.  They sort of trend at the

22  same time.  They are angling down at the same time in 2008.

23         If we could go back, Mr. Hattendorf.

24         These are not stale prices.  There is an active market

25  of people that are buying and selling the Nigerian warrant.

And traders are sending prices to Mr. Balboa that are

consistent with where the market is at.  Those are the offers

he is getting in 2008.

          Now, take a look at 6010.  This is a very important

document.  This shows down in the blue the offers that

Mr. Balboa was being sent, where those numbers were at the

Nigerian warrant.  We are talking about mid 200s.  The top

document, the top bar, the orange and the red, these are the

numbers that Mr. Balboa is passing on to Pratt and De

Charsonville.  Look at the escalation.  Look how different it

is between the offers that he is receiving.

          This is important.  Applying your reason and common

sense, ask yourself, if Balboa thought in September 2008 that

the warrant was worth between 4,000 and 3,000 dollars and

people were giving him an offer to buy this at $200, you would

snap that up in a heartbeat.  You could instantly make like 18

times by buying it at a fraction of what you think it is worth.

But he doesn't.  He doesn't buy a single Nigerian warrant in

all of 2008.  This shows you that he knows these numbers that

he is passing on are bogus.

          What else is important about this?  You know why he

didn't buy a single warrant in 2008, because if he bought one,

a single one, GlobeOp, the valuation agent, would have gotten

information about that trade.  So if a trade came in where he

purchased the warrant say, $220, what it was actually worth,

DCHUBALF                    Summation - Mr. Cowley

1    GlobeOp could compare that to the counterparty mark he was

2    getting at like $3,000 and that would raise a red flag.

3           Here's what Eammon Greaves had to say about that.

4    "Q   Let's say you have that exact situation, you buy it for

5    like 200 bucks and you have a counterparty mark for like 3,500.

6    Would that raise any red flags?

7    "A   Yes.

8    "Q   Explain why and what would happen.

9    "A   Because when we are putting together the month end

10   valuation, we do a check against anything that's been bought or

11   sold within that month to make sure that the ending value is

12   within tolerance to any purchase or sales, so that gives us a

13   point of reference."

14          So he knows he can't do that or he will get caught.

15          Now, you heard a lot of argument about these offering

16   memos.

17          Could we have Government Exhibit 6008 again.

18          first, you have heard they are not real emails because

19   they have that language "subject to call."

20          Well, you listened to Federico Sequeira from Exotix.

21   You listened to Robert Knapp who was with Ironside Partners who

22   bought the warrant.  You know that subject to call does not

23   somehow make these emails fake in anyway.  You also heard that

24   well a lot was sent to his Bloomberg address and the messages

25   scroll down.  Ladies and gentlemen, the idea that he somehow

DCHUBALF                    Summation - Mr. Cowley

went to the bathroom and missed these offers forever is simply
not believable.  You also heard Mr. Knapp talk about the fact
that Bloomberg, like any other email system has a search
function.  All that you have to is type in the word "Nigeria"
and any of these offers would have come up.

Additionally, he gets a ton of offers sent to his
corporate account.  Take a look at Government Exhibit 888 --
these don't even include the "subject to call" language that
they said was such a big deal.  So 888, no "subject to call"
language.  1233, no "subject to call" language.  1566, this is
from Phillip Hamilton at Merrill Lynch, no "subject to call"
language.  We also see no offers sent to his Millennium
account.  Government Exhibit 1014.  Government Exhibit 1233
government Exhibit 1159.1.

You know what?  You know how you know he gets some of
these Bloomberg messages?  Because he responds to some.

Look at Government Exhibit 808.  This is an email from
Patrick Willis of Exotix, April 17, 2008, an offer for numerous
securities including Nigerian Oil rights, all subject to call.

What is Mr. Balboa's response?  He asked about another
security.  He doesn't even think it is important enough to even
ask a question about the Nigerian warrant, even though he is
marking it at multiples of that amount.  This would have been
an excellent buy opportunity for him.  He doesn't even ask a
question about it.  Same thing with an IM exchange on Bloomberg

DCHUBALF                   Summation - Mr. Cowley

1    with Mr. Phillip Hamilton of Merrill Lynch.  Mr. Hamilton gives

2    an offer for several securities, including the Nigerian

3    warrant.  What does Mr. Balboa do?  He asks him about another

4    security.  Doesn't ask him about the Nigerian warrant Phillip

5    Hamilton follows up with him during the conversation.  What

6    about any of the other offers?  Any cares?  No response.

7         So you have all of these offer emails and he doesn't

8    take a single one.  Strong evidence that he knows the numbers

9    are fake.  How else does he know?  He has access to ALL-Q

10   numbers that indicate where the market is at.

11        I want to take a step back and talk about this ALL-Q

12   issue.  You heard Mr. Pratt and Mr. De Charsonville say they

13   couldn't find anything on screen about these ALL-Q numbers.

14   Then you heard testimony from the Bloomberg witness that sort

15   of straightened this out.

16        Here is what happens.  Brokers like Exotix can put up

17   ALL-Q numbers on Bloomberg, but they have to grant access to

18   people to see those numbers.  So it makes sense that Mr. De

19   Charsonville and Mr. Pratt who worked for rival brokers are not

20   going to be granted access to these numbers by Exotix, but keep

21   in mind that Mr. Balboa is a client of Exotix.  He purchased

22   Nigerian Oil warrants from Exotix, so it makes sense Exotix

23   would give him access to these ALL-Q numbers.  In fact this is

24   what Mr. Sequeira said, and he is referring to some of the

25   ALL-Q numbers.

DCHUBALF                    Summation - Mr. Cowley

1   "Q    That is something that Exotix clients would have access

2   to?

3   "A    Yeah, all our clients would see that."

4           So you know he is getting access to this.  And how

5   else do you know?

6           Look at Government Exhibit 205.  So this is an email

7   that actually Mr. Balboa sends describing the Nigerian warrant

8   May 30 of 2007.  And where does he describe where it is trading

9   at?  Currently around $240 per warrant.  So let's check out

10  what Exotix ALL-Q numbers say for these dates.

11

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DCHAABAL2                    Summation – Cowley

             MR. COWLEY:  Look, between 238 and $243.  He has

access to these numbers.  He has access to the numbers that

Exotix was trading on.  He's looking at them and that's giving

him a sense of where these numbers are at.  He is reporting

that to other people about where he thinks the market is at.

He knows where these Nigerian oil warrants are being traded and

he's grossly over trading the value month end and month out.

You've seen the documents.  You know that there is not any

collateral linked to the warrant.  The payments of the warrants

will not be secured by any collateral.  The language cannot be

more simple.  You've also heard from a director of the World

Bank in the form of Finance Minister of Nigeria that no

collateral as related to the Nigerian warrants.  It is not

collateralized.  You heard that from John Oshilaja.  What did

he say?  No, the Nigerian oil warrants were not collateralized

in any form.  They are totally unsecured obligations.  You

heard that from Robert Knapp.  Was there any collateral count

from Nigeria warrant?  No, there is none.

             Now, the defense called Dr. Muhtar back to the stand

to talk about something called the excess crude account.  Make

no mistake that had absolutely nothing do with the Nigerian oil

warrant.  Here is what Dr. Muhtar said about that.

             Dr. Muhtar, it's true the access crude account had

absolutely nothing at all to do with the Nigerian oil warrant,

is that correct?

DCHAABAL2                    Summation - Cowley

 1            Answer:  That's correct.

 2            All it says is the same account that the government of

 3       Nigeria that by the way was created over a decade after the

 4       Nigerian oil warrants for a period.  It is in no way relevant

 5       to this at all.  Expenditures are made out of this all the

 6       time.  They use that money for budget shortfalls, power plants,

 7       other infrastructure investments and there is no way that

 8       Mr. Balboa, this expert in emerging markets would somehow think

 9       that's a collateral account in any way, let alone when

10       affiliated with the Nigerian warrants.

11            Mr. Balboa knew how these securities operated.  He

12       knew that cause he was an expert in the field.  You actually

13       see e-mails he is receiving explaining how this security

14       operates.  Let's look at a few.  Philip Hamilton from Merrill

15       Lynch.  This is an explanation that he give Mr.~Balboa.  The

16       oil price stays above the strike price and the -- until

17       November 20.  This means the holder would receive a total of

18       $290.  You see that math ad nauseam.  These were numbers that

19       are being sent directly to Mr. Balboa.

20            Keeping that in mind, look at Government Exhibit 6009.

21       You have heard a lot of talk about models.  That's great.

22       Portfolio managers do.  But the bottom line is you could have a

23       lot of debate and build a complicated model about whether or

24       not this thing should be at 220 or 238.  Under no circumstance

25       is your model going to say anything over $390.

DCHAABAL2                         Summation - Cowley

1              Take a look at Government Exhibit 6011.  Again, these

2        are the actual trades that you see.  Again, with the offers

3        that are being sent to Balboa not one of them is over $252.  I

4        am sure the people involved in these trades have models but

5        they know nothing is going to be above $390.

6              Who else knew this?  Mr. Balboa himself.  How?  Let's

7        look at the e-mail he authors.  May 30, 2007 he sends

8        Ms. Molberg a description of the Nigerian oil warrant.  What

9        does he say?  The same thing.  He's paid 30 per warrant per

10       year until 2020 provided the oil price stays above 35.  When he

11       talks about oh, we hope Nigeria does a second buyback, he talks

12       about it being near 300 per warrant.  It's not a thousand or

13       two thousand or three thousand.  He knows there is no

14       collateral associated with this.  In fact, this reference to

15       the buyback raises an interesting point.  Mr. Balboa speaks

16       volumes about the fact that he knew there was no collateral

17       associated with these warrants.  Let's look at an exchange

18       between Mr. Dubin and Dr. Muhtar during his cross-examination.

19             Mr. Dubin asked him, in preparation for your testimony

20       today did you determine whether or not Millennium Global

21       Emerging Credit made a bid during that auction?  Do you know,

22       sir, whether or not?  Let me ask you this.  As you sit here

23       today, do you recall saying that the highest bids were actually

24       much higher within the $500 range?  I don't recall that.  Do

25       you recall, sir, that there were, in fact, bids that exceeded

DCHAABAL2                    Summation - Cowley

1    $500?  I would be most surprised if I did.  Sir, there were

2    bids on a whole wide range.  OK.  There are some people

3    regardless of whether you recall a specificity how high the bid

4    went there were bids exceeding the $220 the Nigeria -- I guess

5    that would say willing to pay for them.  Answer.  There were

6    and we had the breakdowns of bids that were done by our

7    advisors.  Then there is a little bit.  We go through the math

8    get to the 390.

9         This is on March 21, 2007 was instructing to put the

10   entire amount 2350 to be tendered at $280, well below 390,

11   certainly, not above.  This shows clearly that Mr. Balboa knew

12   there was no collateral account.  Now, again, speaks volumes.

13        Now, let's move on.  Let's assume that Mr. Balboa

14   somehow thought that there wasn't a price gap or something like

15   that and oil kept going up, the price of the warrant kept going

16   up.  Again, this is important too.  So after the auction on

17   May 30 when he's talking about the possibility of a second one,

18   again, he is saying the price would be nearer to $300 per

19   warrant.  Again, still under the sum of what the total payments

20   would be.  Further evidence that he doesn't think there is any

21   sort of collateral due the warrant orders.

22        Mr. Tacopina made a representation to you during

23   openings, the higher the oil prices go equals higher valuation

24   on these warrants.  Let's look at what happens to the price of

25   oil in 2008.  It goes up for a while but it actually starts

1   declining around July of 2008.  What happens to Mr. Balboa's

2   numbers?  Well, they keep going up.  They keep going up from

3   July to October even though oil prices go down.  That shows

4   that even if he thought there was a cap or something like that

5   that it should be still affiliated with oil prices, right?  But

6   instead, oil starts to plummet.  It starts to decline.  The

7   numbers that Mr. Balboa feeds to Mr. Pratt and Mr. De

8   Charsonville they keep going up.

9           Another example, this is the final marks with oil

10   still going down.  Now, if your recall during Mr. Howards'

11   cross-examination they shifted the chart back to suggest there

12   was some sort of six month lag time, right?  You know that that

13   formula about how you can figure out each payment price is

14   important, that references only how that one pay period works,

15   right, about whether or not the next payment is going to be

16   somewhere between zero and $15.  It doesn't have anything to do

17   with the overall valuation of the security.  And that makes

18   sense, right?  If you are thinking I'm a warrant holder.  I

19   need to figure out what are the chances that all of my payments

20   of this in the future are going to hit $15?  Well, oil's going

21   down so that's, obviously, going to impact that.  You don't

22   have to take my word for it.  Mr. Howard explained this.

23   Mr. Knapp who's traded in Nigerian warrant explains this.

24   Again, strong evidence that he knows that his numbers are

25   complete bogus.

DCHAABAL2                    Summation - Cowley

1           How else do you know that Mr. Balboa is committing

2      fraud?  His authorization of one counter-party.  Now recall

3      that in January to about April both his co-conspirators are

4      involved, Sam Pratt and Gilles De Charsonville.  They are both

5      passing on his numbers to GlobeOp.  Then there comes a point

6      where Mr. Pratt says he doesn't pass on any numbers any more.

7      So after that you know you are supposed to get two

8      counter-parties.  That's what the documents say.

9           Here is the DDQ.  It talked about what a portfolio

10     manager's responsibilities were, that if the portfolio

11     manager's aware of second counter-party that was available what

12     are GlobeOp's expectations as to what he should do?  That he

13     should provide secondary contact for that counter-party.  What

14     does he do starting in May?  He approves one counter-party

15     mark, just Gilles De Charsonville and does he it again in June.

16          Now, recall Mr. Balboa's receiving offer after offer

17     from people in 2008, people that can serve as counter-parties

18     that are trading this security.  Let's take a look at some

19     examples.  These are all the offers Philip Hamilton from

20     Merrill Lynch, Philip Hamilton is actually serving as

21     counter-party mark for other securities in Mr. Balboa's fund.

22     He doesn't direct them.  Philip Hamilton doesn't direct them to

23     Patrick Willis from Exotix.  Doesn't direct them to Federico

24     Sequeira.  Mr. Balboa actually bought warrants from UBS.  Look

25     at Defense Exhibit F, UBS is serving as a counter-party.  He

DCHAABAL2                    Summation - Cowley

1  isn't directing them, no, he approves one counter-party mark.

2  He doesn't direct GlobeOp to a second counter-party mark.  Why?

3  Because he wants to control the flow of information.  He knows

4  that Sam Pratt was willing to do this for him.  Gilles De

5  Charsonville was able to do this for him.  Federico Wouldn't.

6  Maybe Philip Hamilton would.  Maybe somebody from UBS not.  He

7  knows that if he introduces another counter-party the scheme

8  could be up.  And you don't have to speculate about this cause

9  that's exactly what happened.

10      Take a look at Government Exhibit 1291.  So GlobeOp

11  implements now a system in October 2008 and Balboa loses

12  control of directing which counter-party marks GlobeOp should

13  go to for his funds.  They reach out to guess who?  Exotix and

14  UBS.  And what numbers do they give?  190 mid and 180 mid.

15  These are literally a fraction of a number that Mr. De

16  Charsonville is passing along around 3500 mid.

17      Instantly, by GlobeOp making it decision $80 million

18  of fake value in Mr. Balboa's fund disappears.  Right through

19  that.  And the fund for whatever reason goes into liquidation.

20  He wasn't able to keep this scheme going for bonds by approving

21  one counter-party.  Recall the conversation Mr. Pratt has with

22  Mr. Balboa you need to find somebody else to do it.  He says I

23  am looking.  He knows there are other people trading in this

24  security.  That's how he kept this scheme going.

25      Now, I also want to talk with you about sort of

DCHAABAL2                     Summation - Cowley

another issue relating to oversight capacity which is this idea

correcting errors, OK.  Some of the things you saw was

Mr. Balboa having interactions with GlobeOp where, for example,

there's like 128 trillion error where and Mr. Balboa finds it

so that is him showing good faith.  Ladies and gentlemen, these

are errors that were going to be detected 128 trillion is the

multiple of U.S. national debt.  Don't confuse that for a

second Mr. Balboa's trying to do the right thing.  You contrast

that with the Nigerian oil warrant.  Really at the end of day

between January and October of 2008 Mr. Balboa is the only

source of information to GlobeOp for the Nigerian oil warrant

he was hiding behind Mr. Pratt and Mr. De Charsonville but at

the end of the day he is the only source of information and he

is using that to manipulate the process and directly inflate

the fund's NAV.

You know how else do you know that Mr. Balboa was

committing fraud?  His massive coverup efforts when Millennium

and regulators started looking into things.  So let's start in

2008.  Now, Mr. Balboa's is helping to create lies to coverup

his scheme even with GlobeOp.  Let's take an example.  Would

GlobeOp asking questions about things.  Do you recall 6001?

This shows the number that Mr. Pratt and Mr. De Charsonville is

passing on to GlobeOp.  That raises some questions for GlobeOp

and they reach out to De Charsonville about it.  Here's what

they ask.  Gilles, we would like to confirm the Nigerian oil

DCHAABAL2                    Summation - Cowley

warrant prices again since they different way too much from the

last time.  He passes this along to Mr. Balboa.  GlobeOp didn't

get to see this.  They were expecting an explanation to come

from the independent counter-party, so he reaches out.  They're

asking for a justification.  I have no idea.  Again, clearly

showing Mr. Balboa that Mr. De Charsonville isn't getting the

prices for himself.  He has no idea.  Mr. Balboa says just say

the price of oil is up.  There's no nonsense about that.  He is

saying just say oil prices went up.  What happens?  Perfect.

Great.  And he passes that right along.  Confirmed the asset

oil prices up tremendously.  GlobeOp thinks they are getting an

explanation when in reality Mr. Balboa is helping with the

cover story.

         Let's talk about post liquidation conduct.  Mr. Balboa

later in 2010 Millennium starts looking into this valuation

issue and Mr. Balboa provides written explanation to Millennium

about how these warrants could be valued at numbers they were

valued at.  Government Exhibit 1535, ladies and gentlemen, is

literally chocked full of lies.  I am going to spend some time

walking through some of the things you know are lies because

you have been hearing from witnesses and seeing the documents

that show the truth.

         The first lie, so he writes at time of its creation of

idea that the collateral account oil trust account never

occurred to anyone but whatever original warrant document

DCHAABAL2                    Summation - Cowley

1    transfers of the right of oil trust to holders.  Well, you know

2    the truth.  You've looked at the offering memorandum.  There is

3    no reference to any sort of oil trust account in that.  It says

4    the payment of warrants will not be secured by any collateral.

5    You recall even for bond that was collateralized that was U.S.

6    Treasury obligation that this had nothing to do with oil one

7    way or the other.  You also know there was no collateral

8    existed for the bonds after late 2006 when bonds were paid off,

9    no collateral exist for 2007 for anything and no oil trust --

10         Dr. Muhtar said we never had an oil trust account or

11   collateral account.  It's not collateralized.  They called Dr.

12   Muhtar back to talk about the crude account, not a collateral

13   account, nothing to go with the Nigerian oil warrant.  You know

14   what else is true about the warrant.  It wasn't created until

15   2004, the warrants.  The bonds were issued in 1992, a decade

16   previously.  There is no way there could be a reference to

17   Mr. Balboa relying on cause this wasn't created until over a

18   decade later and it's not a collateral account in any way,

19   shape or form.

20         What's another lie?  After this auction -- to this

21   warrants became restricted and the government starts to solicit

22   auctions from local Nigerian groups start to broker deals.

23   What's the truth?  After this auction did the Nigerian

24   government start to solicit offers from big holders on the

25   warrant?  No.  That was never even contemplated.  That's from

DCHAABAL2                    Summation - Cowley

the former Finance Minister of Nigeria and the former head of
the Debt Management Office.  You know that is a totally lie.

          Next.  So in November of 2007 Millennium was contacted
by a local Nigerian named John Oshilaja wanting to partner up
around the idea of selling large blocks to the government at a
thousand or two thousand dollars or more given the over
collateralization of oil account.  Well, you'll hear from
Mr. Oshilaja you guys have no dog in this fight, whatsoever,
and he came here and he is asked whether or not that statements
was true and what did he say?  It was totally false.
Mr. Oshilaja had interacted with Millennium early that year but
those discussions were over by May, June and never any
discussions about buyback relating to Nigerian warrants,
totally false.

          So just going along with that same lie, so at that
time this would be like November 2007 we tried to buy warrants
in the market below four hundred dollars but were unsuccessful
as supply was so small.  You know that is a lie because you've
seen the e-mails that he is getting with offers.  Let's take a
look at a few.  November 8, 2007 to Michael Balboa, Nigeria
it's offered at 230 to 235.  Here's another one November 26,
2007, the warrants are offered at 234.  Another one,
December 12, 2007 again offered at 234, well below $400.  Here
is another one December 12, 231 to $235 is what the bid ask
range is well below $400.

1          Here is Government Exhibit 600 which shows a summary

2     chart all of the offer communications getting in 2008.  He

3     doesn't respond to a single one even inquiring about the

4     Nigerian oil warrant despite the fact that he's respecting to

5     Millennium later that we couldn't find any warrants under four

6     hundred dollars.  You now know that is totally.

7          Also keep in mind Government Exhibit 2004.  So in

8     March of 2007 he puts in an offer at the auction at $280.

9     Again, he is a trying to sell these things back in the Nigerian

10    government and well below four hundred dollars.  It shows he'

11    lying when he's talking to Millennium later.

12         Again, Nigerian government trying to buy private block

13    warrants.  That's a lie.  You heard that from Dr. Muhtar.  The

14    Nigerian government ever try to buy these warrants back over

15    the maximum payout amount?  That certainly wouldn't make sense

16    to anybody.

17         What else?  There's other representations made, not

18    just about John Oshilaja or what the Nigerian government's

19    doing.  He describes other investors that are in similar

20    situations.  He references this guy Nick Corby he describes him

21    also a hold out of significant size meaning this is somebody

22    else holding onto a lot of these Nigerian warrants.  He is

23    expecting a big pay out or a second buyback.  Well, the records

24    from Bridge Asset Management are in evidence.  This is

25    Government Exhibit 5019.  Bridge Asset Management LLP since its

DCHAABAL2                    Summation - Cowley

1    incorporation in 2007 has never traded, held or had any

2    involvement with the following assets.  What's included?  The

3    Nigerian warrant.  Another lie.

4         What else?  The over-collateralization of the oil

5    warrants account can be seen on Bloomberg.  As of 2008 this

6    already reached approximately five hundred per warrant.  You

7    know this isn't true.  Your heard from the Bloomberg witness.

8         How else do you know it wasn't on Bloomberg?  One the

9    categories of information that was on Bloomberg at the time

10   about the Nigerian oil warrant was this category is unsecure.

11   And the answer yes.  This security is unsecured.  You heard

12   from Luongo testify that this page was on Bloomberg in 2008.

13   You know there's no representations that it was secured in any

14   way, shape or form.

15        You might look at the list of payments that shows if

16   you recall sort of the formula being crunched and then saying

17   subject to a cap.  It has nothing to do with collateral any

18   way, shape or form.  It's just information that Bloomberg has

19   put on saying these are what the formula said and it's subject

20   to a cap.  Nothing to do with collateral.

21        This is the secured indicator that Mr. Luongo was very

22   competent in 2008.  What does it say?  No, the security is

23   unsecured i.e. no collateral.  So you know that's a lie as

24   well.  It doesn't end there, ladies and gentlemen.  He passes

25   on his lies to Mr. De Charsonville so they can get on the same

1    page, so they he can tell the same story to regulators,

2    Millennium, anybody who asks.  You have that in documentary

3    evidence.  Here is an e-mail that Mr. Balboa sends to Mr. De

4    Charsonville wife's account and passes on the same story.

5    Again, why?  To get the stories straight.  So they're saying

6    the same thing.

7           What does Mr. Balboa send Gilles De Charsonville?  A

8    Fed Ex package of the damning e-mail so Mr. De Charsonville can

9    review them.  Fed Ex package that shows that.  Ms. Molberg

10   recognized Mr. Balboa's signature on that Fed Ex package.  Sure

11   enough what happens?  Mr. De Charsonville goes into his meeting

12   with regulators in Madrid and he starts telling lies, starts

13   telling the cover story but he didn't count on something, the

14   fact that they had recorded phone calls from his office.  When

15   they referenced fact that they have these calls Mr. De

16   Charsonville stops the interview and leaves.

17          Now, we've talkeded about Mr. Pratt.  We have talked

18   about Mr. De Charsonville.  You've also seen a video deposition

19   of Mr. Nesti.  Now I want to talk about that for a moment.  So

20   an eerily similar pattern plays out with Mr. Nesti.

21   Mr. Balboa -- he should expect a fax from Nesti.  Well, let's

22   see what Millennium didn't see.  Balboa e-mails Leonardo Nesti.

23   This the same Leo Nesti from Greenwich days?  What does

24   Mr. Balboa ask?  He again asks a favor of someone and what's

25   that favor?  To pass on a fax to Millennium.  You have e-mail

DCHAABAL2                      Summation - Cowley

1   correspondents documents.  So Mr. Balboa sends -- first they

2   ask him for a personal e-mail in the file from his Gmail

3   account, sends to Mr. Nesti Yahoo account.  If possible send

4   the e-mails as separate documents, that would be great.  If

5   not, just fax to the fax number on the letter.  Thank very much

6   in advance, Mike.

7         What happens after that?  He also instructs them that

8   what happens if you are contacted about the fax?  He suggested

9   to me not to mention about the fact that he give me this fax.

10  Do not tell them that this came from me.  That's what's going

11  on here.

12        And you know just take a step back.  You watched that

13  video deposition of mr. Nesti.  The idea that Mr. Balboa would

14  sit across from -- from Nesti and be like this guy is going to

15  know a lot about the Nigerian oil warrants, not Federico, not

16  Philip Hamilton, not UBS, not any of these institutions that I

17  deal with all the time.  I am going to call Nesti up who I

18  haven't had a business interaction with in almost a decade and

19  this is the guy who I can trust to send in these numbers for

20  Nigerian oil warrant.  Ladies and gentlemen, that is

21  unbelievable.  Just unbelievable.  What happens?  Mr. Nesti

22  sends in the fax with the numbers.  Once again, it doesn't

23  work.  Millennium contacts Mr.~Nesti and he quickly says that

24  the numbers didn't come from him.  He came from Mr. Balboa.

25        At the end of the day who does Mr. Balboa try to

DCHAABAL2                    Summation - Cowley

contact again?  Mr. Nesti.  Mr. Nesti doesn't want to speak to

him.  Who else does he try to contact around then?  Mr. Pratt.

You saw that text message you saw in the e-mail.  Mr. Pratt

doesn't want to speak to him.  Mr. Balboa is losing control of

the flow of information and he can't cover up his scheme any

more.  So that cover up evidence is strong evidence that

Mr. Balboa knew exactly what he was doing was wrong.  If he

thought, oops, I got this one wrong or something like that

would he be going through these massive efforts to cover up and

come with cover stories for what he did?  Absolutely not.

            Briefly, ladies and gentlemen, before I sit down I

want to talk about the charges.  Mr. Balboa is charged with

five counts, two counts of conspiracy.  Conspiracy to commit

securities fraud.  Conspiracy to commit wire fraud.  Now the

Court will give instructions and I anticipate that what it will

tell you is you don't need some sort of solemn pact to find a

conspiracy.  You just need to find that Balboa reached an

understanding to do something wrong.  The evidence that you see

with the testimony of Mr. Pratt and Mr. De Charsonville, the

e-mail communication involving Mr. Balboa, the audio recordings

involving Mr. Balboa, these things show you a conspiratorial

agreement.  Those clearly show an explicit understanding.  And

what else?  The wire fraud, let's talk about that for a moment.

All wire means is sending an e-mail communication or

transferring funds something like that, OK.  That's what a wire

DCHAABAL2                    Summation - Cowley

1    communication is.

2              I am now going to talk about the substantive counts.

3    All of these show is a scheme to defraud.  That means telling

4    somebody a lie in order to get money from them, all right.  If

5    the wire fraud, again, you see example of e-mails being sent,

6    these newsletters being sent here right here into Manhattan.

7    You see examples of financial transfers coming into the bank

8    account in Manhattan.

9              In term of securities fraud what that is is the

10   security at issue is the investment in Mr. Balboa's fund,

11   investors buying shares in Mr. Balboa's fund.  He's doing a

12   scheme to defraud in relation to purchase or sale of that

13   security.

14             And finally investment advisor fraud that count

15   alleges that Mr. Balboa committed a scheme that we discussed

16   in -- he serving as the investment advisor.

17             So at the end of the day Mr. Balboa had a choice.  In

18   2008 he could have told the truth.  He could have marked the

19   Nigerian warrant or he could have let the independent process

20   play out, he could have had independent counter-parties but

21   instead he chose to lie.  He chose to undermine that valuation

22   process.  He chose to inflate the valuation that warrant.  He

23   made that choice to commit fraud and you should hold him

24   accountable for that choice.

25             And as you consider all of the evidence, I

DCHAABAL2                    Summation - Cowley

1    respectfully ask you to do what Mr. Miller said at the

2    beginning, use your reason and your common sense.  At end of

3    the day when you use that reason and your common sense we

4    submit to you that you'll find the only verdict that's

5    consistent with the verdict, that all your common sense is a

6    verdict of guilty on all counts.

7            THE COURT:  Thank you, Mr. Cowley.  We'll now take our

8    morning recess.  We'll resume in 15 minutes.

9            (Jury not present)

10           THE COURT:  OK.  We'll start at quarter of 11.

11           (Recess)

12           THE COURT:  Be seated.

13           Marlon, get the jury.

14           (Jury present)

15           THE COURT:  Please be seated.

16           We'll now hear the summation on behalf of Mr. Balboa.

17           Mr. Tacopina.

18           MR. TACOPINA:  Thank you very much.

19           Good morning, ladies and gentlemen.

20           First of all, I think it's appropriate for both sides

21   to just give my appreciation and thanks to all of you for your

22   service here.  It was a little longer than, obviously, we had

23   promised you it would be.  So your commitment obviously and

24   dedication to this important task is something that both sides

25   I have to tell you I appreciate greatly.  So, thank you for

DCHAABAL2                    Summation - Tacopina

1    that.

2              Judge Crotty instructed you at the end of every day

3    before you all left to keep an open mind.  He keep saying that.

4    Keep an open mind.  You heard from the beginning of the case

5    that Mr. Balboa is entitled to a presumption of innocence.

6    Those aren't just words.  Judge Crotty will give you the

7    instruction on law when we're done here but he sits here an

8    innocent man unless and until proven beyond a reasonable doubt

9    of his guilt and that couldn't be more poignant and more

10   important than at this very moment right now.  And if over the

11   course of the next couple hours you hear something that I said

12   that gives you pause that causes you to say, you know what,

13   he's right, you know what I forgot about that or that doesn't

14   make sense, something along those lines, those are breathing,

15   living manifestations of a reasonable doubt.

16             You'll recall some of witnesses in this case, witness

17   after witness coming in here answering questions by the

18   prosecution on direct with ease and when it came time to

19   cross-examination questions by defense counsel, those same

20   witnesses who had no problem answering questions whether on an

21   important matter or insignificant one, it was like pulling

22   teeth to get an answer.

23             And from Ms. Gibson-Stark not agreeing to the simple

24   when Mr. Dubin was down on his knees with that chart that

25   simple proposition about the unchanging value of the Nigerian

DCHAABAL2                     Summation - Tacopina

1   oil warrant and how that would not, obviously, cause the NAV,

2   the net asset value of the fund to get up in that three month

3   period where the Nigerian oil warrant didn't move, it took a

4   half hour to get that answer from her to Mr. Keswani

5   intergalactic response to something it's almost as if this were

6   a game and they were trying to win.  This is not a game,

7   obviously.  This is the man's future, Mr. Balboa, hangs in the

8   balance.  It is not a game at all.

9           What that is supposed to be is about, whether they can

10  prove it with real facts, not conjecture or speculation, real

11  facts, credible evidence his guilt beyond a reasonable doubt

12  and I tell you that cannot.  I am going to take you through the

13  evidence and show you where the reasonable doubts lurk

14  throughout.

15          Someone looked at Michael Balboa's numbers, his

16  valuations long after the fact, years after the fact and

17  thought they were wrong and jumped to a conclusion he must have

18  somehow inflated them fraudulently.  And that of course was in

19  the midst of a ton of litigation, in the midst of finger

20  pointing, of someone trying to blame someone else, lawsuits

21  flying around between Millennium, GlobeOp, investors over the

22  collapse of the fund even though that collapse had nothing to

23  do with the Nigerian oil warrant at all.  So they needed a

24  scapegoat.  And who better than the fund manager, the portfolio

25  manager?

DCHAABAL2                    Summation - Tacopina

1              What then happens is regulators, authorities then come

2      after these counter-parties, De Charsonville and Pratt, and

3      what both said repeatedly from day one is that they did nothing

4      wrong.  But the government obviously didn't like that answer,

5      so it gave them a choice, to say you've done nothing wrong and

6      you get prosecuted like him or agree that in your opinion some

7      sort of scheme and you get a non prosecution agreement and you

8      don't go to jail.  You don't have to plead guilty and you get

9      to walk away, keep the license, nothing.

10             So what were they going to do after years of denying

11     they had done anything wrong?  Both said to you they were

12     scared to death when they read that criminal complaint against

13     Mr. Balboa.  So they took the prosecution up on their offer,

14     obviously, and they said they did something wrong with

15     Mr. Balboa to get their free pass and that's why he's here at

16     that table.

17             We're going to go through the evidence and see why De

18     Charsonville and Pratt's trial testimony doesn't prove beyond a

19     reasonable doubt Michael Balboa's guilt.  To the contrary, what

20     it shows is innocent states of mind in 2008 at the time --

21     innocent states of mind across the board.  There was no scheme

22     to defraud anyone and there was no crime.  And you know that's

23     why investor, two investors in this fund, the supposed victims

24     in this case, two of them came in here, halfway across the

25     world.  You saw one live.  One we read to you to speed this

1     thing up a little bit.  They came in here who actually lost

2     money to testify on Michael Balboa's behalf.  If that's not a

3     resounding endorsement of his innocence, nothing else is.

4     These are the so-called victims who came in here to testify on

5     behalf of Michael Balboa.

6            You know Mr. Cowley repeated this tag line throughout

7     "secret and forbidden" or "secret and hidden agreement".  There

8     was nothing secret and hidden in 2008.  This was open and

9     notorious as you can get.  And if you load a question up,

10    Mr. Charlesworth, you are not allowed to be secret and hide the

11    fact that you are giving prices.  Well, of course, you are not

12    allowed to do that.  That is not what happened here, folks.

13    That's not what happened by a long stretch.  And we are going

14    to go through some of the evidence.  I am going to give you a

15    little preview.

16           One thing we have to get straight is one rule of law

17    the judge is going to instruct you about that is important

18    because it's not something we deal with in our daily lives or

19    walk around doing when we're interacting with our kids.  We

20    don't apply proof beyond a reasonable doubt when our kids haves

21    done something.  You make a decision, you are not going to give

22    them that standard.  But what I am here to do is help point out

23    the numerous reasonable doubts that lurk in this evidence.  And

24    it's not just reasonable doubts, ladies and gentlemen, which is

25    all you need by the way, one.  These are major doubts, some

DCHAABAL2                    Summation – Tacopina

1    serious major doubts, any one of which is enough to acquit

2    Mr. Balboa on all counts.  And the judge is going to instruct

3    you about this idea of reasonable doubt, proof beyond a

4    reasonable doubt and what that means.

5          By the way, that seems to have served us very well in

6    this country.  The people who founded this country, certainly,

7    no stranger to controversy, no stranger to social dangers,

8    having created, they figured our foundering fathers that the

9    best way to secure the liberties and guarantee the liberties of

10   the citizens was to make sure that if the government brought

11   charges they were proved and not just by a preponderance of the

12   evidence but by the highest standard the law permits, proof

13   beyond a reasonable doubt.

14         Proof beyond a reasonable doubt isn't that, he may

15   have done this.  It's not, he probably did this.  It's not, I

16   am also certain he did this.  It's there's no reason to doubt

17   he did this.  In this case you have dozens of reasonable

18   doubts, one of which is enough.  The government has brought

19   these charges in here and they have a heavy burden and that's

20   why they get to sum up first and that's why they get to go

21   after I go.

22         And the five charges that Mr. Balboa is accused of in

23   sum and substance is this conspiracy to commit securities

24   fraud, wire fraud.  You are going to get a verdict sheet with

25   all this on it.  So then the securities fraud and the wire

DCHAABAL2                    Summation – Tacopina

fraud without the conspiracy element and then this investor

advisor fraud.  It sounds like a lot but it really boils down

to the same thing.  They allege Michael Balboa defrauded

investors by interacting with counterparts.  They allege that

he did that as part of some scheme to falsely overvalue the

Nigerian warrant, that he tried to cover up the scheme and they

did so in a conspiracy with others.

        Let's go through some of the evidence now in detail

starting with the prosecution, the claim that Balboa

manipulated the valuation process.

        Michael Balboa was allowed to be part of this

valuation process and to tell others what he believed his

prices were, especially, especially and distinctly with

illiquid securities.  You can't lump everything into one

pattern.  Liquid securities and illiquid securities are two

different beasts all together.  And that's exactly by the way,

what investors were told exactly.  Michael Balboa -- and you

saw some of the offering memorandums.  Let me show you one of

them.  Government Exhibit 1A page 12, we saw this time and

again, has a separate section, folks, in this offering

memorandum for illiquid portfolio investments, not just the

regular investments of the fund.  There was a separate section

for illiquid portfolio investments, investments which is under

its risk section.  You'll have all of this.  There we've seen

this language up there.  But when we're talking about illiquid

DCHAABAL2                    Summation - Tacopina

securities that aren't being actively traded you can take into

account things that just aren't out there.  Well, at that point

when it's appropriate, where it's appropriate for instance for

illiquid securities, directors or their delegates you involved

in the valuation.

          Maria Gibson-Stark tried to tell you that the delegate

meant GlobeOp.  That is not true and you know that's not true

why?  Let's look at this flow cart.  This is the offering

memorandum for March 3 of 2008.  If you look at page one it

identifies the valuation agent as GlobeOp right away.  On page

nine it defines GlobeOp as the valuation agent in parens.  Then

on page 12 of this document the valuing illiquid securities a

special section what it does there is it discusses illiquid

securities and how it would be priced and does not define the

delegate as valuation agent, nor does it ever refer to GlobeOp

as the delegate.  And you are looking right there.  It would be

very easy if they wanted to identify the delegate as the

valuation agent for GlobeOp to do so.  They did it before.  And

every time we brought this up, every time we brought this up

what the prosecution did is showed you so some provision and

tried to go and make you think that, well, here's who the

delegate is.  They went 28 pages down in this exhibit.  We're

on page 12 talking about illiquid securities.  Let's look at

that on page 40.  What it says there is the directors have

delegated the valuation agent to determine the net asset value.

1         Ladies and gentlemen, that doesn't define the
2   valuation agent as the delegate or a delegate.  It doesn't deal
3   with the pricing of illiquid securities at all here.  It simply
4   uses the word "delegated" and it says the fund has delegated
5   the valuation agent to determine the NAV, net asset value,
6   which is something completely different than what's on page 12
7   which is the part where it's discussing illiquid securities.
8   So -- end of month value of entire portfolio than valuing what
9   that shows.  If they wanted to delegate something to GlobeOp in
10  this document here if they want to they know how to do it.
11  They did so on page 40.  And what's also important and that's
12  why by the way, they also didn't do on page 12.  This is such
13  an important document because it shows you that the delegate of
14  the directors of this fund that was Michael Balboa as you'll
15  hear and first from Mr. Charlesworth to name a few, had the
16  ability on illiquid assets to be involved in the pricing in the
17  fair value, OK.  And the prosecutors worked so hard on this
18  because they understand how devastating this is for their case,
19  devastating.
20        The testimony of Charlesworth, Anthony Warners,
21  Ms. Molberg who was here, Warners was one who was read in, more
22  importantly showed you that illiquid securities would clearly
23  be the exception to the rule.  Mr. Charlesworth said who did
24  you understand the delegate to be?  That would be the Michael
25  Balboa.  That's an investor, not someone who is his friend.  He

DCHAABAL2                    Summation – Tacopina

1    didn't know Michael Balboa except that he used to invest with

2    him, never socialized with him.  He lost a lot of money.  He

3    came here from the UK to sit in the witness stand and testify

4    on Michael Balboa's behalf.

5            Millennium's marketing and client relations

6    representatives came here also as defense witness, Ms. Molberg.

7    She's the one who interacted with the investors.  And she told

8    you that the delegate did not mean GlobeOp either.  In fact,

9    GlobeOp corroborated Ms. Molberg when Mr. Graves came in here

10   from GlobeOp and read that exact same language I just showed

11   and said that that language did not say the directors' delegate

12   GlobeOp at all.  Mr. Graves from GlobeOp agreed with that.

13   It's in the testimony.  You can have a read back of anything

14   you want.  I say something to you and you doubt it you could

15   look at the transcript it's going to be there.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1            MR. TACOPINA:  The language is so plain on its face

2     that we just saw.  It meant any delegate that the directors

3     choose, and who better for the directors to choose as their

4     delegate than the person who knew the most about illiquid

5     securities, the portfolio manager, Michael Balboa -- the same

6     portfolio manager -- by the way he was the portfolio manager,

7     let's be clear, for the Millennium Global Emerging Credit fund

8     that retained the oversight capacity to insure fair pricing of

9     assets.  That's exactly what investors were told in the due

10    diligence questionnaire, and that is 9.6.1.  We saw this.

11            If you look at these two sections they seem to be

12    inconsistent on their face.  It doesn't mean that something is

13    being hidden.  No assets valued in-house.  GlobeOp Financial

14    Services is the valuation agent, but the portfolio manager for

15    Millennium Global Emerging Credit, Michael Balboa, retains

16    oversight capacity to insure fair pricing of assets.  We are

17    dealing with illiquid securities.  It is clear as day.  That's

18    what he has the ability to do.

19            I am going to show you a living example of this

20    shortly, a living example coming from the investors own files.

21    That's exactly what Karoline Molberg told investors, what she

22    said she told investors.

23            And why was Mr. Balboa given the oversight to insure

24    fair pricing of assets in this emerging credit fund because the

25    securities in his fund, in large part, were illiquid.  You

DCHUBAL3                    Summation - Mr. Tacopina

1    heard that from Charlesworth, someone who was against the rest
2    of the market who had this whole different theory.  Warnaars
3    said that too, why Balboa was so important to them in their
4    minds -- these very experienced hedge fund managers and
5    investors.  He was the one portfolio manager in these illiquid
6    securities that aren't readily available and pricing all over
7    the place and there is no mark for them.  It is the portfolio
8    manager who is going to know most, who was involved in the
9    pricing of these things and that's what happened.
10           You heard prior testimony from an overseas witness,
11   Mr. Warnaars, the investor.  We read his testimony in.  Anthony
12   Warnaars told you -- that's what it is, he told you, that's his
13   sworn testimony -- he lost 5 million of his own personal
14   dollars.  He is the unique investor in this case, unlike
15   everyone else who was investing other people's money and funds'
16   money.  He lost 5 million of his own money.
17           And Warnaars what he also told you, he had his own
18   team investigate the liquidation of that fund and what happened
19   after he lost his $5 million, put his own due diligence team in
20   there to investigate why that fund went down and what happened.
21           After that investigation was complete, Anthony
22   Warnaars flew halfway away the world a few months earlier to
23   testify under oath on behalf of Michael Balboa, portfolio
24   manager, who was overseeing the fund where he lost $5 million
25   of his own dollars.  And he came in here and said to you, you

DCHUBAL3                    Summation - Mr. Tacopina

1    he didn't think Balboa did anything wrong and he investigated

2    it.  That is someone, not a motive -- he has anti-motive.

3    Clearly, he said, I was upset I lost the money.  We

4    investigated.  I investigated it.  I am here as a subpoenaed

5    witness telling you I don't believe he did anything wrong,

6    despite the fact that he lost his money.

7            He expected Balboa to be involved in the pricing of

8    these illiquid securities.  They were complicated, the pricing.

9    They were thinly traded.  The prices were not out there.

10   Couldn't take a few trades if someone was doing over the course

11   of the year and say that is the market price the documents

12   explain that.

13           You heard from Molberg, Charlesworth, others who told

14   us, illiquid securities are different than liquid securities.

15   Liquid securities have hundreds of trades a minute; illiquid

16   securities like the Nigerian warrant could have hundreds of

17   trades a year.  That's why you can't get that comfort in those

18   hundreds of trades a year that's the market value, and that's

19   something that Millennium warned investors about.

20           And Government Exhibit 3002, this is an offering

21   memorandum that dealt with that specific thing, valuation and

22   liquidity of instruments.

23           The last two sentences:  Due to the lack of adequate

24   secondary market liquidity for certain securities, the

25   investment manager may find it more difficult to obtain

DCHUBAL3                    Summation - Mr. Tacopina

1    accurate market quotations for the purpose of valuing the fund

2    and calculating the NAV.  Market quotations may only be

3    available from a limited number of sources and may not

4    represent firm bids for actual sales.

5              Millennium warned the investors about these assets in

6    that fund, warned that those market prices are not readily

7    available and, if they are, they may not represent real prices

8    or real bids.  When you read that and understand what the

9    investors were told prior to making an investment, that is

10   exactly what happened here.  It is exactly what happened.  The

11   illiquid securities were different and more difficult to value.

12   Michael Balboa's input into the valuation as an expert in

13   emerging markets was necessary and demanded -- at least by the

14   investors who understood what they were investing.

15             The prosecution kept pointing to language in documents

16   that the independent counterparties and independent valuation.

17   They brought in witnesses here.  Three investor witnesses --

18   none of whom had heard anything about the Nigerian warrant or

19   didn't care about it -- but they brought them in, the investor

20   witnesses, and they asked them to interpret what this language

21   meant.  The problem was two of them hadn't even read it.  They

22   told you that.  They hadn't read it before they were on the

23   witness stand.  But they were going to tell you what they

24   expected.  Read the documents, gentlemen, before you come in

25   here and opine, give your opinion as to what you thought was

DCHUBAL3                    Summation - Mr. Tacopina

1    going to happen before you charge him with misrepresenting.

2    That's the best that you had -- the witnesses, the investors

3    who didn't read the due diligence documents or the offering

4    memorandums?

5          You know, different interpretations, open to different

6    interpretations some of these documents.  What that really

7    means is people can look at it and see different things.  If

8    that's the case, folks, if that's the case, you can't say that

9    Michael Balboa misrepresented or is guilty based on that.

10   Someone looks and says, I think it means this.  Someone looks

11   at it and says I think it means something else.  And he is

12   going to be held to the highest penalty the law allows, a

13   criminal offense for something that is ambiguous, open to

14   interpretation.

15         Investor McNally when finally confronted read -- when

16   he is the one who read it, he is the only one of the three that

17   read it -- confronted with Millennium documentation

18   acknowledged that the fund in certain instances could actually

19   substitute its own value.

20         Let me show you a piece of that testimony.  First

21   question and answer really does it, that offering memorandum,

22   what that is telling investors in certain instances, OK, the

23   fund may say, you know what, we are going to substitute our own

24   value -- The thing that can never happen.  It does say that.

25   Of course it does say that.  It is telling them that.  It

DCHUBAL3                    Summation - Mr. Tacopina

wasn't a surprise to anyone.  Only with illiquid securities
which was what Nigerian warrant was.

         Ms. Molberg told you that Mr. Balboa was permitted
under the documentation to communicate with GlobeOp and
counterparties to give his opinion.  He was certainly permitted
to say what he believed the price was.  That's what she told
investors.  She told you all.  Just because some investors
didn't read the offering memorandum because they chose not to,
doesn't mean that Michael Balboa should be branded a criminal
because they mistakenly thought something else because they
didn't bother to read this.

         Look, here's some of the investors.  I want to show
you, Mr. Keswani.  Did he read the due diligence questionnaire?
Did he read the offering memorandum?  Did he invest because of
the Nigerian warrant?  He told you no to all of this.

         Another investor was Mr. McNally.  Did he read the due
diligence questionnaire?  Did he read the offering memorandum.
Did he invest because of the Nigerian warrant?  He told you no.
And Mr. Daniels is the only one that read it, but two of the
three people didn't even read it.  In fact, had Mr. Keswani
gone to some of the investor meetings he would have known --
when I say investor meetings, the meetings with the Millennium
people, Mr. Balboa. Ms. Molberg, when Dolomite was considering
investing.  He would have known that Michael Balboa was
involved in the valuation process, as opposed to getting on the

DCHUBAL3                    Summation - Mr. Tacopina

1    stand and saying he didn't know, he never would have invested.

2    Maybe you should have spoken to the people who were at those

3    meetings with Dolomite, Mr. Keswani, maybe you should have.

4              Remember what I said earlier, that I was going to show

5    you living proof that what happened in reality was that Ms.

6    Molberg told investors about Mr. Balboa being involved?  Here

7    is the living proof.  Someone from Dolomite's team -- this is

8    from the Dolomite due diligence package that is in evidence --

9    someone from the Dolomite team who was doing diligence on this

10   fund wrote that very significant note.  When it came to

11   valuation, according to the notes in the Dolomite file, from

12   the people who were actually at the meetings and read the due

13   diligence questionnaire, unlike Mr. Keswani who came here to

14   tell you about it -- valuation, Mike Balboa.  That's in their

15   notes.  That is devastating to them.  They can't even touch

16   this.  They can't get around it.  It is clear as day.  That's

17   what the investors were told when they were deciding what to do

18   and now they are trying to say, they never said Michael would

19   be involved in the valuation, ever.  There it is.  That is

20   their pen, not Balboa's, not anyone at Millennium.

21             The prosecution makes a big deal out of certain

22   language.  It says no valued in-house, the next paragraph says

23   that there is an exception, you saw that the portfolio manager

24   retains oversight.

25             But GlobeOp, as the valuation agent would certainly be

DCHUBAL3                    Summation - Mr. Tacopina

1    responsible at end of the day for valuing the portfolio, except

2    for the exceptions, but they are responsible for it.  The asset

3    were not valued in-house.  It is up to GlobeOp to put the final

4    number up there.  And with regard to illiquid securities --

5    illiquid securities only -- the counterparties gave their marks

6    to GlobeOp, and GlobeOp was free to accept or reject them as

7    they chose.  GlobeOp at the end of the day clearly calculated

8    the NAV, the net asset value of the fund at the end of every

9    month.  No question about that.

10           Don't forgot why GlobeOp was brought in as valuation

11   agent.  Karoline Molberg told us.  Mike Balboa brought in a

12   valuation agent to help with back office functions because the

13   fund didn't have all the abilities, didn't have all the

14   infrastructure in place to do the heavy lifting that is needed

15   when valuing funds that deal with a significant number of

16   illicit assets through the mark to market process.  It was

17   Balboa that suggested that.  Think about that for a second.  He

18   brought in GlobeOp.  Mr. Balboa, if he truly had some criminal

19   intent, why bring in an outside valuation agent in the first

20   place.  Just do it yourself like Joe Strubel did.  Joe Strubel

21   was Mr. Balboa's boss at Millennium, but he also had his own

22   fund.  This fund called the High Yield fund.  You heard from

23   Molberg, from Gibson-stark.  He didn't have GlobeOp.

24   Independent valuation, they can do it all in-house, which she

25   could have done, but he brought in GlobeOp.

DCHUBAL3                    Summation - Mr. Tacopina

 1          By the way, because a valuation agent is assisting the

 2     fund by calculating its net asset value doesn't mean that

 3     Balboa was not part of the valuation process get those two

 4     things --

 5          The portfolio manager giving his opinions to

 6     counterparties and correcting GlobeOps' mistakes is not

 7     Millennium using manager marks.  Nobody gave manager marks in

 8     this case, and they can say that all they want.  That didn't

 9     happen here.  On what the numbers were and living example --

10     GlobeOp was free to accept or reject, as were the

11     counterparties.

12          Charlesworth came in here with his 25 years of

13     experience managing these funds, investing in them.  He told

14     you he dealt with 5 to 700 different hedge fund managers.  And

15     he firmly expected that Balboa would be telling counterparties

16     what his belief of the valuation of the illiquid securities.

17     The government attacked Mr. Charlesworth like he was a

18     co-conspirator.  He was a victim in his case, according to

19     their theory.  He fraudulently lost money, according to them.

20     Because he on his own here and testified on behalf of Michael

21     Balboa, the guy doesn't know other than to be in some

22     investments with him, who lost him some money.  He believed

23     that was the right thing to do.  You heard his testimony on

24     that --

25          The prosecution tried to make you believe that even

DCHUBAL3                    Summation - Mr. Tacopina

1   Balboa could have absolutely no part, that was their first pick
2   at this.  Balboa could have no part even speaking to
3   counterparties.  You remember the testimony here.  First, there
4   was this issue of a conflict.  They said, Michael Balboa could
5   have no part in the valuation process, only GlobeOp could
6   because that would create a conflict of interest.
7   Ms. Gibson-Stark said because Balboa could make more money if
8   the NAV went up.  Guess who else had a conflict of interest?
9   Ms. Gibson-Stark admitted it in her testimony, she said,
10  GlobeOp's fee is based on the net asset value.  The higher the
11  NAV goes, GlobeOp gets more money too.  That's not my conflict.
12  That's GlobeOp's conflict.  She is right.  It is GlobeOp's
13  conflict.  And Mr. Greaves from GlobeOp even said, so basically
14  I asked him, the higher the value of the fund, the more fees
15  for GlobeOp got.  Yes, that's how it works.
16        Now, regarding what relative percentage of the fees
17  that we are getting, that doesn't matter.  He will say, well,
18  there was a less percentage of fees.  They still get more money
19  the higher the NAV goes.  It is all relative.  That's how they
20  get paid.
21        One other thing on this point, that is sort of
22  crucial, Ms. Gibson-Stark, looking at the Millennium offering
23  memorandum, acknowledged that the directors of the fund can
24  adjust GlobeOp's value.  Think about that.  The board of
25  directors, the directors of the fund can adjust GlobeOp's

DCHUBAL3                    Summation - Mr. Tacopina

1    value.  That is after GlobeOp sets it.  Think about that for a

2    second.  All of this talk about final mark, you can't touch it.

3    That undercuts any notion whatsoever that only GlobeOp could be

4    involved in the valuation process and avoid a conflict of

5    interest.

6          Now, what happened initially is when Ms. Gibson-Stark

7    was asked, Balboa didn't even Balboa speak to counterparties.

8    Look what Ms. Gibson-Stark said to you on direct examination.

9    When it came to the portfolio manager with respect to

10   counterparties that GlobeOp was consulting, what could he do?

11   He couldn't do anything.  It's on the record.  Could he talk to

12   them, the prosecutor asked?  No.

13         That's what they are trying to make you believe

14   initially.  Balboa, like those phone calls made, game set and

15   match.  He is wrong.  He has committed some sort of crime.  He

16   is doing something wrong.  That was then.

17         Then on cross-examination after being confronted with

18   all the documents, of course, he can talk to GlobeOps.  He can

19   give his opinion.  Look what happened?  This is the same

20   person, Ms. Gibson-Stark on cross.

21         Did you testify later on during your examination that

22   portfolio managers could give their opinion regarding the value

23   of an illiquid security?  That is what is consistent with the

24   offering memorandum.  That is what is consistent with what

25   Eammon Greaves from GlobeOp told us.  It is consistent with

DCHUBAL3                    Summation - Mr. Tacopina

1    emails.

2              And then she tried to downplay the importance of the

3    documents when she had to admit this.  She said, well, the

4    documents couldn't possibly set forth everything that was in

5    there.  She told you that, basically, things that aren't in the

6    documents could happen anyway.  That was the whole point.  They

7    were saying, it wasn't in the documents.  If he did it, it must

8    be misrepresentation.

9              So now, I guess, they want to have it both ways.  They

10   hoist the documents up to show that the language may be it

11   helps them, albeit a misinterpretation of the language.  They

12   say, here is the document.  You have to rely on these.  Then

13   when there is something that is not in the document, they tell

14   you, well, it don't really matter because there are other

15   things that happened that are not written.  You can use the

16   documents only as a guide.

17             The judge will instruct you about witness credibility

18   in his instructions.  One of the witnesses I want you to think

19   about is Ms. Gibson-Stark.  On cross-examination, she couldn't

20   answer a single question directly.  It was like pulling teeth.

21   She had to be directed to answer questions.  I will just give

22   you one example.  It is so long, it is by Mr. Dubin where,

23   basically, she was asked if Balboa and GlobeOp -- not the

24   valuation agent -- were interacting about valuation issues, the

25   very heart of this matter.  And when Mr. Balboa told GlobeOp in

DCHUBAL3                    Summation - Mr. Tacopina

1    an email that the security was making 3 million, more like

2    600,000, she wouldn't give a straight answer on this at all.

3    Back and forth, and the Court asked, is the answer to the

4    question yes?  Yes.  Why did we have to pull teeth to get a

5    straight answer.

6         First of all, one thing she didn't want to give a

7    straight answer on there.  Look what Mr. Balboa is doing there.

8    He is giving his opinion that the funds's value, based on

9    GlobeOp's error, should be lowered by 2.4 million dollars lower

10   the fund's value by 2.4 million.  And she didn't want to admit

11   that.  She was resistant.  Why?  The whole finger-pointing, it

12   can't be Millennium's fault.  It must be his fault -- or

13   GlobeOp's fault.  It is unbelievable, and when you say the word

14   "scapegoat," it comes out live from the transcript on these

15   papers.

16        Let's not forget this question over and over, the

17   valuation agent staying consistent.  There was the one question

18   about the warrant, and we talked about this already.  But the

19   notion that the Nigerian warrant price stayed the same from

20   September of 07 to March of 08.  If it stayed the same, it

21   means that it couldn't add to the NAV, didn't add any increased

22   value.

23        First, she said no.  Then she said it was a very

24   complex calculation.  What was she talking about?  If the price

25   doesn't move.  You can't add any value to the NAV.  Of course.

DCHUBAL3                    Summation - Mr. Tacopina

 1    It was something that had to be asked about 9 or 10 questions

 2    before she finally gave the answer.  But even, even with her

 3    agenda, the fact that she is in Millennium right now, she

 4    agreed that GlobeOp consult with the investment manager, and

 5    that was obvious because the document said so, and that the

 6    investment manager -- the investment manager was Millennium

 7    Global Investment Limited.  That's not a person.  That is a

 8    business entity, OK.  And who was the representative of that

 9    business entity.

10          It was Michael Balboa, the manager and the managing

11    director of the Emerging Credit fund for Millennium Global

12    Investments limited.  That's why Balboa was listed as the

13    contact person on the document that you saw, Government Exhibit

14    2, name of contacts for Millennium Global Investments Limited.

15    Michael Balboa and Molberg.  Balboa's title managing director,

16    Emerging Credit.

17          There is this whole thing, Mr. Keswani -- I don't want

18    to get into that whole thing with his son in Wisconsin, but he

19    tried to say that Balboa's title is just a title, he didn't

20    have any power or authority.  Read this, of course.  This lists

21    Balboa as someone who has an entire team below him.  Even in

22    the event of such loss, meaning incapacitation of Michael

23    Balboa, like he is kidnapped, died or can't work anymore, they

24    identified who has to replace him.  He is not someone with just

25    a title.  This was someone else who was so valuable, they had

DCHUBAL3                    Summation - Mr. Tacopina

1    to decide who was going to replace him.  This was a guy who was

2    so valuable, they had to anticipate, God forbid something

3    happened to him who was going to replace him.  That was in the

4    offering memorandum that Mr. Keswani obviously didn't read.  He

5    was the one for the investment manager.

6         And the other thing about that, Dolomite didn't know

7    that -- the due diligence team from Dolomite was paying

8    attention because here is another one of their notes in their

9    due diligence document, IM investment manager, Michael Balboa.

10        Wondering who the representative for the investment

11   manager was?  It is very clear from those documents, from those

12   notes it was Michael Balboa.  Don't let anyone try to convince

13   you otherwise.

14        We heard Matt Daniel, he said the same thing.  Based

15   on the documents, he understood that the valuation agent could

16   consult with the investment manager for the most appropriate

17   valuations.  And when confronted with that slide, confronted

18   with that language, he said that different investors might have

19   different understandings of consulting.  That was Mr. Daniel on

20   cross.

21        Again, depending on exactly what your definition of

22   consult is, you may have certain definition of consult with

23   another.  Is it fair to say yes, yes.  He said that it was

24   correct that the valuation agent could have consulted the

25   valuation manager.  That was the first question and answer.

DCHUBAL3                    Summation - Mr. Tacopina

1    Think about that scene right there.

2            So the different interpretations of what consult is

3    and what that means, the fact that they are trying to squeeze

4    that into some notion that he did something wrong, that there

5    was a misrepresentation is unbelievable.

6            You saw the emails.  There was as lot of emails

7    with -- you know heard from Molberg and Greaves that there was

8    interaction between Pratt and Balboa and GlobeOp and De

9    Charsonville and Balboa.  Of course, Pratt even told us that

10   Balboa could communicate with GlobeOp, he was the fund manager.

11   and not only could he talk to them, but he talked to

12   counterparties about pricing -- paid someone who would

13   certainly not be in a position to help Mr. Balboa at this point

14   with all of the litigation.

15           You would agree, Mr. Greaves that Mr. Balboa directly

16   interacted with GlobeOp with respect to valuation on many

17   occasions in 2008.  He certainly provided his opinion on

18   whether or not he thought the values were accurate or not.

19           All agree that Mr. Balboa directly interacted with

20   counterparties in the same way?

21           Yes, he did.

22           There was no secret here.  There was no secret in any

23   way, shape or form.

24           There are a bunch of emails.  They are all in

25   evidence, but I just want to review one or two of them.  And

DCHUBAL3                    Summation - Mr. Tacopina

1     what the email show is that Mr. Balboa is talking to

2     counterparties about valuations.  In fact in some of the

3     emails, Mr. Balboa did more than talk about the valuations of

4     assets.  He went so far as to actually challenge the valuations

5     of the counterparty.

6            If you look at Defense Exhibit L, this is an email

7     from Mr. Balboa to Mr. Howe at Citibank -- a counterparty, by

8     the way -- saying that his prices for another asset, this Sri

9     Lankan TRS, looked wrong.  He is challenging them.  And you

10    know who was CC'd on that?  Mr. Greaves was CC'd on that.  He

11    agreed this was another example of Balboa challenging

12    counterparty prices with GlobeOp knowing.  That was

13    Mr. Greaves' testimony.  With GlobeOp knowing, they are CC'd on

14    that email where Balboa said that the price is wrong.

15           I thought he couldn't be involved, according to

16    Ms. Gibson-Stark.  Now he is telling them the price is wrong.

17           You know, GlobeOp never said this -- and Mr. Greaves

18    said this -- well, you can't do that.  You can't tell the

19    counterparties who are giving us prices that their prices are

20    wrong.  He did it right in front of them.

21           Now, there was something else in Mr. Cowley's

22    submission.  He showed it to you.  He said Mr. Greaves told

23    you, on direct he told you, if Balboa had sent you marks for

24    any securities in his fund, could GlobeOp have utilized those

25    to value his fund.  He said no.  And that's what the testimony

DCHUBAL3                    Summation - Mr. Tacopina

1   he said showed.

2           Here's the thing about this.  Look at how they argued

3   that.  What they tried to show you let's look at reality.

4   Let's look at Defense Exhibit M, please.  This is June 2008.

5   Michael Balboa is interacting with GlobeOp -- Ms. Ganapathy is

6   from GlobeOp -- regarding the price of a security in his fund,

7   not the Nigerian warrant, but a different one.

8           Ms. Podill, and he is interacting and saying it

9   shouldn't be one price, it should be another.  Look at how he

10  says it, telling GlobeOp, this security of mine, Podill,

11  shouldn't be priced at this, but 100, as this bond was put at

12  100.

13          MR. TACOPINA:  I would suggest he is telling or

14  directing GlobeOp what the price should be.

15          If this were Gilles De Charsonville on this email

16  instead of GlobeOp -- and the oil warrant, this is evidence --

17  that he was directing the counterparties.  There will be

18  evidence.  This is a security.  No allegation of wrongdoing and

19  he is telling GlobeOp what the price should be -- telling them,

20  not asking them.

21          And Mr. Greaves said on his direct, and they pull that

22  one thing out, if he was giving his price, we couldn't accept

23  it.  They just did.  They just did.  In that instance on cross,

24  when I showed that to Mr. Greaves, he said, that is Mr. Balboa

25  providing his opinion.

DCHUBAL3                    Summation - Mr. Tacopina

1          Now, you will never find in that Podill -- that is

2     Defendant Exhibit M -- you will never find in this case any

3     stronger language from Mike Balboa to De Charsonville or Pratt,

4     when it comes to valuing the Nigerian oil warrants.  He is

5     telling GlobeOp what the price is.  That's OK.  They have to

6     check their own numbers, but that's OK.  They all told you

7     that.

8          Anyone who was going on back then, it wasn't a problem

9     was called or dealing with liquid securities.  Defense Exhibit

10    X is known -- very quickly -- it is the same thing.  Mr. Balboa

11    is speaking to another counterparty at UBS, telling him the

12    price, 105, 106.  He is giving his opinion.

13         Same to do with De Charsonville and Pratt.  This is

14    the same kind of counterparties, has nothing to with any

15    allegations of wrongdoing -- same thing he did with De

16    Charsonville and Pratt.

17         They described the month-to-month market, De

18    Charsonville, and he said that he would be contacted by

19    GlobeOp.  Then he would call Balboa and help develop the access

20    valuation.  He would that he would be contacted by GlobeOp and

21    he would call GlobeOp to help develop the assets valuation.  De

22    Charsonville said, he wasn't requesting Ms. Balboa's opinion on

23    prices.  That is what he told you?  This is a scheme.  I'm

24    asking his opinion on prices.

25         This is him testifying now as a cooperating witness,

DCHUBAL3                 Summation - Mr. Tacopina

getting a free pass.  That's what he was doing back then, he

tells you.  And there is nothing wrong with that.  Mr. Balboa

can give you security.  Mr. De Charsonville admitted that.  Of

course he admitted that?

        Once he admitted that, he realized, that's going to be

a problem.  So I basically said he could give me his opinion on

securities -- no difference than any other security with the

Nigerian warrant.  It is the same interaction.  Same cadence.

Same tone.

        But what he then says when Balboa gave him his opinion

on the price, what he then says is this.  The Nigerian Oil

price, it was a direction; it wasn't an opinion.

        Look at him trying to explain that ridiculous answer.

It is a long stretch of transcript, but I think it is important

to see what happened here.  This is from De Charsonville on

cross.  On the bottom there is an attribution:

"Q    Where you were telling Mr. Balboa you have it at a certain

price and he gives you his opinion, that is on of the

securities in his fund, correct?

"A    It is one of the securities in his fund, yes, that's

correct.

"Q    And you gave him a price and he gave you his opinion on

it, correct?

"A    Yes, I mean, you know, very thin line between opinion and

direction."

DCHUBAL3                    Summation - Mr. Tacopina

1            Let's follow that thin line through.  Let's focus on

2    this one.  I started going through examples with him.  There is

3    a discussion there about the pricing of a security and Balboa

4    said, "they probably should be a bit lower, I think."

5            I asked him about that one, is that a direction or an

6    opinion.  How do you decide that, Mr. De Charsonville?

7            Well, 62 would be an opinion, 67 would be a

8    direction -- actually deciphering between the lines, which line

9    is opinion and which line is direction.  Then again on this

10   one, Balboa said, why don't we take it down like 5.  I am

11   guessing something like that.

12           Yes.

13           He is asking why don't we take them down 5.  And he

14   says that was a subtle direction.

15           Next, look at this.  The next page.  We keep going on

16   this.  I go through another one of the securities, the pricing,

17   the back and forth.  I ask him, is that a direction or an

18   opinion?  "Same answer as before."

19           He didn't want to say that again.  It was ridiculous.

20           What was the answer?  It is a very thin line between

21   opinion and direction in this case.

22           The last one, on page 2, you start going through it

23   and you go to the securities in Michael Balboa's fund during

24   that mark-to-mark that you heard on tape.

25           So is that the same thing, is it a direction?

DCHUBAL3                     Summation - Mr. Tacopina

1           He says it is a direction.

2           I said, so he is directing you to mark it down?

3           Yes, yes, he is.

4           This was what Mr. Balboa did, not only with him, but

5     with all the other counterparties.  It was no difference with

6     De Charsonville.

7           De Charsonville starts scrambling for an answer:

8     Opinion is OK.  Direction is no good.  That was a subtle

9     direction.

10          He was ridiculous in trying to come up with excuses as

11    to why when something was wrong when nothing was wrong.  In his

12    own mind, in De Charsonville's mind, maybe there was a thin

13    line between opinion and direction, but what is important here

14    is what was in his mind -- not De Charsonville -- what was in

15    his mind.

16          You saw Mr. Balboa make the same comments time again

17    in different processes.  Again, the tone of the case,

18    everything is the same.

19          Mr. De Charsonville and Mr. Balboa, and Mr. Pratt, for

20    that matter, were not accused of wrongdoing with any other

21    marks.  In fact, he testified, Mr. De Charsonville, now at this

22    trial that the law directed him to give prices like 3 to 4,000

23    he testified at a prior proceeding earlier this year, that

24    prices weren't directed.  So in other words, a few months under

25    oath, this process was going on, he never used the word

DCHUBAL3                    Summation - Mr. Tacopina

1    "directed" before.  I got it him on the cross and that is in

2    there.  I never used the word "directed" before, and that's

3    something that I just started using now.

4                 MR. COWLEY:  We would object based on the motion in

5    limine.

6                 THE COURT:  Overruled.

7                 MR. TACOPINA:  Balboa never threatened De Charsonville

8    to give him a price.  I asked him all of these questions.  Did

9    he ever say that he would cut off work from Millennium for you

10   guys if you don't do this?

11                The answer is no across the board, and he admitted to

12   this day, DeCharsonville said, I don't even know what happened.

13   I told him I wasn't doing it.

14                We found out with Pratt.  Nothing happened.  I don't

15   know what would have happened if I had challenged the price.

16   Why?  Because I never did that.  I never did that.

17                De Charsonville knows that he could have rejected

18   Balboa's prices.  He said that to you.  There it is from the

19   transcript.  Whatever thin line between opinion and direction

20   De Charsonville created in his own mind when trying to avoid

21   prosecution and trying to come up with an answer for these

22   conversations that are clearly not problematic for Mr. Balboa,

23   this thin line between direction and opinion.  That thin line,

24   maybe in his mind regarding direction or opinion -- there is a

25   very, very clear line between guilty and not guilty.  It is not

DCHUBAL3                  Summation - Mr. Tacopina

1    a thin line.

2           The prosecution tried to do things like showed you

3    emails.  I don't have it on the screen, it is 1144.  It is that

4    email where de Charsonville and Balboa are interacting.  And

5    apparently the prosecution tried to show you that there was

6    intent to commit fraud from a brief message chat with De

7    Charsonville whether he was free to do the mark-to-mark.

8           Balboa said, can we do tomorrow -- that was in Mr.

9    Cowley's summation.

10          They are not talking about just the Nigerian

11   warrant -- they are talking about all of the assets, the

12   mark-to-market on all of the assets when there is no allegation

13   of wrongdoing.

14          GlobeOp was asking De Charsonville for the numbers.

15   De Charsonville has been responsive, simply wanted to give him

16   a reason for blowing them off.  And he wanted to say, well,

17   tell GlobeOp, I will talk with them tomorrow.  I didn't do my

18   diligence yet.  I haven't gone through this yet.

19          Pratt also told you about talking to counterparties.

20   He said there was nothing abnormal here at all. It is not any

21   intent to commit a crime.

22          Pratt also told you about talking to counterparties,

23   and I could cite transcripts on him, but he said there was

24   absolutely nothing abnormal here at all.  It is customary,

25   especially for illiquid materials, just like De Charsonville

DCHUBAL3                    Summation - Mr. Tacopina

1    said, and he understood what Balboa was doing was getting his

2    opinion.  That's what Pratt told you.  He said that he believed

3    that for illiquid securities was fine.  He said that when he

4    first started counterparty pricing with Mr. Balboa, Mr. Balboa

5    said to him, Sam, I want you to provide independent valuations

6    on securities in my fund.  That's how Michael Balboa directed

7    Sam Pratt to do anything?  By independent valuations, confirm

8    the price I am giving you.  That's what Pratt said.

9            It is not just giving his opinion.  Mr. Pratt told you

10   that he was free to reject and not pass on any of Mr. Balboa's

11   prices, his opinions, like he ultimately did, without any

12   repercussions from Mr. Balboa whatsoever.  He only did this for

13   three months in 2008.  He passed on January, February, March.

14   That's when the Nigerian oil didn't move an inch and it stayed

15   stagnant.  Then what happened?  Pratt said, I'm out.  Nothing

16   bad.

17           Balboa went on, Mr. Cowley said, then he went with one

18   counterparty to control the process -- Balboa went with one

19   counterparty?  We are not GlobeOp.  GlobeOp agreed to one

20   counterparty.  Millennium agreed to one counterparty.  He made

21   this decision.  Everyone agreed to that, not Mr. Balboa alone.

22   He couldn't alone.

23           Again, he said he was afraid to have someone else in

24   the scheme.  Really?  Who like Emanuel Gill who, by all

25   accounts, was not part of any scheme, was an emerging markets

DCHUBAL3                    Summation - Mr. Tacopina

1   securities expert?

2          When you think about the stuff that you heard from

3   Mr. Greaves at GlobeOp who said that we could have accepted or

4   rejected the prices.  Mr. Balboa is not marking the fund.  If

5   De Charsonville and Pratt had done their jobs that they were

6   supposed to do -- we will get into that.  And if they didn't,

7   not doing their jobs -- they never once told him they disagreed

8   with the value.  Not one stitch of evidence on the record where

9   they ever said, Mike, we don't agree.

10          Sam Pratt said I am not doing it.  He said, that's

11   fine.  That's fine.  Both knew that they could have, just like

12   GlobeOp could have rejected it.  So everyone accepted it.

13          And then Ms. Gibson-Stark told us, if GlobeOp had a

14   problem, they could have rejected it.  Mr. Greaves said, if

15   GlobeOp had a problem we could have rejected it -- he actually

16   said, well, we can exclude the counterparty price.  They didn't

17   decide not to use it.  They had the ability to do that.

18          De Charsonville said the same thing, that GlobeOp was

19   free to reject the prices, and that's what they did,

20   ultimately, in 2008.  You saw one example.  In 2008, GlobeOp

21   rejected BCP's price for the Nigerian warrant and went with the

22   lower prices they received from two other counterparties.

23   Under their umbrella, UBS and Exotix -- you saw in Defense

24   Exhibit I, that email and they sent it to De Charsonville, and

25   said we were going with our sources for this.

1          By the way, GlobeOp, could have checked the values

2     with UBS or Exotix way earlier than October 2008.  And GlobeOp

3     had under their roofs as clients, UBS and Exotix with

4     valuations for Nigerian warrants.  Mr. Greaves told you that.

5     So they were not using them and for some reason Balboa is

6     supposed to know that?  Balboa is supposed that GlobeOp was not

7     using their vast array of clients and this system that they

8     invented, this GoPricing?  Balboa is supposed to know that they

9     weren't using it.  That's why this whole scheme doesn't make

10    sense.  Balboa wasn't doing this in a vacuum.  He wasn't

11    handing envelopes in a restaurant under a table.  This was done

12    openly and notoriously and another entity was doing it.  And

13    according to all witnesses, GlobeOp was free to reject the

14    counterparty's pricing here, free to reject.  They chose not

15    to -- until October.

16         If every witness thought that, why would Balboa think

17    that?  Think about that for a second.  Every other witness

18    thought that GlobeOp was free to reject the counterparty

19    pricing.  Why wouldn't Balboa?  Of course he thought that.  It

20    was obvious.  Despite that, he still told them here is the

21    price for some other security.

22         Basically, at this point, we have talked about why,

23    Mr. Balboa did absolutely nothing wrong with regarding GlobeOp,

24    counterparties, the warrant's value.

25         I want to talk to you about the value and any notion

DCHUBAL3                        Summation - Mr. Tacopina

1   that Mr. Balboa had some scheme, some motive in his mind to

2   falsely inflate the value of the Nigerian warrant.  There was

3   absolutely no evidence of motive, and I just want to go over

4   some of the things the prosecution said because some of them

5   were just flat-out inaccurate.

6        What is his motive?  Molberg and Charlesworth said

7   that he was not trying to attract new investor money into the

8   fund in 2008 -- that is powerful state of mind -- knowing that

9   you have these false values to increase your NAV.  You get more

10  money, the NAV goes higher.  He wasn't taking in any new money.

11  OK.  Investors were subject to this lockup period, so even if

12  they were not impressed by Balboa's NAV, they were not going

13  anywhere.  They were subject to a lockup period in 2008.

14       By the way, the volatility of the fund you heard a

15  little bit about that.  It was well within range to where it

16  needed to be -- it wouldn't have affected that -- the Nigerian

17  warrants, one way or another.

18       You heard about these fees, the performance fee versus

19  the management fee.  Performance fee is the one where you get

20  the big payday, if you do.  And that is where if you reach that

21  high water mark -- and we talked about that -- you get 20

22  percent of that profit.  The only problem is, it never happened

23  after March of 2008.

24       More importantly, the 8 million that was paid, the

25  check was not payable to Michael balboa -- they tried to make

DCHUBAL3                   Summation - Mr. Tacopina

1   you believe when they put that up.  That was paid in March for

2   performance fees that were in the first three months and back

3   to many people.  You heard that from Ms. Molberg.  The 2

4   percent management fee was payable regardless of the high water

5   mark, but that was to deal with the expenses of the fund and

6   other things of that nature.

7            Balboa never earned a performance fee in 2008 -- he

8   never earned it after March.  So the rise of the Nigerian

9   warrant with this false value had nothing to do with any

10  performance fee earned by anyone because he didn't get.  That

11  is the high water mark.  It was reached in March and never

12  again for the rest of 2008.

13           What else about that?  Look at the price.  This is the

14  government's chart, 615.  Look at the price of the Nigerian Oil

15  warrants for January, February, March.

16           517, 5-something-or-other, the chart is moving now and

17  something else is going to happen in a second -- and there.

18           So the fund reaching that high water mark had nothing

19  to do with the Nigerian warrant because the Nigerian warrant

20  didn't raise it not even a bit -- it stayed in a straight line.

21  Then after that, there was no more performance fee earned.  It

22  is important that you understand that because they are trying

23  to attribute some financial motive to Michael Balboa by

24  increasing these warrants.  And you can take this back and look

25  at all of these exhibits.

DCHUBAL3                       Summation - Mr. Tacopina

1              Now, also, what you have to have and understand is

2     that there would be no -- Mr. Charlesworth, by the way, came

3     and told you, the thing that the prosecution was trying to do

4     was, well, the Nigerian warrants comprise 10 percent of the NAV

5     as opposed to what you really should be looking at which is the

6     gross asset value of the fund.  And he said it is like

7     comparing apples and oranges because it doesn't compare the

8     Nigerian warrant with all of the fund's holding which was in

9     the billions.  So a warrant was only a sliver of the fund's

10    entire positions.  That's the thing that Charlesworth said that

11    the investors are focused on.

12             By the way, Matt Daniel even said that in an email to

13    Ms. Molberg.  He asked her for the gross positions.  You can

14    look at it if you want.

15             The NAV, regarding the percent of a warrant is

16    irrelevant because Mr. Balboa didn't benefit from its increase

17    whatsoever.

18             And then the individuals from FINRA with all of those

19    charts trying to sway you saying the same thing over and over

20    in different ways.  Look how much red is on the chart.  That is

21    the relative size of the warrant to the NAV.  That is wrong.

22    That is not what you look at.

23             First of all, he admitted he had no personal

24    information about anything on those charts.  He made know

25    independent determination, Mr. Howard, and the prosecutors told

DCHUBAL3                    Summation - Mr. Tacopina

1    him what to create in those charts, a series of systems, as he

2    said

3            second, the chart was so skewed it misrepresented.

4    The fund's NAV started with a point of 400 million.  That's

5    where the chart started 400 million instead of zero to make the

6    impact of the warrant look so much bigger-- look what happens

7    here.  They will acknowledge that by the way, Mr. Cowley on

8    cross-examination, that last question and answer.  It is a lot

9    tougher seeing that with your chart starting from zero.  Look

10   at the two charts.  That was Government Exhibit 2006, much more

11   red up here.  Starting up here, much more red up her.  But you

12   see 400 million, see what happens when zero is supposed to

13   start -- heck of a lot less red.  That is the appropriate piece

14   of Nigerian Oil warrants for the entire fund.

15           Look at this pie chart.  Instead of looking at the

16   NAV, by the way, Mr. Charlesworth said he drew it, this was the

17   version.  The correct valuation of the Nigerian warrant is here

18   in the gross, the one that was 2 percent of the 80 million.

19           I'm sorry.  Mr. Dubin, thank you very much.  2 percent

20   of the 3.5 billion which equals 80 million.  Look at the NAV,

21   which Mr. Charlesworth told you not to do, was 9.5 percent of

22   the 844 million.  It is a big difference.  That's what you have

23   to be looking at as an investor, and Charlesworth told you,

24   that Ms. Molberg told you that.

25           If there is any question, Mr. Balboa didn't try to

1    falsely inflate the Nigerian warrant.  There are a couple

2    things that you can look at.  You can look at his state of

3    mind.  During the very same time period, he is accused of

4    trying to falsely inflate these things by pumping them up, he

5    caught a serious mistake by GlobeOp that caused the fund to be

6    reduced by $30 million.  You heard Mr. Keswani, some of the

7    investors got angered by that mistake.  GlobeOp made a mistake,

8    Mr. Balboa caught it.  He is looking to falsely inflate values,

9    but he corrects 1 of the mistake that GlobeOp makes in which

10   his fund goes up $30 million.  It is like a freebie, because it

11   was GlobeOp's mistake.

12           That wasn't the only evidence that you heard of him

13   correcting valuations because he believed that GlobeOp set the

14   NAV too high, which would have earned him more money.  You

15   heard it before where GlobeOp says that they thought the profit

16   of one particular instrument was too high, where Balboa thought

17   it was too high, $3 million and Balboa said the instrument

18   should have been around 600.  That is evidence of him lowering

19   the value of his net asset value of his fund.

20           MR. COWLEY:  Objection.

21           THE COURT:  Mr. Tacopina, don't talk about markdowns.

22           MR. TACOPINA:  That was a correction of GlobeOp.  I

23   will move on.

24           THE COURT:  Thank you.

25           MR. TACOPINA:  Those are the ones that slipped through

DCHUBAL3                    Summation - Mr. Tacopina

the cracks.  I didn't mention anything about the trillion

dollar whatever error.  Obviously that was a ridiculous error.

But these were not mentioned at all in the prosecution's

summations.

        You heard that these warrants are incredibly

difficult to price.  Witness after witness came in.  And,

ladies and gentlemen, it is easy to Monday morning quarterback

getting nonpublic -- nonpublic -- trading information with a

government subpoena.  And being able to discuss the inner

workings of the Nigerian debt office, with their advisors.  It

is easy to come in five years later and talk about that, but

when Mr. Balboa is dealing with this in real time and 800 other

securities, by the, way.  He didn't have the luxury of a United

States federal government subpoena, the power to get these

numbers that Mr. Howard was able to get via subpoena.  And he

certainly didn't have any heads of state advising him or

anything like that.  You heard about the warrant being thinly

traded Nigerian warrant, highly illiquid securities.

        Half a dozen witnesses came in here and all said the

same thing, that this was almost impossible to price.  I think

De Charsonville said it was a nightmare to price.

        And Mr. Sequeira, for some reason, came in and he

didn't really want to use that term, illiquid.  He struggled on

it, but at the end of the day, he said that he was really a

little confused about the Nigerian warrant.  He might have said

DCHUBAL3                    Summation - Mr. Tacopina

1     that to the prosecutors.  He said it.  He told us that stocks

2     like IBM trades tens of millions of times a day.  And you heard

3     the difference between an IBM liquid security and an illiquid

4     security and a Nigerian Oil warrant security.

5          The prosecution keeps pointing to those other prices

6     on the market, and you can't just look at a tremendously small

7     number of trades.  And Mr. De Charsonville, you heard from that

8     some who lives and breathes the stuff, not from lawyer's

9     argument.  You cannot take a relatively small number of trades

10    and say, trading 200 times in a year, in this range, that must

11    be the price.  That doesn't work with illiquid securities.  And

12    that's why Millennium specifically made this warning in that

13    offering memorandum.  It talked about illiquid portfolio

14    investments.  It gave you that warning about prices not being

15    reliable and not taking into account some of the trades that

16    are there.

17         Now, they are trying to convince you that Mr. Balboa's

18    was wrong and they were trades over the year -- even though

19    they were illiquid.  Those weren't even real trades.  As you

20    learned they were not even real trades experienced.  Portfolio

21    manager knows that you cannot price illiquid of a couple of

22    hundred of trades a year.  Mr. Charlesworth came in here and

23    that's what he did.

24         These prices that were up in those charts were not in

25    Bloomberg for the public to see.  They were not publicly

1    available on Bloomberg in 2008.

2             Mr. De Charsonville told you he looked and he didn't

3    see.

4             Pratt told you he looked and he didn't see it.  And

5    Pratt said that Goddard that he worked with was an emerging

6    market specialist and he didn't see it.

7             And Greaves from GlobeOp, to get these counterparties

8    involved, the reason that he did that was, even if he saw

9    illiquid securities like Nigerian warrants on Bloomberg, he

10   would not be comfortable relying on those prices because they

11   could be wildly inaccurate.

12            What Mr. Sequeira from Exotix testified to was, he was

13   able to pull up Exotix's prices on Bloomberg, but that was

14   different; that was an Exotix screen.

15            And Mr. Cowley kept saying, Mr. Balboa had to have

16   access to the ALL-Q Bloomberg screen.  The one Exotix had

17   access so Mr. Balboa had to.  No.  Those were nonpublic numbers

18   for the Nigerian Oil warrant.

19            It would make sense if he had access to it, it would

20   make said sense is not enough.  Millennium's computers would

21   have been right in front of you  You would have seen records

22   of the fact that Mr. Balboa had access to those nonpublic

23   Bloomberg screens back in 2008.

24            MR. COWLEY:  Objection.

25            THE COURT:  Overruled.

1          MR. TACOPINA:  And more, Mr. Sequeira admitted that he

2     only accessed that information from an Exotix terminal.

3          I think you heard yesterday, the Bloomberg witness

4     came in here and he said that those Exotix screens were private

5     to Exotix and in order to access them, Exotix had to give you

6     authorization.  That's what the Bloomberg witness came in here

7     and said yesterday.

8          The market in general could not see those warrants in

9     2008.  No dispute.  Witness after witness told you that, and

10    that's why the prosecutors had to subpoena them.  Mr. Howard

11    even told you that in his testimony:

12          The information contained on the chart was not

13    publicly available, was it, Mr. Howard?

14          No.  I don't believe so.

15          A subpoena was necessary to get that information.

16          Yes.

17          We also know the recollection -- let's take Mr. Howard

18    for a second.  He admitted that the charts weren't meant to

19    imply that the information on them were known to the general

20    public.  He said that on cross-examination.

21          At this point these charts were not meant to convey

22    that the trading prices were known to Mr. Balboa.  He said, I

23    wasn't trying to convey that.

24          Funny, Government Exhibit 6000 that they put up just

25    now says actual known trading prices.  They just argued that to

1    you, despite the guy who created the charting telling you by

2    the way of his testimony that those were not actual prices.

3    They were not publicly available.

4              I subpoenaed them.  I wasn't trying to imply that

5    Mr. Balboa knew those.

6              Actual known trading prices -- known to whom?

7              They are still trying to make you think that Michael

8    Balboa had access to these numbers back in 2000 argument when

9    he did not.

10             His charts -- they speak for themselves at this point.

11   You have seen the different valuations.  It doesn't matter.

12             Greaves told us that the prices on Bloomberg, on this

13   case -- didn't recall -- he said that the prices don't always

14   report accurate values for illiquid securities, and he agreed

15   with that statement.

16             Now, the accuracy of the price of this Nigerian Oil

17   warrant, various witnesses came in and said that different

18   managers come up with different valuations for illiquid

19   securities.  You heard Mr. Knapp say 10 portfolio managers

20   could have vastly different views about future values of

21   investments.  It is an open-ended question type of

22   hypothetical, but the answer is yes to that.  That is the

23   reason why certain valuables -- and Anthony Warnaars testified

24   to that, and you heard the readback of his testimony.

25             Ms. Molberg confirmed that Mr. Balboa in fact used a

DCHUBAL3                    Summation - Mr. Tacopina

1   model to price these things.  You may not have a computer model

2   in front of him doing mark-to-market.  Charlesworth said that's

3   OK.  A manage who knows his models, you don't plug it in like a

4   formula.

5         What did you learn about valuation?  You heard about

6   the written explanation that Mr. Balboa sent about his mind set

7   in 2008 valuing his Nigerian Oil warrants from that 1553 which

8   I am going to show you in a minute that exhibit, where he wrote

9   that to Mr. De Charsonville.

10        His belief as conveyed in that letter to others show

11  that the price of the Nigerian warrant was tied to oil -- no

12  question about that and its increasing value was arrived from

13  the excess collateral account in his mind.  To him, in his

14  mind, without access to all of these things, someone without as

15  advisors from the Nigerian government let's see what was out

16  there.

17        Oil was rising very quickly in 2008, during the same

18  time period Mr. Balboa believed the value of the warrant was

19  rising.  Mr. Howard from FINRA told us that from January of

20  2007 to August of 2008, the price of oil roughly doubled,

21  doubled in the course of a year and a half.  It wasn't some

22  excuse that Mr. Balboa came up with.  It did roughly double.

23  We know that he just wasn't simply entering his own price at a

24  computer in a back office, coming up with it.  He had a basis,

25  a good faith basis is what you will hear from the Court.  It is

DCHUBAL3                    Summation – Mr. Tacopina

1   important.

2            Look at what De Charsonville told us about that good

3   faith basis.  Manuel Gill at BCP was an emerging market

4   specialist and Gil told GlobeOp that he thought that the prices

5   for the warrant which Mr. Balboa expressed to BCP during mark

6   to mark was fine.  Manuel Gill agreed.  That's in evidence.

7   That is in the email from Manuel Gill to GlobeOp.  He is an

8   emerging market specialist.  He didn't have a problem with Mr.

9   Balboa's prices.

10

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TACOPINA:  He is not someone that alleged in part

2     of the conspiracy or scheme.  Look for the testimony.  And

3     moreover when you look -- Pratt even said, Mr. Pratt said that,

4     well, it's possible, you know I did when I started cooperating

5     it's possible I did tell that the prosecutors that the prices

6     that Mr. Balboa was sending were good.  That is after he was

7     cooperating.  Just try and explain this when they stand up, I

8     am going to ask Mr. Miller to try and explain what happened

9     here how they tried to deceive you and fast talk you in

10    summation, talk so fast about these things.  Watch this.  The

11    prosecutors showed you Government Exhibit 204.  They showed you

12    this Exhibit 204.  What it was is 204 said that Mr. Balboa made

13    an offer for the Nigerian oil warrant, to sell Nigerian oil

14    warrant at $208.  Well, I tell you that sounds like pretty good

15    proof that he doesn't believe his own pricing and he is trying

16    to sell it at 280.  Except there's one thing they forgot to

17    tell you about Government Exhibit 204 in that e-mail that they

18    showed.  That e-mail was in March of 2007, a year before any of

19    the prices of the warrants started rising.  They didn't tell

20    you that when they argued that to you, March of 2007, well

21    before the price of oil rose dramatically.  And if you remember

22    it almost doubled by August of 2008.  And guess what else they

23    didn't tell you?  That's the price Mr. Balboa had in 2007,

24    March.  Look, this is the government chart.  In March of 2007

25    he had it over two hundred dollars, slightly over.  That was

 1   Balboa's price in 2007.  Yet they try and show you an e-mail

 2   and say, look, offering it for 280.  That e-mail is from 200

 3   when he knew that.

 4          Also Government Exhibit 1553 Mr. Balboa's sort of

 5   right up on what he believed.  This is what he sent to others

 6   explaining his thought process.  Mr. Balboa is saying

 7   originally purchased in 2007.  He is trying to make 20 bucks

 8   selling for 280.  One, that makes this document credible and

 9   corroborates the numbers first and foremost.  And secondly,

10   misleading about that trying to say that 280 is an offer as

11   proof.

12          MR. COWLEY:  Objection.

13          THE COURT:  Overruled.  Fair argument.

14          MR. TACOPINA:  The government tried to show that

15   Mr. Balboa's explanation for rising oil prices was not correct.

16   You saw this.  I want to show Government Exhibit 1613, that

17   chart where they were comparing Mr. Balboa's values to Nigerian

18   oil warrant and the price of oil and the rise.  It's so off, as

19   his price is going up, oil is going down.  But the problem with

20   that -- and Mr. Cowley talked real fast on that one -- it has

21   to do with payment.  He said.  No.  If you look at Government

22   Exhibit 4, the Nigerian oil warrant offering memo.  The price

23   of oil to be used in the calculation was based on an average

24   six month period that trailed by 60 days before the payment

25   date.  It's not simply a matter of comparing month to month.

DCHAABAL4                    Summation - Tacopina

You had to back out.  60 days and six months.  Look what

happens when you back up 60 days in six months.  They

corresponded almost exactly, almost exactly that's the right

formula to use that's the formula that Mr. Balboa believed was

the appropriate formula based on offering memorandum.  Even

Mr. Howard conceded that, OK.  That does look much closer.

What were these charts meant to represent?  A mistake by the

way -- and I said this in my opening -- a mistake in this

process if Balboa believed this was right, him being wrong or

making a mistake is not a crime and the judge will instruct on

the law.  This is what Michael Balboa was explaining to people,

the basis of his rise of the Nigerian oil warrant was in 2008,

the person would know and what also happened is De Charsonville

said that he believed that money was accumulated in some excess

collateral account.

Look at this.  So he explained to you he believed the

balance in the excess account increased as the prices of oil

increased.  In 2008 he didn't come up with this concoction now.

Look at what De Charsonville said.  He said, OK, we'll leave it

at that.  Mr. De Charsonville spoke to that as well.  It's in

the testimony.  He actually said he saw a description of that

on the Bloomberg with his own eyes, OK, and that's what he said

that De Charsonville and this might be it -- told the

government believed Mr. Balboa when he told you that the excess

collateral account said that he believed him and that's what he

DCHAABAL4                    Summation - Tacopina

1    told the prosecutor.

2            In any event, what happens here is if it's wrong and

3    you have to understand that if he's wrong that is not a crime.

4    If he had a good faith basis to make a valuation that is not a

5    crime and the government has to prove that he was not acting in

6    good faith beyond a reasonable doubt and the burden is on them,

7    obviously, and you'll see how they haven't satisfied the

8    burden.

9            First of all, when these Nigerian oil warrant

10   methodology the pricing was so complicated the Nigerian

11   government getting this wrong.  Dr. Muhtar told us that it was

12   a dense complicated document that needed a lot of reading, OK.

13   He said but the debt office was clear.  Mr. Balboa was not in

14   the debt office of Nigeria in 2008 and he didn't have advisors.

15           Secondly, he is not a lawyer, not sophisticated in the

16   reading of these documents.  These are documents from a

17   Nigerian offering memorandum.  And Mr. Muhtar told us that

18   there were times when the Nigerian government didn't know how

19   to value these Nigerian oil warrants.  By the way, what he said

20   was as a result of default the Nigerian government, we never

21   heard that the additional one money, what was or how much it

22   was but Dr. Muhtar agreed that additional interest was payable

23   to the warrant holders.

24           The bottom was collateralized -- one moment and look

25   at this.  The bottom was collateralized.  Dr. Muhtar and

1    Mr. Knapp both acknowledged that Nigeria's obligations under

2    the warrant were pari passu to the bond on equal footing to the

3    bond.  Dr. Muhtar told us that the document does not say

4    specifically what happens, the effect of Nigeria's retirement

5    of the bond because he doesn't tell us what the effect is.  He

6    doesn't know, the document doesn't say it.  It is not even

7    agreed he didn't know whether according to his examination does

8    the information memorandum discuss the fact of Nigerian's

9    retirement of the bond -- it doesn't -- it's silent to that.

10   It's silent to that.

11          So look at this Mr. Dubin yesterday cross-examined

12   Mr -- or examined Dr. Muhtar again.  Remember this chart he

13   drew with these four little boxes and Dr. Muhtar went through

14   this with him.  Let's start out with this.  The warrants were

15   attached to the bonds.  That's the first thing that happens.

16   Those two are attached.  This is the Nigerian oil warrants and

17   the bonds.  The Nigerian government had an excess crude account

18   that was building up cash and they also had treasury bills that

19   were originally there to secure the bonds.  Dr. Muhtar told you

20   that and then they had this excess crude account, crude oil.

21   That was there building up cash as the Nigerian government sold

22   more and more oil.

23          When the Nigerian government Dr. Muhtar told you

24   decided to sell the bonds, the money in that excess crude

25   account was used to buy those bonds back, therefore,

DCHAABAL4                    Summation - Tacopina

1    extinguishing the bonds.  They were gone.  All that was left

2    was those three things.  Now the treasury notes were not needed

3    any longer.  So at that point they're sold off and the money

4    from those proceeds go into this excess crude account and all

5    you have left at that point from anyone looking from the

6    outside in is the warrants and the excess oil account, this

7    excess crude account.  That's all you have left.  What else is

8    there?  The Bloomberg screen shot, if you look at that, some of

9    that we had to cull one from Bloomberg.  We put it no evidence.

10             Let's look at that.  It says there are two prices

11   listed for these Nigerian oil warrants.  And what it does next

12   is it says that it's capped at $15 per payment and that would

13   be no reason to list the accumulating amount over that per

14   right if the only amount due was $15.  In 2007 there were 13

15   more years of payments left before we got to 2020, obviously.

16   If most of the warrant holders were entitled to, the most they

17   could be entitled to is $30 a year.  The most they could be

18   entitled to is $30 a year and that the most their rights would

19   be worth is $30 a year, times the thirteen years or $390.  And

20   Mr. Cowley just said on summation anything over $390 must be a

21   fraud because it can't be possible.  That's not true.  And

22   that's not the only interpretation that was out there because

23   look what happens here.

24             Despite that payments being capped and the ceiling

25   being at 390, what does Bloomberg list on their own lists, on

DCHAABAL4                    Summation - Tacopina

```
 1    their own screen shot of Nigerian warrants a price of $445
 2    plus, OK.  And by the way, that's more, obviously, than the
 3    ceiling.  I guess according to Mr. Cowley that must be fraud.
 4    He said any price over 390 is fraud and it wasn't just there
 5    for Michael Balboa to see and come to the conclusion just
 6    there.  There was excess crude account that we just showed you
 7    that only had warrants.  There was only Nigerian oil warrants
 8    in this excess crude account hanging out there.
 9               MR. COWLEY:  Objection.
10               THE COURT:  Overruled.
11               MR. TACOPINA:  De Charsonville told you that he saw a
12    description of excess collateral account on Bloomberg.  He
13    believed that the money was accumulated in the excess
14    collateral account, right?  Yes, there's a description on
15    Bloomberg that's a description De Charsonville said he saw back
16    in 2008.  So in the end by the way, if Mr. Balboa
17    misrepresented this to mean over the $15 by annual payment as
18    the price of oil was skyrocketing and the bonds were all gone,
19    that misinterpretation is not a crime.  He had a legitimate
20    basis, that is what he wrote in this document back in 2008,
21    2009, 2010, not in 2013 when he is on trial trying to come up
22    with an answer.  And you can be sure that these factors -- and
23    by the way, if the Nigerian government would not be at all
24    happy, obviously, if they knew that anyone was taking a
25    position that they owed money to warrant holders, a lot more
```

money, so Mr. Muhtar didn't take that position.  Of course, he

still wants to work for the Nigerian government.  Putting that

aside, this is what's out there for people to see.

          And then we had, of course, Mr. Oshilaja and whether

he was asked questions about having the specific conversation

with Mr. Balboa about selling back the warrants to the Nigerian

government at a higher price and whether they had any reason to

deny that he was double dealing behind the Nigerian

government's back.  He said absolutely not.  Keep in mind on

cross-examination what Mr. Dubin showed him.

          First of all, he admitted when he sat down with the

prosecution that when he said to you that that conversation

with Mr. Balboa never happened.  But he told the prosecution

back in April of this year, well, I am pretty sure it didn't

happen.  I am pretty sure.  That's what he said about it.  I am

pretty sure.  If you are absolutely certain about something

seven or eight months earlier, pretty sure it didn't happen.

          Look at this.  First in March of 2007 Mr. Oshilaja has

this PowerPoint presentation.  These are in evidence.  And in

this presentation that he is using to try and get partnerships

with funds because of his high level contacts he said I

arranged investments for the fund exclusively.  He then

forwards the same month he forwards to Michael Balboa,

Mr. Oshilaja does, this e-mail from the Central Bank of

Nigeria.  And what he is doing here is touting his connections,

1    showing that he as an e-mail with an official at the Central

2    Bank of Nigeria which Oshilaja was giving his views.  He

3    forwarded that to Millennium and he said I am the man.  I have

4    those connections.  Then his resume he sent to Millennium, I

5    have to high level contacts.  So he is trying to do this deal

6    that's referencing Michael Balboa's writeup, that's Government

7    Exhibit 1553.  That's' exactly what's here.  And then there was

8    a discussion clearly about a possible deal here.  He was

9    speaking to the Nigerian government about things that he would

10    do with Millennium.  Look at what happens when Mr. Dubin asks

11    him these questions.

12          So what was he doing?  Pulling the wool over

13    Millennium's eyes and that's what it purports to be.  That's

14    what Government Exhibit 1553 speaks to.  And look, let's

15    just -- this is the things we showed you before Michael

16    Balboa's right if the price of warrants of 2007 he talks about

17    here, you can see this highlighted stuff the idea of

18    collateral/oil trust and we heard about crude being oil.  Put

19    that aside.  Here, November 2007 Millennium was contacted by a

20    local Nigerian named John Oshilaja wanting to part up -- at a

21    thousand or two thousand or more giving the

22    over-collateralization of the crude of the oil trust.

23          This is what he said based on those e-mails you saw

24    Oshilaja sent to Millennium that Oshilaja said, well, that's

25    not correct.  Well, that's what the e-mails say but that's

DCHAABAL4                    Summation - Tacopina

still not correct.  So who is Mr. Oshilaja lying to or

pretending to?  Millennium?  Was he trying to convince

Millennium to do some deal or was he going to do a deal?

And, again, if he was so far off on the pricing

Mr. Balboa, understand he had a basis for this.  If he was no

far off why did one person over the years say to him over that

whole year say to him what are you doing?  Are you crazy?

Three thousand?  $1500?  Are you nuts?  Not one person -- look

at all the people who laid eyes on that thing.  You had the

people at GlobeOp.  They have no problem accepting it.  They

had access to others.  You had the people at BCP and they're

not De Charsonville and Pratt.  But Emanuel Gil but also the

guy at Mint, Mr. Goddard, who Mr. Pratt went to.  That's

another emerging market, the people at Millennium, look at it.

I mean you heard at that time all Michael's Balboa's

team.  You saw them listed on that thing.  Michael Balboa's

boss, directors of the fund, speaking to Joe Struble by the way

in which when they were trying to show you -- e-mails were real

offers.  The only thing important on there that no one

mentioned, if those were real offers Joe Struble was CC'd on

that too.  If he would have thought those were real offers he

would have said to Balboa look at this, we could buy these

things that $200, they're worth a thousand, two thousand, three

thousand.  What a great deal.  Go buy it.  Joe Struble didn't

bite on that either.  Joe Strubel would have said what are our

DCHAABAL4                    Summation - Tacopina

valuations up here for if these valuations are here?  You never

heard that from Joe Strubel.  He is CC'd on that e-mail.

          Aside from the people at Millennium, what else also

happened was this, folks, there was an annual audit which was

required by law and, of course, you heard the audit.  According

to Ms. Gibson-Stark the audit never uncovered any allegations

about Mr. Balboa was committing fraud, an audit by an

independent auditor.

          So, in the event Mr. Balboa misunderstood what the

warrants holders would do -- by the way, the maturity date is

in 2020, OK.  We don't know if he was right.  He believed he

was right.  We won't know if he's right for another seven years

or so as we sit here today, OK.  But if he believed that and he

was wrong, that misinterpretation is not a crime.  He was so

open and notorious about his price he wasn't hiding it from

anybody.  And the judge is going to instruct you on good faith

and please, please listen to that.

          How am I doing on time, your Honor?

          THE COURT:  Another half an hour.

          MR. TACOPINA:  I am probably saying a lot of things

that most of you know and may know already.  If I am saying

things that you like, I don't know what you all know and I just

can't take a chance that I am not going to say something that's

important enough to him just, please, bear with me.  I have

another half hour left.

DCHAABAL4                    Summation - Tacopina

1      So here now I want to briefly talk about these warrant

2   offers.  I mentioned already Joe Strubel on this e-mail.  They

3   tried to show you that Mr. Balboa didn't really believe they

4   are worth as much as he said they were because he didn't buy

5   them from Exotix in that offer.  You were told by the witness

6   from Exotix that the e-mail messages blasted out by -- were

7   like spam.  They were subject to call.  Subject to call is very

8   simple.  They don't even own the assets.  They are just

9   throwing out numbers on an asset that is traded a couple

10   hundred times a year.  We don't know.  Balboa received those

11   messages if he even opened them we know he as a busy trader

12   would receive hundreds and thousands of messages a day.  The

13   Bloomberg messages were told scroll down.  Ms. Molberg said

14   that Mr. Strubel ran the high yield fund.  The fact he didn't

15   buy any speaks volumes.

16      By the way, there are so many conflicts in this case,

17   ladies and gentlemen, so many confusing concepts that my brain

18   is fried after two weeks of this stuff.  This is not for me.

19   But let me say this.  People sort of who lived back in the day

20   who lived this stuff like Mr. intergalactic and Mr. McNally and

21   all these people who actually understand this and breathe it,

22   Mr. Charlesworth, they all had different answers about what

23   different things meant.  They all had different -- how is he to

24   be held?  They want you to look at in hindsight Monday morning

25   quarterback.  If there's confusion if it's not crystal clear,

please, do not hold that against Mr. Balboa.  Hold that against

the government.  They have a burden to prove his guilt beyond a

reasonable doubt.  So if you are scratching your head saying I

don't understand something or that piece of evidence or that

proffer, that's a reason to doubt it in and of itself and this

whole issue is so far fetched and ridiculous it's sort of

trying to distract you from the issues at hand because it's not

a close call on the other issues, on valuation he had a good

faith basis to argue what he believed and he told everyone he

wasn't hiding it.  He didn't do anything wrong.  So then must

be the coverup to show he must have thought he was guilty.

          Not so fast because if they can't prove the fraud they

are going to say why did you cover it up?  Ladies and

gentlemen, there is no coverup.  Let's be clear about

something.  The authorities, regulators, whoever were not

closing in on Mr. Balboa in 2010 when he was having these

conversations with Nesti or De Charsonville, they were not

there in 2010 during these conversations.  You heard that FSA

first notified they were conducting an investigation in

February of 2011.  So in 2010 when he was having these

interactions there was nothing going on regarding an

investigation that he was worried about.

          And in the fall of 2010 all that was happening was

this.  Millennium was asking Mr. Balboa to get other people to

verify the pricing including counter-parties who GlobeOp

DCHAABAL4                    Summation - Tacopina

1   accepted the numbers from.  Remember the fund was liquidated at

2   this point and the liquidators were becoming curious and

3   litigation started to ensue and finger pointing began.  So

4   think about that.  Think about the importance of what I just

5   said to you.  It was Millennium and Ms. Gibson-Stark said it

6   and it's in the record.  It was Millennium who asked Mr. Balboa

7   to go get counter-party numbers two years later in 2010.  He

8   was doing what Millennium asked him to do.

9          Let's look at Nesti very quickly.  Nesti claimed that

10  Mr. Balboa told him not to mention Mr. Balboa's name on

11  Millennium calls.  Think about how ridiculous that statement

12  is.  It was Millennium who asked Mr. Balboa to go to these

13  counter-parties to get pricing.  That was consistent with

14  Millennium's pricing and Balboa's pricing from 2008.  What

15  Millennium asked him to do was get pricing and Mr. Balboa said

16  he would do that and fax it in.  So, of course, the fact that

17  Millennium was asking Balboa to do it means that he nothing to

18  hide by doing it.

19         Number two, Balboa told Nesti that Millennium would be

20  quoting him according to Mr. Nesti.  So what was Nesti supposed

21  to say when he sent the fax if he couldn't mention Balboa's

22  name.  Sir, who are you?  Why did you send us a fax?  Oh, I

23  don't know.  Just wanted to talk to you about the prices of the

24  warrant ridiculous.  Of course Millennium would know that

25  Michael Balboa reached out to him.  He was the portfolio

DCHAABAL4                    Summation - Tacopina

manager of this fund and that's what he was doing.  So there

was no secret about it.  Mr. Nesti tried to give you some

impression.  Don't mention my name.  It's ridiculous.  It

wouldn't make sense.  He fluffed Mr. Nesti.  The reason we went

through that long grueling hour of cross-examination with him

which was not fun to do in Italy in a room that was

100 degrees.  That was beside the point.  He was fluffing his

credentials.  He was pretending he is this big oil guy.  It was

like he was a broker -- the world.  It want like he was this --

hey buddy, do me a favor.  His credentials, at least the way he

said, it were substantial, OK.  And he was purported to be an

expert on oil.  We know that wasn't true.  But if you get the

benefit of that hindsight.  And, again, he was the one who

worked there nine years ago at this desk at Greenwich and if

there was no proof of a scheme to coverup anything at all which

there wasn't Mr. Balboa said something to him, folks, and this

is just consistent with everything else he did in this case.

He said here is the price, Leo.  Only send them if you're

comfortable and confident that they're right.  Think about that

statement for a second.  There's a scheme to coverup, another

scheme to cover up -- was saying the opposite.  Nesti admitted

that.  It's in the tape.  It is in the transcript.

        And by the way, then he said about this De

Charsonville had this conversation with him, right, where he

said, you know this coverup where he went and met him at

1    London, went to his office and what he admitted Mr. De

2    Charsonville and that Balboa didn't ask him to find people to

3    coverup a scheme or get someone to confirm inflated numbers.

4    De Charsonville said Balboa never said that to him.

5            Then he said this thing about these damning e-mails.

6    De Charsonville told you about the damning e-mails.  First he

7    admitted having given them to him in his office, in the lobby

8    in prior testimony.  Balboa gave him these damning e-mails.  So

9    he shifted his version.  He gave me the e-mails in a restaurant

10   a table or two, quiet thing.  Everything you know about this

11   guy De Charsonville, everything you know, can you believe him?

12   The guy said he's an admitted liar.  Even though they didn't

13   know he was lying, every single person.  How are you supposed

14   to be able to tell when he's lying?  They told you about this

15   e-mail that Mr. sent to De Charsonville.  I think they put it

16   up here with the Fed Ex thing, the package.  And then there was

17   e-mail -- they tried to put some slant on that like it was

18   Balboa sending it to his wife's e-mail address.  De

19   Charsonville told you in the testimony he said, I don't know if

20   it was me or Balboa who suggested that.  I don't remember.

21   Clearly, there's no conspiracy because there's no agreement.

22           These guys were quick to be in a scheme with

23   Mr. Balboa when they needed to that they were terrorized to

24   saying they were doing something wrong, the government wouldn't

25   go away.  Well, wait a second.  All I have to say is I did

something wrong and all this goes away?  Look at this.  This is

sort of an evolution chart.  Look what happens first.  In 2011

De Charsonville met with the SEC in March of 2011 he said he

did nothing wrong and Balboa did nothing wrong.  By the way, if

he is lying there he is a lying to federal officials that's a

crime and he acknowledged that.

     Then December of that year there was a criminal

complaint filed against Michael Balboa.  Now look what happens

next.  About a month later he sends his lawyer in to meet with

the prosecutors to say I want to cooperate.  When he wants to

cooperate his story is I didn't do anything wrong and Balboa

didn't do anything wrong.  But he was still saying he did

nothing wrong.  He didn't get his agreement.

     Again, so what happens next?  He meets with the

government in Madrid, Spain.  This time knowing that

Mr. Balboa's trial's coming up and this time I did something

wrong.  What happens when he says that?  Balboa signs a non

prosecution agreement, gets a free pass waltzes in and out of

here, lied to the SEC but no problem.  He just leaves and gets

hired jobs.  He lies on his job interviews, no problem.  Again,

not even a scratch on his license, non prosecution agreement

when he changes his story.

     And you know remember in that non prosecution

agreement something that's important he said only if he tells

the truth.  It's not exactly like he is put on a lie detector

DCHAABAL4                    Summation - Tacopina

 1    box and the government's exhibit box determines if he tells the

 2    truth or you get to vote on that.  They get to decide if he is

 3    telling the truth.  So it's their truth that he has to tell.

 4    If he doesn't tell their truth he doesn't get a non prosecution

 5    agreement.

 6            THE COURT:  The jury will determine whether he is

 7    telling the truth.

 8            MR. TACOPINA:  Of course.  But that's a factor to

 9    consider in his agreement in order to get a non prosecution

10    agreement he has to tell the truth as determined exclusively by

11    the prosecutors.

12            Now, one thing I want to show you, just to show you

13    how willing he was to please and go along with the

14    prosecution's desire, one example there was that tape that was

15    played, OK.  It was Government Exhibit 863.  I am not going to

16    play it now.  But basically the one where Mr. De Charsonville

17    said I swore when I heard that I heard Balboa's response to him

18    discussing warrant price.  I heard him say it's a little low.

19    Well, that didn't quite work out.  And that's what he said, OK.

20    Yes, that's what I heard then.  At this proceeding he said he

21    heard Telulla, Telulla, Michael Balboa's daughter.  You could,

22    if you have ears you could hear that.  Why is that important?

23    What's important is the last trial the prosecution heard it's

24    too low, it's too low.  They showed it to Mr. De Charsonville.

25    This trial when it was corrected properly --

1           THE COURT:  You mean the prior proceeding.

2           MR. TACOPINA:  The prior proceeding.  In this trial,

3    at a prior proceeding then at the trial here when Mr. De

4    Charsonville looked at it what he heard was Telulla, Telulla.

5    If it said Mack truck, Mack truck, he would have heard Mack

6    truck, Mack truck.  He is pleasing his master because they hold

7    the carrot over him.  That's an example of what he will do to

8    please them and to get out.

9           Listen to what he says about his lying and what not.

10   He says, well, when you say lie you start believing your lies,

11   yes?  Yes.  And he also testified that when you convince

12   yourself that your lies are the truth you are not just lying to

13   everyone else, you are lying to yourself, right?  Yes.  So this

14   is the man who originally said he did nothing wrong.  Then the

15   story changed and now we have the lies.  He's convinced

16   himself.

17          And there are certain stubborn facts that Mr. De

18   Charsonville's lies can't hide from.  De Charsonville admitted

19   that Michael Balboa never asked him to participate in a scheme,

20   whatsoever.  These guys were social friends.  They didn't know

21   each other.  They were going to hook up on the phone and

22   decide -- they were going to -- orally and Balboa never said to

23   him, I want to give you false prices or I am going to pass on

24   to you false prices, never did anything like.  He never asked

25   De Charsonville to lie for him, ever.  Never -- SEC deposition.

DCHAABAL4                    Summation - Tacopina

1   De Charsonville told you that.  Never saw in one of those

2   e-mails that the prosecution put up, Government Exhibit 511,

3   512, 513, 510, never saw anything saying don't tell GlobeOp I

4   gave you the numbers.  Michael Balboa did that with others and

5   other securities and also did it with GlobeOp too and you saw

6   that exhibit.

7          When Mr. De Charsonville was asked you made an

8   agreement to commit a crime with Mr. Balboa?  There was no

9   written agreement.  But in my view there was an understanding

10  in my view.  So that's it, Mr. De Charsonville had a view that

11  now suits his needs.  So now he is not going to be prosecuted

12  and he is not sitting at a table.  This was all in De

13  Charsonville's mind.  If he even believed that and didn't just

14  make it up to avoid being prosecuted that is all in his mind

15  because when asked if he intended to defraud -- this is a

16  little fact that snuck out, this little gem.  When he did the

17  same thing with Mr. Balboa remember in 2007 he did the same

18  thing with the Nigerian oil warrant.  He couldn't find any

19  prices for it so he just passed them on.  Look what he said in

20  2007 there came a point where you couldn't find --

21          How could that be?  That's the same thing he did in

22  2008 cause the charge in this case only goes from January 2008

23  to October of 2008?  So the same thing he was doing in 2007 he

24  wasn't doing a crime?  So ridiculous.  This guy doesn't think

25  he did anything wrong, clearly.  Think about this.  When De

1    Charsonville said to Emanuel Gil, when De Charsonville couldn't

2    do the mark to market for Balboa for the warrants in August, De

3    Charsonville claimed that he was in a criminal conspiracy with

4    Balboa and didn't know anything about it.  He exposed someone

5    else at BCP to his criminal scheme who was a part of the scheme

6    and holds himself out as emerging market specialist.  That

7    doesn't make any sense at all.  If De Charsonville really

8    thought he was doing something wrong he never would have turned

9    someone else on at his own companies who knew emerging markets.

10        If there really was some criminal conspiracy when De

11   Charsonville said to Michael Balboa, hey, Michael, send your

12   Nigerian oil warrant prices to Manuel Gil, Mr. Balboa would

13   have said Charles, what are you crazy?  He will know that this

14   is nonsense.  I am not sending him those prices.  Only you and

15   I are doing this.  Nothing happened.  Do you know what Balboa

16   did?  He sent it right to Manuel Gil.  When you informed Balboa

17   to send the warrants did he say, are you crazy?  No.  He sent

18   them to Gil and you learned that Gil then sent them on to

19   GlobeOp.  GlobeOp saying they look fine to me.  Now they are

20   trying to criminalize and make it sinister.  Secret from who?

21        If you know then he said this thing about Peter

22   Bartlett and he sent him a price cause he thought the price

23   was, he was concerned so he sent Peter Bartlett a price in May

24   of 2008.  Now, if this conspiracy scheme supposedly started in

25   January of 2008, think about it.  De Charsonville said I knew

DCHAABAL4                 Summation - Tacopina

 1   when he was passing offer these prices in January of 2008, why

 2   in May is he trying to verify Balboa's price with somebody

 3   else?  Cause it didn't happen.  There was no conspiracy.  There

 4   is no scheme.  If he were doing this in January of 2008

 5   illegally and improper he won't be trying to check in with

 6   somebody else which he did with this Peter Bartlett.

 7          By the way, you heard a stipulation in 2008 was in a

 8   stipulation Quadruple Z, he thought that Bartlett's prices were

 9   wrong and Balboa's prices were right.  Now he said today,

10   balboa's prices were wrong and Bartlett's were right.  Again,

11   it's all in evidence all there.  This guy wasn't getting paid

12   to do this.  None of these people were getting paid.  They

13   weren't getting anything from Balboa.  No one as extorted.  Sam

14   Pratt again is someone who he said he lied.  Never charged with

15   anything.  Got his non prosecution agreement, decided to tell

16   the truth so he didn't get prosecuted.

17          He said first to you his prior testimony at a prior

18   proceeding was accurate, OK.  Then what happened was he started

19   getting caught up in things that a little different than what

20   he said under oath before he said I was nervous.  But then I

21   said are you nervous now?  How do you tell which one was right?

22   If he was wrong before cause he was, if he's -- how do you tell

23   which one is right?

24          Just some things Pratt said now, no meeting of the

25   minds just like with Manuel Gil.  The evidence is this is again

DCHAABAL4                    Summation - Tacopina

the best evidence that there was no conspiracy because if you

are in a conspiracy it's a secret agreement as Mr. Cowley said

secret.  You don't bring people in the secret agreement

conspiracy who can blow the cover off of it.  You just don't do

it.  That's what Pratt did with Goddard at Mint.  It doesn't

fit at all.  He shows Goddard the prices and he said you heard

testimony that Goddard knew those prices were coming from

Balboa and passed on to GlobeOp.

          Again, you'll see the e-mails, initially, that there

was an e-mail from Mr. Pratt to Balboa in January of 2008.  He

wrote to Balboa saying, OK.  I'll hold off doing anything.

This is the first month in 2008 that's the pricing.  Hold on

doing anything including getting the prices until they speak

again.  In this scheme why is Pratt worried about getting

prices for?  That is not what they were thinking in 2008

because that's not what it was.

          Pratt also told you that he had no problem and of

course that Balboa was able to give his problem -- Pratt said

that he can't make prices.  Pratt said but he can certainly

tell you I believe that's five hundred.  I believe that's two

hundred.  That's, of course, what he did.  And even after he

started cooperating he still told prosecutors he thought that

Balboa's prices were good.  So how could that be a meeting of

minds?

          Again, Pratt told you he trusted Balboa.  What he also

DCHAABAL4                    Summation - Tacopina

1    did was send an e-mail to his compliance officer saying oh,

2    should I pass this on.  Are you crazy?  If this guy was

3    involved in a criminal conspiracy knowing he was passing on

4    false numbers he was going to pass on to his client officer,

5    are you guys okay with this?  Now that you are fired you get

6    arrested, nothing happened to him then, OK.  He never would

7    have sent that to his compliance officer, goes to show his

8    state of mind after he stopped doing anything with Balboa.  In

9    April he said I don't want to do this any more.  What did

10   Michael Balboa say to him?  He simply said, no problem.  I am

11   OK with that.  And then what happens?  A year later they go off

12   to Germany.  He flies Balboa to Germany.  He introduces him to

13   two of his clients so Balboa could do business with him.

14           Let's go to this.  We're going to go through these

15   five charges real quickly.  In this case you would expect to

16   see when you talk about Michael Balboa's state of mind.  You

17   would expect to see evidence and agreement of some sort.  What

18   actually happened?  There is no evidence of an agreement

19   between Balboa and Pratt, Balboa and De Charsonville at all.

20   What you would expect to see if this was a fraud is Balboa

21   telling him don't check the prices I give you.  No discussion

22   of checking prices.  What actually happened in this case, no

23   suggestion by Balboa not to check the price.  What you would

24   expect to see if this is a fraud you don't have counter-parties

25   like Pratt and De Charsonville actually checking Balboa's

DCHAABAL4                    Summation - Tacopina

1    prices.  What you saw in this case is they repeatedly checked

2    his prices.  Pratt said he did it every month.  What you would

3    expect to see if this was a fraud of his state of ind was

4    criminal.  There would be knowledge that the prices are wrong

5    what actually happened, these guys had no idea, told you

6    whether the prices were wrong or not.  If there is a criminal

7    agreement you would, expect to see Balboa saying to don't say a

8    word to anyone else.  What happened here is this is done openly

9    and transparently.  The recorded calls and, of course, Balboa

10   knew the calls were recorded.  They were recorded calls and the

11   e-mails.  They were sent from his work e-mail.  Did you think

12   they were going to blow up and disappear?  What you would

13   expect to see is Balboa getting angry when those two guys

14   involved others.  What you saw when Balboa was asked to send

15   something to Gil no reaction and he complied and sent his

16   numbers to Gil.

17          What you would expect to see is Balboa getting angry

18   and frustrated when Pratt pulls out.  What you got was the

19   opposite of that, no consequences, whatsoever, to that.  Mint

20   stays as a client of Millennium.  What you would expect to see

21   if the scheme ends in October of 2008 or April as it were for

22   Mr. Pratt communications end.  What you get here is these guys

23   continuing to do introductions doing new business deals and

24   going on and so forth.

25          THE COURT:  Four minutes left.

1              MR. TACOPINA:  Thank you, your Honor.  I could list 50

2     reasonable doubts in this case for you.  I tried to spend two

3     hours talking to about a lot of them.  This is a quick hit

4     list.  Any one of these is enough.  Michael Balboa's

5     involvement in the valuation processes was disclosed to

6     investors.  Balboa never asked or agreed with De Charsonville

7     or Pratt to inflate the value.  That's a fact.  Balboa never

8     had a negative reaction when Pratt no longer wanted to give

9     counter-party marks.  Pratt and De Charsonville conducted due

10    diligence on Balboa's pricing.  That wouldn't make sense.

11    Pratt tries to conduct business after the scheme.  GlobeOp

12    never questioned Balboa on these prices once until October.

13    And when he did there was not any kickback from Balboa or

14    anyone else.  That's when the fund was being liquidated.

15    Others at Millennium would check Balboa's pricing.  It wasn't

16    Balboa in his only little fund in his basement.  Not one penny

17    of performance -- ever point for the increase of warrant is

18    nothing for his pocket.

19              These charts and grafts that you saw were so distorted

20    that even the judge is going to instruct you on good faith and

21    I need you to please let's come to the end of it.  What you are

22    going to hear is good faith on the part of Mr. Balboa is

23    complete defense to all the charges against him.  Please listen

24    carefully when you hear the judge mention good faith in the

25    charge.

DCHAABAL4                    Summation - Tacopina

1            The government is going to go last they are going to

2       get rebuttal.  Again, that's because they have the burden.  I

3       can't respond to them but you can on my behalf but you could

4       think what my response would be based on the evidence.  You are

5       now at the point when we're done here today that you are going

6       to pass on Mr. Balboa's reputation, his future.  It's important

7       that you do this as perfectly as possible.  With complete

8       independence, with nothing to influence or control your inner

9       guidance and your conscience.  You took these oaths that I know

10      you took seriously.  And these oaths are taken to uphold the

11      Constitution and the laws of this country and government.

12           The prosecution has a heavy burden to prove a case

13      beyond a reasonable doubt against one of its citizen.  And if

14      you hold them to that heavy burden in this case and you are

15      really satisfied with your verdict, we will be too.

16           It's been my privilege to represent Michael Balboa

17      and, obviously, it was an important moment in his life and I

18      would like to thank him for putting his confidence in me at

19      this time.

20           Years from now folks when you are laying in bed or on

21      an airplane or something when you are contemplating what you

22      went through here, what you do here can never be undone, so

23      gives us the attention and the seriousness it deserves because

24      there is no turning back the hands of time.  You can't say you

25      know what?  That didn't make sense.  You know what?  I don't

DCHAABAL4                    Summation - Tacopina

1   feel right relying on the words of people that didn't read the

2   documents before they came in here to tell me what those

3   documents meant.  I can't rely on the testimony of witnesses

4   who turned 180 degrees to avoid sitting where he is sitting

5   right now.  Or if you just get a feeling that something is

6   missing or something is not right, that is reasonable doubt

7   coming out live and well.  I beg you to end this nightmare on

8   behalf of Mike Balboa and thank you for your patience.

9            And, your Honor, thank you.

10           THE COURT:  Thank you, Mr. Tacopina.

11           Why don't we take a ten minute recess and we'll then

12  finish up with the government's rebuttal.

13           (Jury not present)

14           THE COURT:  We'll resume as close as we can to one

15  o'clock.

16           MR. MILLER:  Your Honor, I have 35 minutes.  Is that

17  correct?

18           THE COURT:  I think Mr. Cowley went from 9:07 to

19  10:37.

20           MR. COWLEY:  We clocked it at an hour and 27 minutes.

21           THE COURT:  30 minutes.

22           (Recess)

23           (Continued on next page)

24

25

DCHUBAL5                        Rebuttal - Mr. Miller

 1            (Jury present)

 2            THE COURT:  All right, Mr. Miller.

 3            This is the government's rebuttal.

 4            MR. MILLER:  Thank you, your Honor.

 5            Everyone is lying.  The exhibits are lying.  The

 6    recordings with the defendant's own words are misunderstood.

 7    It is all one big frame job by the government.

 8            This is what defense counsel wants you to believe, but

 9    as we showed in our closing statement, the evidence of the

10    defendant's guilt is uncontroverted.  When Mr. Cowley spoke

11    with you, he took you through methodically, the evidence

12    showing that the defendant conspired or agreed with others to

13    undermine the independent valuation process and inflate the

14    price of the Nigerian warrant.  And he also showed you how the

15    defendant undermine the independent valuation process and

16    inflate the prices of the Nigerian warrant in Millennium's

17    hedge fund.

18            Mr. Tacopina tries to make this case much more

19    complicated than it actually is.  And I will get to his

20    arguments in a moment, but I want to say a few things

21    generally.

22            Now, the defense has no burden.  The government has

23    the burden of proving the defendant guilty beyond a reasonable

24    doubt.  We are happy to accept that burden.  We believe that we

25    have met it.  But when a defense lawyer makes arguments to you,

DCHUBAL5                    Rebuttal - Mr. Miller

1    you are allowed to use your common sense to scrutinize those

2    arguments.  I would like to do that right now.

3          Throughout this trial, the defense, in cross-examining

4    witnesses and in direct examination of witnesses would say X,

5    with one witness and then try to seem like it is not X with the

6    next.

7          You can consider this in determining whether those

8    argument are credible to you, whether they are able to

9    withstand scrutiny.

10         Right at the top, I want to address a couple of things

11   that Mr. Tacopina just did.  And when he was explaining to you

12   over the last couple of hours of what witnesses testified to.

13   He would say generally this witness said this or this witness

14   said that.  We encourage you to go back and look at the

15   testimony because much of what Mr. Tacopina just said is

16   absolutely inaccurate.

17         Just to give you two quick examples and then I am

18   going to walk through the arguments.

19         First, with respect to Mr. De Charsonville, you heard

20   Mr. Tacopina just say that Mr. De Charsonville testified that

21   he saw the excess collateral account on Bloomberg in 2008.  Not

22   true.  In fact, Mr. De Charsonville testified that he thinks

23   that he looked at in 2010.  He never said 2008.  And that makes

24   sense and I will get to that a little later, but that makes

25   sense considering the fact that that is when he received

DCHUBAL5                    Rebuttal - Mr. Miller

1   Mr. Balboa's write-up showing, as we all know, that Mr. Balboa

2   was lying and trying to get his lies out to Millennium and to

3   the investigators.  That's why he was saying that.  That's why

4   Mr. De Charsonville said that, and he didn't say 2008 -- never

5   did.  In fact, I asked him that question to make sure and he

6   confirmed on the record.  Your recollection controls and you

7   have access to the testimony.

8          Second, Ms. Gibson-Stark.  You just saw Mr. Tacopina

9   during his closing put up a segment where Ms. Gibson-Stark said

10  that you can't talk to counterparties.  Well, she clarified

11  that.  She wasn't saying that he could never call up and

12  express his opinion and say how are you doing to a

13  counterparty, of course not.  She clarified it right after that

14  snippet that Mr. Tacopina just showed you.  She said that he

15  could talk to them.  He could express his opinion.  But what

16  can't he do?  He can't direct them, especially when Mr. Balboa

17  knew that Mr. De Charsonville and Mr. Pratt had no idea, no

18  clue what the prices were.

19         Finally, just in terms of a general overview here, Mr.

20  Tacopina likes to point to the documents.  And it was

21  interesting because in his opening statement he said that you

22  are going to see from the government plucking out statements

23  from documents.  And in fact that's what you have seen from the

24  defense.

25         Indeed, there is no ambiguity here.  This case is not

DCHUBAL5                    Rebuttal - Mr. Miller

1    about contractual interpretations.  This is not a law school

2    class.  This is about what actually happened between people on

3    recording and emails.  It is not about trying to interpret

4    documents.  The documents that you have seen, the DDQs and the

5    offering memos are absolutely 100 percent clear.  I will get to

6    that in a moment.

7            Let me break this case down quickly.  As you saw, Mr.

8    Balboa lied about the price of the warrant, the process and he

9    covered up those lies.

10           First, with respect to the price, you know that the

11   highest price of a Nigerian warrant between 2007, 2008 was

12   $258, and Mr. Balboa knew that.

13           You heard throughout this entire trial including in

14   opening and closing statements by Mr. Tacopina, Mr. Balboa is

15   an expert.  Well, is he is an expert or is he not?  Because if

16   he is an expert, he certainly knows what all of these prices

17   are and it makes no sense that these prices are at 258 and that

18   he is pushing these prices to 3,500 and 4,000 dollars to Mr. De

19   Charsonville to feed to GlobeOp to value the funds.  You know

20   that he knew what these offers were, not only did he get 26

21   emails with these offers -- by the way, a good percentage of

22   which were not subject to call -- which I will get to that in a

23   minute.  He replies to them, so you know that he knows where

24   this is being priced at, and the prices were on ALL-Q on

25   Bloomberg.  Mr. Balboa, the expert, as you heard testimony

DCHUBAL5                      Rebuttal - Mr. Miller

about, financial professionals look at Bloomberg.  Mr. Balboa,
the expert, obviously, was on Bloomberg looking at this
instrument.  ALL-Q was accessible to him as a client of Exotix,
so he saw what these prices were.  And you saw also that the
prices that were on ALL-Q match up with the price that
Mr. Balboa knew to be true -- 200-some-odd dollars, not 3,000,
4,000 dollars.  There is no reason to price this warrant 18
times where it was traded at, what the prices were, especially
given the price cap.

        And witness after witness, including witnesses that
have no dog in this fight like Mr. Knapp and Dr. Muhtar told
you, it makes no sense to price those things that high because
there was no collateral in the warrant.  You know this from the
witnesses.  You know this from the information memorandum which
is clear as day and from Bloomberg.  Balboa, the expert, knew
this.

        The process.  You also know that Mr. Balboa lied to
investors about the process.  You know that Balboa used De
Charsonville and Pratt to feed inflated prices to GlobeOp.  You
know that contrary to what Mr. Tacopina has told you,
everything was not done in the open.  Things were hidden from
GlobeOp, and we saw a myriad of emails and the recordings and
you heard evidence that Balboa didn't even realize that BCP's
calls were being recorded and flipped out when
Mr. DeCharsonville told him that.

DCHUBAL5                        Rebuttal - Mr. Miller

1            Further, you knew that Balboa knew that De

2       Charsonville and Pratt had no clue what the real prices should

3       be and what the justification was for them.  They told Balboa

4       that in emails and conversations.  You have written documentary

5       evidence to corroborate that.  And investors relied on the

6       independence of the process.  Remember, GlobeOp valued the

7       portfolio.  Counterparty marks are final.  There are no manager

8       marks.  That is a key point.  That was in all of the DDQs.

9            As I said in the opening statement, you cannot tell

10      investors things are independently valued and then behind the

11      scenes direct the marks, not raising issues or objections, but

12      directing them.

13           Finally, the cover-up in 20008, Mr. Balboa is pushing

14      Mr. Pratt to sign that audit documentation that is clearly

15      false.

16           In 2010, after investigations commenced, he is feeding

17      De Charsonville his reported justifications for his

18      outlandishly inflated prices, justifications that we have

19      proven are not only without reason but are false as Balboa, the

20      expert, knew.  Indeed, he feeds these cover-up information

21      including the damning emails right up to 2011 after the

22      investigation has already commenced.

23           Finally, you saw Mr. Nesti.  Mr. Balboa didn't select

24      Mr. Sequeira or UBS.  Who did he go to when he wanted somebody

25      to feed over those prices claiming to be their own, years after

DCHUBAL5                    Rebuttal - Mr. Miller

1  the fact to be their own?  Mr. Nesti, and you don't have to

2  take his testimony for that.  You can look at the emails.  They

3  are clear as day.  The government has clearly proven

4  Mr. Balboa's guilt beyond a reasonable doubt.

5        Mr. Tacopina ignores the recordings.  He ignores these

6  emails saying that De Charsonville and Pratt have no clue about

7  these prices, and he mitigates the importance of the cover-up

8  which you all know why it is extremely important.

9        I want to say a couple of things about and respond to

10 a couple of quick points that Mr. Tacopina raised in his

11 closing and then I want to go to a couple of themes.

12        First, the investors read the documents.  Some of

13 these guys had teams of due diligence teams who went and looked

14 and reported that, and you heard testimony about that.

15        You also heard testimony from Mr. McNally and others

16 that were personally invested -- not just retirees' money,

17 pension moneys, but also their personal investment and they

18 looked at the documents.

19        That whole handwritten notes "valuation -- Michael

20 Balboa" we have no idea what that means and there is no

21 evidence to substantiate that means that Mr. Balboa valued the

22 fund.  In fact think about that argument because this is an

23 important argument that Mr. Tacopina likes to make over and

24 over again, particularly both in opening and closing.  If

25 Mr. Balboa was entitled to value these marks, then wouldn't

this make this fund and internally marked fund where manager

marks are permissible?  Yet every single piece of paper says

this fund, manager marks are not used, GlobeOp does the final

valuation.  So the defense will say, when it suits them,

manager marks are OK.  But then they will say that GlobeOp is

the one that finally does the valuing, it is OK for Mr. Balboa

to give opinions.  That inconsistency is something that you can

consider in evaluating defense arguments.

        To dispense with the red herring, we don't have a

problem or a dispute with the fact that Mr. Balboa could give

his suggestions or his objections.  What he can't do is use two

people that he knows have no clue what the prices are to need

his outlandishly inflated price 10 to 18 times the actual

trading price to bump up the value of the NAV.

        In terms of the charts, I don't want to spend a lot of

time on this, but blue or red, it is 10 percent and 10 percent

of the NAV is not only a substantial incentive for Mr. Balboa

to commit fraud, it has actually a material effect on the fund.

        The whole idea that we are doing some Monday morning

quarterbacking, I think Mr. Tacopina said, with respect to the

information is also another red herring.

        The subpoenas are issued by the United States

Government.  The United States Government doesn't dispense with

the fact that Mr. Balboa, the expert, had access to the email

that he got, the Bloomberg pages, yada, yada, yada.  So,

DCHUBAL5                    Rebuttal - Mr. Miller

1   ultimately, the chart that says actual known trading prices,

2   that is because those were the offering emails that were sent

3   out, the prices on ALL-Q, the things that Mr. Balboa knew of

4   and got.

5            With respect to Government Exhibit 204, that shows

6   that Mr. Balboa knows that the Nigerian warrant can't be valued

7   higher than 250, 280 dollars during this period.  Yes, it was

8   in 2007, but think about that for a second.  Either there is

9   collateral in Mr. Balboa's mind or there is not to this

10  warrant.  If there is collateral in mind, and you know that is

11  not true from the overwhelming evidence, then in early 2007, he

12  should be actually pricing the warrant even higher than 3,000

13  4,000 that he is pricing in late 2008.  Why?  Because there are

14  more payments that are left.  Early 2007 is earlier in time

15  than late 2008 and you got until 2020 to get payments.  So

16  that's how you know this makes no sense.

17           So ultimately and finally, on the audit issue, the

18  audit was not of the 2008 valuations and you heard that

19  testimony.  It was not of the hedge fund either.  The fact that

20  the audit didn't catch Mr. Balboa's fraud is proof of nothing.

21           Look, I am not going to be able to cover every single

22  argument of Mr. Tacopina's.  Let's walk through a couple of key

23  points.  Obviously, Mr. Tacopina spent a considerable amount of

24  time calling Mr. De Charsonville, Mr. Pratt, Mr. Nesti -- the

25  insiders -- liars.  They have to do this because their

DCHUBAL5                    Rebuttal - Mr. Miller

1   testimony is just too damaging for the defense.  They want you

2   to believe that they are not telling the truth on the stand

3   and, therefore, the defendant is not guilty, but that is wrong

4   for several reasons.  First, the insiders actually have the

5   utmost incentive to tell you the truth and we will get to that

6   in a second.  We will get to that in a second.  Second, they

7   are corroborated.  And you from the emails and recordings, they

8   are corroborated.

9        Third, as I will show, even without Mr. De

10  Charsonville, Mr. Pratt's testimony on the stand, you still

11  know that the defendant is guilty beyond a reasonable doubt.

12  You know this from the emails.  You know this from the

13  recordings.  In fact, we submit to you that we have proved a

14  conspiratorial agreement which I will get to in a second.  Even

15  if you find there was one, and you should, there is no question

16  beyond any reasonable doubt, much less any doubt at all, that

17  Mr. Balboa used Mr. DeCharsonville and Mr. Pratt to feed his

18  prices through and to falsely inflate the NAV.  So even if you

19  weren't to find conspiracy -- and you should -- he is certainly

20  guilty of all of the substantive counts in the indictment.

21       Keep in mind, of course, who picked these guys as part

22  of this conspiracy.  Mr. Balboa.

23       Look, it would be nice if only upstanding citizens

24  came to testify on behalf of the United States Government as

25  insiders but, unfortunately, that is not the way it works

DCHUBAL5                    Rebuttal - Mr. Miller

1  because those aren't the people who actually commit the fraud

2  with people who are accused of committing fraud.

3            Ultimately, Mr. Tacopina can talk about the

4  government's motives all it wants to, but if these guys were

5  lying, their agreements get torn up and they know that.  Mr.

6  Tacopina, well, we are the ones determining the truth, well,

7  the thing is that these guys had no idea, no clue, if you will,

8  whether they were going to get non-prosecution agreements when

9  they walked through our door.  Common sense tells you that.

10  They weren't promised anything, they told you that.  So if they

11  come in and they lie, they are getting nothing and they are

12  getting prosecuted, so they have the utmost incentive to get on

13  the stand and tell the truth.

14            Ultimately, if they were lying wouldn't they have come

15  up with better lies?  For example, if they were lying, wouldn't

16  they say that they had meetings where Mr. Balboa admitted

17  everything to them and they all sat away a table and discussed

18  this, as Mr. Tacopina likes to refer to.  Oh, know, that's not

19  what happened.  So they would come up with better lies if they

20  were actually lying.

21            And, ultimately, if, they were lying, for example,

22  even about the cover-up aspect.  Do you think Mr. De

23  Charsonville would have gotten on the stand and said, I can't

24  remember when I got the damning emails, if it was at this

25  meeting in London or another meeting.  Why would he say it was

DCHUBAL5                    Rebuttal - Mr. Miller

1    at that lunch meeting, and then say, by the way, at that lunch

2    meeting, Mr. Balboa said he was really worried about all of the

3    fraud that we committed.  When Mr. De Charsonville had that he

4    saw collateral for the warrant on the Bloomberg in 2010.  Think

5    about that for a second.  You know from the witnesses and the

6    warrant, everybody told you cold, no question, there is no

7    collateral.  And Mr. Balboa, the expert, clearly knew that.  So

8    it is clear that Mr. De Charsonville, who is a salesman not an

9    analyst or trader, is just mistaken and he is saying that based

10   on the writeup he got in 2010.  Remember he testified 2010, not

11   2008.

12        Indeed, it is crystal clear in his testimony that he

13   didn't see anything for the warrant in 2008 and you know from

14   the mountain of evidence there was no collateral on Bloomberg

15   in 2008 and 2010.

16        Of course, don't forget about Mr. Pratt who told you

17   he wanted to stop doing any business, but then all of a sudden

18   now he is not passing the prices on anymore in 2008, but then

19   Mr. Balboa wants him to sign the audit request forms and he is

20   pushing him, and he is pushing him and he is pushing him.  And

21   Mr. Pratt -- you can assess his demeanor yourself -- relented.

22        Ultimately, as to the reasons why these witnesses were

23   offered the kind of agreements they have, that is not what this

24   is about.  The judge will tell you, that the reason the

25   government made certain agreements with witnesses is not a

DCHUBAL5                    Rebuttal - Mr. Miller

1    proper concern for the jury.  You are here to decide United

2    States v. Michael Balboa, the man who is accused of committing

3    the crimes charged.  Don't let other issues distract you.

4           As I say, of course, the cooperators are the

5    corroborated.

6           With respect to the conspiratorial agreement issue,

7    Mr. De Charsonville's testimony and Mr. Pratt's testimony was,

8    this was obvious.  There was no reason -- you will hear from

9    the judge in jury instructions that you don't need an explicit

10   agreement to form a conspiracy.  It could be implicit.  It

11   could be obvious.  This was obvious.  Remember, of course,

12   Government Exhibit 873.  I have no idea what Mr. De

13   Charsonville is telling Mr. Balboa, or Government Exhibit 1155,

14   Mike, I last sent 2750 to 3200, what should I send now?  Then

15   Pratt, of course, tells you in multiple conversations with

16   Mr. Balboa where he said, I have no clue what the prices are.

17          It can be obvious.  It doesn't need to be expressed

18   explicitly.  You know Balboa is lying from the offer emails he

19   got, the one he replied to, the ALL-Q prices.

20          Don't forget Mr. Knapp's testimony where he says --

21   the question was:  If somebody tried to tell you the Nigerian

22   warrant for $3,000 in September 2008, what reaction would you

23   have?

24          He said, I am confused because that bears no

25   resemblance to reality.

DCHUBAL5                    Rebuttal - Mr. Miller

1          On this missed Bloomberg messages, you saw he relied

2     to them, but anyway you also know there are search functions in

3     Bloomberg.  And by the way, Mr. Howard never testified about

4     the scrolling Bloomberg messages.  What he said he never used

5     Bloomberg messages.

6          On the collateral issue, Mr. Cowley walked you through

7     that.  Dr. Muhtar's testimony is clear.  The only collateral is

8     for the bonds and that ended in 2006 and the bonds were

9     retired.  This whole excess account, and they showed you a

10    demonstrative on that, in fact it came 10 years later.  And

11    whenever there were disbursements of it, the press reported it

12    so that people knew, this was where it coming from and it has

13    nothing to do with collateral.  Mr. Balboa, the emerging market

14    specialist, knew that.

15         Pari passu, which you saw a little bit about, as the

16    witnesses told you, absolutely nothing to do with this.  The

17    warrant does not have any collateral.  The documents and the

18    witnesses are clear.  Think about this.  If there is no

19    collateral for the warrant and you know there isn't, then

20    Balboa's inflated prices have no basis in reality, so you know

21    that the prices he fed to De Charsonville and Pratt who have no

22    clue what the prices should be, and Balboa knew they had no

23    clue, especially after they responded so quickly saying I don't

24    know, I don't have a clue -- these were passed on to GlobeOp.

25    So you know he did this.  Mr. Balboa did this to inflate the

DCHUBAL5                    Rebuttal - Mr. Miller

1  NAV and get higher fees.  That shows he is guilty.

2          Let me walk through this $30 million issue.

3          Defense counsel wants you to believe that in July '08.

4  Balboa caught a $30 million error.  If he did this, he doesn't

5  have the guilty mind to inflate the NAV.  Remember, NAV can be

6  inflated.  The incentive is the management fees also, not just

7  the performance fees.  This argument has no basis in reality.

8          First, defense witness Ms. Molberg, who testified that

9  Balboa caught an error, actually admitted on cross-examination

10  she had no personal knowledge of this and testified based on

11  what someone reportedly told her.

12          Ms. Gibson-Stark, the compliance officer from

13  Millennium told you who caught this error.  Balboa didn't catch

14  any error and, also, he admits it in Defense Exhibit A.  It was

15  my error.  How else do you know that he didn't catch anything?

16  He was on vacation.  How else do you know Ms. Gibson-Stark was

17  right when she said that GlobeOp caught the mistake?  Also from

18  DX A itself.

19          Look, at the July 29th email from Dianna Raedle to

20  Balboa saying investors were wondering why we didn't send out

21  another estimate that would have given them a warning rather

22  than just receiving a statement with such a large change.

23  Investors were wondering why the final statement with the final

24  NAV that GlobeOp put together showed things were not doing well

25  because Balboa's estimates painted a different picture.  Take a

DCHUBAL5                    Rebuttal - Mr. Miller

look at Ms. Gibson-Stark's response.  The response is, we need
to discuss a coordinated response to investors.  Balboa didn't
catch anything, GlobeOp did.  You know there was no good faith
here.

          What did Balboa do in response to this $30 million hit
for the June 2008 statement?  He jacked up the prices of the
Nigerian warrant twice for July 2008 by over $1,000 he is
feeding it to De Charsonville to cover the loss in August 5,
2008.  Preliminary projections show that the fund is doing
badly, minus 4.5 percent.  What does Balboa do the next day?
Gilles, do it very wide, 2650 by 3680.  And that is not enough.
On August 12 he emails GlobeOp to ask them to query BCP, again.
Then what happens, jacks up the price.  He lessens the blow to
the funds bleeding for July '08.  You can see that from
Government Exhibit 6007

          Ladies and gentlemen, not only does Balboa's action on
this $30 million ruble issue tell you that he is acting in bad
faith, it is another demonstrable piece of evidence from
Balboa's own words on paper that he is engaged in fraud to
inflate the fund's performance.

          You know with respect to this Nigerian warrant
liquidity issue that people who testified on the stand that it
was not highly illiquid that it was somewhat illiquid.  But
putting that all aside, you got the trades.  He knew what this
was trading at and it was all within a very narrow band

1    width -- the 200 range not 3, 4,000 dollars.

2          The whole idea that GlobeOp being asleep at the switch

3    somehow mitigates Mr. Balboa's guilt is also a red herring.

4    They may have been asleep at the switch, doesn't mean that Mr.

5    Balboa committed the fraud.  On the contrary it shows how

6    easily he was able to commit this fraud.  You also heard

7    Mr. Greaves tell you during GlobeOps there was a separation of

8    functions and they didn't basically integrate everything until

9    much later.

10          Finally, on this thin line with respect to De

11   Charsonville, Mr. Tacopina didn't show you this quote.  This is

12   actually what Mr. De Charsonville said and that is, there is no

13   thin line with respect to the Nigerian warrant.  This case does

14   not come down to verbiage and contract interpretations.  This

15   comes down to guys who didn't know anything about the price and

16   Mr. Balboa using them to inflate the NAV.

17          On this directors and delegate issue, you have seen

18   Government Exhibit 1A -- there are two or three different

19   places.  Not only is he not a director, he is not a delegate

20   either.  You saw that from the fact that a delegate to GlobeOp,

21   indeed not on just that page, that was 30-some-odd pages later

22   but it talks about the fact the directors or their delegate

23   will seek to obtain a quotation from at least two independent

24   investment banks.  Who was doing that?  GlobeOp was getting the

25   counterparties.  You can assess Mr. De Charsonville's

DCHUBAL5                      Rebuttal - Mr. Miller

credibility for yourself on this delegate issue.  Bottom line,

manager marks weren't even supposed to be used, so what are we

even talking about here?

          And that oversight issue, obviously, Mr. Cowley

explained to you.  Of course he was able to have objections and

raise concerns.  He can't direct people from behind the scenes

and tell all of the investors, it is independently valued.

          On the model issue, you have no proof in the record

that Mr. Balboa had any kind of model on the Nigerian warrant

but, more importantly, you have evidence and testimony, I

believe from Mr. Knapp, that this wouldn't be higher on the top

end because the thing was capped, the Nigerian warrant.

          On Manuel and Goddard, to clear up some things,

Mr. Goddard didn't know that Mr. Pratt was just passing on

Balboa's prices.  Pratt told you that.  Manuel was not contrary

to what Mr. Tacopina was saying, the records shows you he was

not an emerging market specialist.  He was not a Nigerian

warrant expert.  In fact you heard testimony to the contrary,

he was just a junior trader who had no clue about the prices of

the Nigerian warrant.  In fact, Mr. De Charsonville was giving

prices to Manuel to feed on to GlobeOp doesn't mean that Manuel

knew there was any kind of conspiratorial agreement.  Mr.

Cowley walked you through on the subject, you saw all the firm

offers.  Bloomberg and ALL-Q, again, shows clear as day and

Mr. Cowley showed you through that, that it says unsecured, no

DCHUBAL5                      Rebuttal - Mr. Miller

1    collateral, yes; secured, no.

2             Finally, incentives and compensation.  You have heard

3    a lot about this.  The fund was actually on the uptick, August

4    2008.  You saw that from the newsletters.  But Mr. Balboa got a

5    performance fee in early 2008.  That's his incentive.  And not

6    even just the performance fee, he gets a management fee that is

7    based not on profits, based on NAV which is a larger number to

8    begin with.  His incentive is clear.  By the way, even if he

9    didn't get one dime from his fraud, much less the $8 million

10   that he got in 2008, He didn't get one dime, he is still guilty

11   of the crime; just because you are not successful at a crime,

12   doesn't mean that you have not committed one.

13            This gross versus NAV thing is also a red herring.

14   You saw that the NAV is important.  Every person on the stand

15   here told NAV is how you gauge performance, even

16   Mr. Charlesworth said that.  Performance is what investors look

17   at when they are investing money and that's the percentage that

18   Mr. Balboa's fees were based on.

19            Finally, ladies and gentlemen, you know Mr. Tacopina's

20   story doesn't make any sense and you know the government has

21   proven beyond a reasonable doubt because of the defendant's own

22   words here, the insiders' response to Mr. Balboa's commands, so

23   Mr. Balboa knew that they had no idea, no clue what the prices

24   were.  Mr. Pratt quit.  He quit the conspiracy and that was, of

25   course, of course after he had a lot of pressure put on him to

DCHUBAL5                        Rebuttal - Mr. Miller

1    sign that false audit paperwork.

2             Mr. Balboa is the expert.  You have heard that time

3    and time again.  He knows these prices are vastly inflated.

4             Fifth point, there were no additional sales and

5    purchases by Mr. Balboa after those initial ones come March

6    '07.  If he actually believes what Mr. Cowley showed you, that

7    those prices were actually that high, he would have brought at

8    200-some odd dollars.

9             Joe Strubel, he didn't buy -- Joe Strubel ran a

10   completely different fund.  That's in the record.  You know

11   that.  It was not as if he is micro-managing Mr. Balboa on a

12   completely different fund.

13            Sixth point, the cover-up, which I have discussed.

14   That is clear.  Ultimately, ladies and gentlemen of the jury.

15   When all is said and done you know the defendant is guilty

16   because the recordings don't lie.  The cooperator's testimony

17   is all corroborated.  And indeed, while we have proven to you

18   conspiracy existed beyond a reasonable doubt, the existence of

19   one is not even necessary for the substantive charges of

20   securities fraud, wire fraud and investment advisor fraud.  It

21   was shown that Balboa used DeCharsonville and Pratt as his

22   mouthpieces.

23            Third, the email and documents which are clear as day

24   and show Manager marks are not used hear.  The fund is

25   independently valued.  That's what investors were told but that

DCHUBAL5                      Rebuttal - Mr. Miller

1     is not what happened here.

2                 THE COURT:  Mr. Miller, you have to bring it to a

3     close.

4                 MR. MILLER:  I am.

5                 Finally, the cover-up.  So what did the defendant do?

6     He conspired or agreed with others to commit securities fraud

7     and wire fraud, and the defendant in fact committed securities

8     fraud, wire fraud and investment advisor fraud.  You know  this

9     from all the evidence.  You have the whole picture of what

10    happened in this case from beginning to end.

11                Ladies and gentlemen of the jury, don't let the

12    defense counsel fool you.  Use your common sense.  And if you

13    do, we submit the defendant's guilt has been proven to you

14    beyond a reasonable doubt by this evidence.  And, accordingly,

15    we ask that you return a verdict of guilty as to all the counts

16    of the indictment.

17                Thank you.

18                THE COURT:  We will take our luncheon recess.  Lunch

19    is served in the jury room.  When you are ready, hopefully

20    around 2 o'clock, we will resume with the jury charge which

21    will take about an hour and a half.

22                (Jury not present)

23                THE COURT:  When I start my jury charge, my request is

24    that everyone get in their seats and stay there and not

25    shuttling back and forth.  It is a distraction for the jury.

DCHUBAL5                    Rebuttal - Mr. Miller

1   If you are getting drinks and so forth, get it all in

2   beforehand.  I want you to stay in your seats.

3              Did you have something to say.

4              MR. COWLEY:  I talked to defense counsel but I assume

5   they would agree to an instruction about prior proceedings.

6   Since we proposed.

7              THE COURT:  Did you see it, Mr. Tacopina?

8              It is relatively innocuous.

9              MR. TACOPINA:  Yes, your Honor.

10             MR. DUBIN:  Is it your Honor's intention to release

11  the two alternates after the charge?

12             THE COURT:  Not this charge.  Excuse them?  They may

13  be called back later on.  Is that what you are asking?

14             MR. DUBIN:  My next question, if you discharge them --

15             THE COURT:  I think it is in the jury charge I

16  circulated.  You notice I say "excuse" you, not "dismiss,"

17  because that's what I say in jury charge because there may be

18  circumstances under which they would be called back.

19             MR. TACOPINA:  On this issue of the prior proceedings

20  language, I just don't want it to appear that -- for instance,

21  it almost appears that they are not to consider anything about

22  the prior proceedings, meaning that there was impeachment from

23  prior testimony.  Maybe it doesn't read that way to you or I.

24             THE COURT:  You know, Mr. Tacopina.  We all slipped.

25  I don't know if you slip.

DCHUBAL5                        Rebuttal - Mr. Miller

1            MR. TACOPINA:  I guess I did.  No.  I guess I this

2      trial.  This trial.

3            THE COURT:  I think this is neutral.  If you want to

4      suggest other language, let me know.

5            MR. TACOPINA:  It is fine.

6            MR. DUBIN:  We talked about this last night when we

7      got this.  The only concern that we have, your Honor, is that,

8      as the Court knows, there were various instances where we were

9      impeaching with the transcripts of the prior proceedings.  And

10     I just doesn't want there to be somehow a juror singled out

11     saying, well that's our concern.

12            Let us think about it over lunch.  I will take your

13     suggestions.

14            (Luncheon recess)

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DCHUBAL5b

```
 1                    A F T E R N O O N   S E S S I O N

 2                                           2:10 p.m.

 3              (In open court, jury not present)

 4              THE COURT:  Anything else?

 5              MR. COWLEY:  We deliberated about the prior

 6    proceedings instruction.  In terms of the draft that you have,

 7    the parties are in agreement that if you take out the third

 8    sentence, "they are of no concern to your deliberations during

 9    the trial," just delete this sentence.  And everyone is OK with

10    that.

11              One other nit that the parties --

12              THE COURT:  Hold on.  There is another spot in this

13    charge that responds to Mr. Dubin about prior inconsistent

14    statements.  So I strike out "they are of no concern in your

15    deliberations during this trial."

16              MR. COWLEY:  Correct.

17              And the other nit that the parties agree to be changed

18    is on page 30.

19              THE COURT:  Yes.

20              MR. COWLEY:  There is a reference to the word "stock."

21    It is the sentence that starts in the second full paragraph,

22    "The fraudulent conduct involved the purchase or sale of

23    stock."  If you could say the "purchase or sale of securities"

24    instead of stock.

25              THE COURT:  OK.
```

DCHUBAL5b

1          MR. COWLEY:  That is it on consent.  I understand that

2     they may have another issue to raise.

3          THE COURT:  Just a minute.

4          (Pause)

5          THE COURT:  Mr. Seigel.

6          MR. SEIGEL:  As the Court is aware, there is only one

7     particular security that the government claims was overvalued,

8     but on page 18, the second paragraph, second line, the

9     statement is that, "that is, Mr. Balboa had an understanding

10    with others to deceive investors, fund investors and company

11    and government investigators about the process used to value

12    certain assets in Mr. Balboa's investment portfolio and/or the

13    value of those assets."

14          The concern here is that by reference to "assets" in

15    the plural, it may cause the jury to think that there were

16    other securities besides the warrants.  So my suggestion would

17    be that we change "certain assets" to a "particular security."

18          MR. COWLEY:  We disagree.  The representations that

19    were made was as to how "assets," plural were valued.  I think

20    they even tried to elicit from Mr. Charlesworth, for example,

21    that there was some type of exception that applied for illiquid

22    assets across the board.  For those reasons we think

23    pluralizing it is appropriate.

24          THE COURT:  I think that I am going to leave it the

25    way it is.

DCHUBAL5b

1          MR. SEIGEL:  Just for the record, it refers to two

2     types of deceptions.  One is the process used to value certain

3     assets.  I think that is what Mr. Cowley is speaking to,

4     however --

5          THE COURT:  I think it is very clear to this jury

6     based upon the summations, the only one we are concerned about,

7     Nigerian assets.

8          Call in the jury, Marlon.

9          MR. TACOPINA:  How long are we staying today?

10         THE COURT:  As long as the jury wants.  I will ask

11    them to let us know.  I don't know what their wishes are.  A

12    lot of them live upstate and it is snowing and they may want to

13    get home early.  I have no idea.

14

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Ladies and gentlemen, I told you at the

3    beginning how important your service is to our country and to

4    our system of justice.  You have been most conscientious in

5    your attendance, your punctuality, and the complete attention

6    you have given over the last two weeks and two days.

7            I am going to read these instructions to you now, but

8    I want you to know that I am going to send the instructions

9    into the jury room so that you can take notes but you don't

10   have to.  Indeed, you would be better off if you just listen

11   and get a sense of the entire direction.

12           I don't want you to single out any particular

13   instruction as alone stating the law, but you should instead

14   consider my instructions as a whole.

15           We are now approaching the most important part of this

16   case:  Your deliberations.  You have heard all of the evidence,

17   as well as the final arguments of the lawyers for the parties.

18   Before you retire to deliberate, it is my duty to instruct you

19   as to the law that will govern your deliberations.  As I told

20   you at the start of this case, and as you agreed, it is your

21   duty to accept my instructions of law and to apply them to the

22   facts as you determine them.

23           Regardless of any opinion that you may have as to what

24   the law may be or ought to be, it is your sworn duty to follow

25   the law as I give it to you.  Also, if any attorney or other

DCHUBAL5b                         Charge

1    person has stated a legal principle different from any that I

2    state to you in my instructions, it is my instructions that you

3    must follow.

4              Your duty as is to decide the factual issues in the

5    case and arrive at a verdict.  You, the members of the jury,

6    are the sole and exclusive judges of the facts.  You decide the

7    weight of the evidence; you determine the credibility of the

8    witnesses; you resolve such conflicts as there may be in the

9    testimony; and you draw whatever reasonable inferences you

10   decide to draw from the facts as you determine them.

11             In determining the facts, you must rely upon your own

12   recollection of the evidence.  None of what the lawyers have

13   said in their opening statements, closing arguments, questions,

14   or objections is evidence.  They are not sworn as witnesses;

15   they do not testify; they make arguments about what the

16   conclusions are that you should draw from the evidence or the

17   lack of evidence.  But as I said, that is argumentation, not

18   evidence.  And the same thing applies to me; anything I may

19   have said is not evidence.  I've allowed you to take notes, but

20   as I said earlier, your notes are not evidence.

21             The evidence before you consists of just two things;

22   the testimony given by witnesses that was received in evidence

23   and the exhibits that were in received in evidence, including

24   the stipulations of the parties.

25             Testimony consists of the answers that were given by

DCHUBAL5b                    Charge

 1   the witnesses to the questions that were permitted.  The

 2   questions themselves are not evidence.  It is the answers to

 3   the questions that count.  Remember, you may not consider any

 4   answer that I directed you to disregard or that I directed to

 5   be stricken from the record.  Also, as I instructed you at the

 6   beginning of the case, and I am sure you complied with my

 7   instruction, anything you may have seen or heard about this

 8   case outside of the courtroom is not evidence and must be

 9   entirely disregarded.

10          It is the duty of the attorney for each party to

11   object when the other party offers testimony or other evidence

12   that the attorney believes is not properly admissible.  Counsel

13   also have the right and duty to ask the Court to make rulings

14   of law and to request conferences out of the hearing of the

15   jury.  All such questions of law have to be decided by me.  You

16   should not allow any prejudice against any attorney or party

17   because the attorney objected to the admissibility of evidence,

18   or asked for a conference out of your hearing, or asked me for

19   a ruling on the law.

20          I am instructing you now that the testimony and the

21   documents that have been admitted into evidence are appropriate

22   for your consideration.  You may consider all the evidence that

23   has been admitted.

24          I also ask you to draw no inference from my rulings or

25   from the fact that upon occasion I asked questions of certain

DCHUBAL5b                    Charge

 1    witnesses.  My rulings were no more than applications of the

 2    law, and my questions were only intended for clarification or

 3    to expedite matters.  You are expressly to understand that I

 4    have no opinion as to what your verdict should be or what

 5    verdict you should render in this case.

 6          You are perform your duty of finding the facts without

 7    bias or prejudice as to any party.  You are to perform your

 8    duty with an attitude of complete fairness and impartiality.

 9    The case is important to both parties.  Mr. Balboa is charged

10    with serious crimes.  He has pleaded not guilty.  It is

11    important to the government, too; enforcement of government

12    laws is a prime concern of the government.

13          The fact that the prosecution brought is brought in

14    the name of the United States of America entitles the

15    government to no greater consideration than that accorded to

16    any other party.  By the same token, it is entitled to no less

17    consideration.  All parties, whether the government or

18    individuals, stand as equals before the Court.

19          It would be improper for you to consider, in reaching

20    your decision as to whether the government sustained its burden

21    of proof, any personal feelings you may have about Mr. Balboa's

22    race, religion national origin, gender, or age.  All persons

23    are entitled to the presumption of innocence and the government

24    has the burden of proof, as I will discuss in more detail in a

25    moment.  It would be equally improper for you to allow any

1   feelings you might have about the nature of the crime charged

2   to interfere with your decision-making process.

3          You are not to be swayed in any way by sympathy.

4   Rather, the crucial question that you must ask yourselves as

5   you review the evidence is:  Has the government proved the

6   guilt of Mr. Balboa beyond a reasonable doubt?

7          It must be clear to you that if you were to let bias,

8   prejudice, fear, disgust, sympathy, or any other irrelevant

9   consideration interfere with your thinking, there would be a

10  risk that you would not arrive at a true and just verdict.  So

11  you are not to be guided by anything but clear thinking and

12  calm analysis of the evidence.  Sympathy should play no role in

13  your deliberations.

14         You should also not consider any personal feelings you

15  may have about the attorneys who represented the parties in

16  this matter.  As I indicated at the beginning of the trial, the

17  lawyers and the other participants at counsel table have been

18  instructed not to have any communications with you as jurors.

19  If due to the congestion in the courthouse you ran into counsel

20  and they ignored you, they did so because they were supposed to

21  ignore you.  That's the rule.  This should not influence your

22  decision regarding Mr. Balboa's guilt or innocence in any way.

23         The question of Mr. Balboa's possible punishment is of

24  no concern to the jury and should not, in any sense, enter into

25  or influence your deliberations.  The duty of imposing sentence

DCHUBAL5b                         Charge

1    rest exclusively with the Court.  Your function is to weigh the

2    evidence, or lack of evidence, in the case and to determine

3    whether or not Mr. Balboa is guilty beyond a reasonable doubt,

4    solely on the basis of such evidence.

5         The defendant, Michael Balboa, was formally charged in

6    an indictment.  He is entitled to know the charges against him.

7    As I instructed you when the trial started, the indictment is

8    not evidence.  It merely describes the accusations made against

9    the defendant.  It may not be considered by you as any evidence

10   of guilt.  You are to give no weight to the fact that an

11   indictment has been returned against the defendant.

12        I will not read the entire indictment to you at this

13   time, as sometimes happens.  Rather, I will summarize the

14   offenses charged in the indictment and I will then explain in

15   detail the elements of the charged offense.  Before you begin

16   your deliberations, you will be provided with a copy of the

17   indictment.

18        Now, the law presumes Mr. Balboa innocent until proven

19   guilty beyond a reasonable doubt.  Mr. Balboa has entered a

20   plea of not guilty to the indictment.  As a result, the

21   government has the burden to prove his guilt beyond a

22   reasonable doubt.  This burden never shifts to Mr. Balboa for

23   the simple reason that the law presumes him innocent and never

24   imposes upon any defendant in a criminal case the burden or a

25   duty of calling any witnesses or producing any evidence.

1          In other words, Mr. Balboa starts with a clean slate.

2     He is presumed innocent until such time as you, the jury, are

3     unanimously satisfied that the government has proved him guilty

4     beyond a reasonable doubt.  If the government fails to sustain

5     this burden, you must find him not guilty.

6          I have said that the government must prove that

7     Mr. Balboa is guilty beyond a reasonable doubt.  And this

8     burden never shifts to Mr. Balboa; instead, it is always the

9     government's burden to prove beyond a reasonable doubt each of

10    the elements of the crimes charged.  Mr. Balboa has no burden

11    to prove himself innocent.

12         The question then is:  What is a reasonable doubt?

13    Well, the words almost define themselves.  It is a doubt based

14    upon reason.  It is a doubt that a reasonable person has after

15    carefully weighing all the evidence.  Proof beyond a reasonable

16    doubt must, therefore, be proof of such a convincing character

17    that a reasonable person would not hesitate to rely and act

18    upon it in the most important of his own matters.

19         A reasonable doubt is not a guess or a whim; it is not

20    speculation or suspicion.  It is not an excuse to avoid the

21    performance of an unpleasant duty, and it is not sympathy.  The

22    law does not require that the government prove guilt beyond all

23    possible doubt; proof beyond a reasonable doubt is sufficient

24    to convict.

25         If, after a fair and impartial consideration of all of

DCHUBAL5b                         Charge

1    the evidence, you have a reasonable doubt as to the guilt of

2    Mr. Balboa, it is your duty to acquit him.  On the other hand,

3    if after a fair and impartial consideration of all the

4    evidence, you are satisfied that the government has met its

5    burden of proving Mr. Balboa's guilt beyond a reasonable doubt,

6    it is your duty to convict.

7             Now, a few words about evidence.

8             In deciding whether Mr. Balboa is guilty or not

9    guilty, you may consider both direct evidence and

10   circumstantial evidence.

11            Direct evidence is evidence that proves a disputed

12   fact directly.  For example, where a witness testifies as to

13   what he or she saw, heard, or observed, this is called direct

14   evidence.

15            Circumstantial evidence is evidence that tends to

16   prove a disputed fact by proof of other facts.  To give you a

17   simple example, one that is used all the time in the

18   courthouse, suppose that when you came into the courthouse

19   today the sun was shining and it was a nice day, but now the

20   courtroom blinds are drawn and you cannot look outside.  As you

21   are sitting here, someone walks in with a dripping wet umbrella

22   and soon thereafter someone walks in with a dripping wet

23   raincoat.  Now, on our assumed facts, you cannot look outside

24   of the courtroom to see whether it is raining so you have no

25   direct evidence of that fact.

DCHAABAL6                      Jury Charge

1          THE COURT:  An inference is the deduction or

2    conclusion that reason and common sense prompt a reasonable

3    mind to draw from facts that have been proven by the evidence.

4    Not all logically possible conclusions are legitimate or fair

5    inferences.  Only those inferences to which the mind is

6    reasonably led or directed are fair inferences from direct or

7    circumstantial evidence in this case.  Whether or not to draw a

8    particular inference is, of course, a matter exclusively for

9    you to decide, as are all determinations of fact.

10         Many material facts, such as state of mind, are rarely

11   susceptible of proof by direct evidence.  Generally, such facts

12   are established by circumstantial evidence and the inferences

13   the jury draws from them.  The law makes no distinction between

14   direct and circumstantial evidence.  Circumstantial evidence is

15   of no less value than direct evidence, and you can consider

16   either or both, and can give them such weight as you conclude

17   is warranted.

18         There has been evidence that Mr. Balboa made certain

19   statements in which the Government claims he made admissions or

20   denials relevant to the charges in the Indictment.  Evidence of

21   these statements was properly admitted in this case and may be

22   considered by you.  You are to give the statements such weight

23   as you feel they deserve in light of all of the evidence.

24   Whether you approve or disapprove of the use of these

25   statements may not enter your deliberations.  I instruct you

DCHAABAL6                      Jury Charge

1    that no one's rights were violated, and the Government's use of

2    this evidence is entirely lawful.

3           You may have heard reference to the fact that certain

4    investigative techniques were not used by the Government.

5    There is no legal requirement that the Government prove its

6    case through any particular means.  While you are to carefully

7    consider the evidence adduced by the Government, you are not to

8    speculate as to why they used the techniques they did or why

9    they did not use other techniques.  The Government is not on

10   trial.  Law enforcement techniques are not your concern.  Your

11   concern is to determine whether or not, on the evidence or lack

12   of evidence, Mr. Balboa's guilt has been proved beyond a

13   reasonable doubt.  Certain audio recordings of conversations

14   have been admitted into evidence.  You are not asked to approve

15   or disapprove of the recording of these conversations.  These

16   recordings were made in a lawful manner, and the evidence was

17   admitted in this case and may be considered along with all the

18   other evidence in the case in determining whether the

19   Government has proved Mr. Balboa's guilt beyond a reasonable

20   doubt.  I instruct you that no one's rights were violated and

21   that the Government's use of this evidence is entirely lawful.

22

23          To help your listening, transcripts have also been

24   prepared.  However, the transcripts were not admitted into

25   evidence.  Only the audio recordings themselves are evidence.

DCHAABAL6                    Jury Charge

You are not to regard the transcripts as anything more than an

aide.  It is what you hear on the recordings that matters.

Nonetheless, if you wish to view the transcripts, they will be

made available to you during your deliberations.

          Several charts that summarize voluminous records have

been received as evidence, in addition to the underlying

records.  The charts and summaries were admitted in order to

save time and avoid unnecessary inconvenience.  They are merely

graphic demonstrations of the underlying information, intended

to be of assistance to you in your deliberations.  It is up to

you to decide whether these charts fully, fairly, and correctly

present the information in the testimony and the documents on

which they are based.  The headings and titles on these charts

are not evidence, however.  They are there as a demonstrative

aid.  You may consider the charts and summaries as you would

any other evidence, if you feel they are of assistance to you.

          In this case, you have heard evidence in the form of

several stipulations.  A stipulation of testimony is an

agreement among the parties that, if called, a witness would

have given certain testimony.  You must accept as true the fact

that the witness would have given the testimony.  However, it

is for you to determine the effect to be given that testimony.

You also heard evidence in the form of stipulations of fact,

which are agreements among the parties that a certain fact is

true. You must regard such agreed facts as true.

1          It does not matter if a specific transaction is

2     alleged to have occurred on or about a certain date or that it

3     involved a specific number of shares or amount of money but the

4     testimony indicates that in fact it was a different date or

5     amount.  The law only requires a substantial similarity between

6     the dates and amounts alleged in the Indictment and the dates

7     and amounts established by the testimony or other evidence.

8     The same goes for most of the other factual contentions in the

9     Indictment.

10          It must be clear to you by now that counsel for the

11    parties are asking you to draw very different conclusions about

12    the significant factual issues in the case.  An important part

13    of your decision will involve making judgments about the

14    testimony of the witnesses you have listened to and observed.

15    In making these judgments, you should carefully scrutinize all

16    of the testimony of each witness, the circumstances under which

17    each witness testified, and any other matter in evidence that

18    may help you to decide the truth and the importance of each

19    witness's testimony.

20          Your decision whether or not to believe a witness may

21    depend on how that witness impressed you.  Was the witness

22    candid, frank and forthright; or did the witness seem to be

23    evasive or suspect in some way?  How did the way the witness

24    testified on direct examination compare with how the witness

25    testified on cross examination?  Was the witness consistent or

contradictory?  Did the witness appear to know what he or she

was talking about?  Did the witness strike you as someone who

was trying to report his knowledge accurately?  What was the

witness's demeanor like?  These are examples of the kinds of

common sense questions you should ask yourselves in deciding

whether a witness is or is not truthful.

In addition, you may consider whether a witness had

any possible bias or relationship with a party, or any possible

interest in the outcome of the case.  Such a bias,

relationship, or interest does not necessarily make the witness

unworthy of belief.  These are simply factors that you may

consider.

Similarly, if you determine that a witness made

statements in the past that are inconsistent with his testimony

during the trial concerning facts that are at issue here, you

may consider that fact in deciding how much of the testimony,

if any, to believe.  In making this determination, you may

consider whether the witness purposefully made a false

statement, or whether it was an innocent mistake.  You may also

consider whether the inconsistency concerns an important fact

or merely a small detail, as well as whether the witness had an

explanation for the inconsistency that appealed to your common

sense.

If you find that a witness has testified falsely as to

any material fact, or if you find that a witness has been

1    previously untruthful when testifying under oath, you may

2    reject that witness's testimony in its entirety, or you may

3    accept those parts that you believe to be truthful or that are

4    corroborated by other independent evidence in the case.

5          You should also consider whether the witness had an

6    opportunity to observe the facts he or she testified about, and

7    whether the witness's recollection of the facts stands up in

8    light of the other evidence in the case.

9          In other words, what you must try to do in deciding

10   credibility is to size up a person just as you would in any

11   important matter where you are trying to decide if a person is

12   truthful, straightforward and accurate in his recollection.

13         Now, a witness may be discredited or impeached by

14   contradictory evidence, or by evidence that at some other time

15   the witness has said or done something that is inconsistent

16   with the witness's present testimony.  The earlier inconsistent

17   or contradictory statements are admissible only to discredit or

18   impeach the credibility of the witness, not to establish the

19   truth of the earlier statements made somewhere else other than

20   here in front of you during this trial.  It is the role of the

21   jury to determine the credibility of a witness who hade made

22   prior inconsistent or contradictory statements.  If you believe

23   that any witness has been impeached and thus discredited, then

24   it is for you to give the testimony of that witness as much or

25   as little weight, if any, as you think it deserves.

DCHAABAL6                    Jury Charge

1                It is for you, the jury, and for you alone, not the

2       lawyers, or the witnesses, or me as the Judge, to decide the

3       credibility of witnesses who appeared here and the weight that

4       their testimony deserves.  After making your own judgment or

5       assessment concerning the credibility of a witness, you can

6       then attach such importance or weight to their testimony, if

7       any, that you feel it deserves.  You will then be in a position

8       to decide whether the Government has proven the charges beyond

9       a reasonable doubt.

10               You have heard evidence during the trial that

11      witnesses have discussed the facts of the case and their

12      testimony with the lawyers before the witnesses appeared in

13      court.  Although you may consider that fact when evaluating a

14      witness's credibility, it is neither unusual nor inappropriate

15      for a witness to meet with lawyers before testifying so that

16      the witness can be aware of the subjects he or she will be

17      questioned about, focus on those subjects and have the

18      opportunity to review relevant exhibits and prior testimony

19      before being questioned about them.  It is your decision what

20      inferences to draw from a witness's preparation for his

21      testimony.

22               You have heard testimony from three Government

23      witnesses, Mr. DeCharsonville, Mr. Pratt and Mr. Nesti, who

24      testified pursuant to immunity and non-prosecution agreements

25      with the Government.  The Government is permitted to make these

 1    kinds of promises and is entitled to call as witnesses people

 2    to whom such promises are given.  The fact that the Government

 3    has agreed not to prosecute a witness does not disqualify that

 4    witness from testifying and does not preclude you from

 5    accepting that testimony as true.

 6           The law allows the use of such testimony and it is

 7    properly considered by the jury.  The testimony of a

 8    cooperating witness may be enough in itself to support a

 9    conviction if the jury finds that the testimony established

10    guilt beyond a reasonable doubt.  It is also the case that

11    cooperating witness testimony must be scrutinized with great

12    care and viewed with special caution.  In evaluating the

13    testimony of a witness who has a non-prosecution agreement or

14    immunity agreement, you should ask yourselves whether he would

15    benefit more by lying or by telling the truth.  Was the

16    testimony made up in anyway because the witness believed or

17    hoped that he would somehow receive favorable treatment by

18    testifying falsely, or did the witness believe that his

19    interest would best be served by testifying truthfully?

20           If you believe that the witness was motivated by hopes

21    of personal gain, was the motivation one that would cause the

22    witness to lie, or was it one that would cause him to tell the

23    truth?  Did this motivation color the witness' testimony?  If

24    you find that the testimony was false, you should reject it.

25    However, if, after a careful examination of the witness'

DCHAABAL6                    Jury Charge

1    testimony and demeanor you are satisfied that he told the

2    truth, you should accept it as credible and act upon it

3    accordingly.   Whether one of these witnesses may have been

4    guilty of a criminal offense is not evidence of the guilt of

5    anyone else, including Mr. Balboa.

6          One final note in this regard, it is of no concern of

7    yours why the Government made agreements with these three

8    witnesses.   Your sole concern is to decide whether the

9    witnesses have given truthful testimony in this case before

10   you.

11         The issue of credibility need not be decided in an all

12   or nothing fashion.   Credibility is a determination entirely

13   for you, the jury.   A cooperating witness' testimony should be

14   given such weight as it deserves in light of all the facts and

15   circumstances, as you would the testimony of any other witness.

16         You may not draw any inference, favorable or

17   unfavorable, towards the Government or Mr. Balboa from the fact

18   that any person or persons other than Mr. Balboa are not on

19   trial here.   You also may not speculate as to the reasons why

20   other persons are not on trial.   Those matters are wholly

21   outside your concern and have no bearing on your function as

22   jurors.

23         You have also heard reference throughout this trial to

24   prior proceedings.   You should not speculate as to the nature

25   of these prior proceedings.   You are accordingly instructed not

DCHAABAL6                     Jury Charge

1    to draw any inference of the fact there was any prior

2    proceeding in this matter.

3          You have heard testimony of Matthew Howard, an

4    employee of FINRA, the Financial Industry Regulatory Authority.

5    The fact that a witness may be employed as a regulatory

6    official does not mean that his testimony deserves more or less

7    consideration or greater or lesser weight than that of any

8    other witness.  In this context, defense counsel is allowed to

9    try to attack the credibility of such a witness on the ground

10   that his testimony may be affected by a personal or

11   professional interest in the outcome of the case.  It is your

12   decision, after reviewing all the evidence, whether or not to

13   accept the testimony of Mr. Howard and to give that testimony

14   whatever weight, if any, you find it deserves.

15         You have to decide this case based on the evidence

16   that is before you.  There may be people whose names you have

17   heard during the course of the trial who did not appear to

18   testify.  The trial has lasted two weeks and two days, but even

19   in a trial this long, there is invariably a selection of

20   witnesses.  Trials cannot last forever, and you cannot put

21   everyone on the stand.  I instruct you that both the Government

22   and Mr. Balboa have the ability to subpoena witnesses.  Each

23   party had an equal opportunity or lack of opportunity to call

24   any of these witnesses.  Therefore, you should not draw any

25   inferences or reach any conclusion as to what they would have

1    testified to had they been called.  Their absence should not

2    affect your judgment in anyway.

3           You should remember my instruction, however, that the

4    law does not impose on the defendant in a criminal case the

5    burden or duty of calling any witness or producing any

6    evidence.

7           The Defendant, Michael Balboa, did not testify in this

8    case.  Under our Constitution, a defendant has no obligation to

9    testify or to present any evidence, because it is the

10   Government's burden to prove guilt beyond a reasonable doubt.

11   That burden remains with the Government throughout the entire

12   trial and never shifts to the Defendant.  A defendant is never

13   required to prove that he or she is innocent.

14   You must not attach any significance to the fact that Mr.

15   Balboa did not testify.  No adverse inference against him may

16   be drawn by you because he did not take the witness stand.  You

17   may not consider this against Mr. Balboa in any way in your

18   deliberations in the jury room.

19          The Indictment contains five counts or "charges."

20   Count One of the Indictment charges the defendant with

21   securities fraud conspiracy.  Specifically, it charges that,

22   from in or about January 2008 through in or about March 2011,

23   Michael Balboa conspired or agreed with others to commit

24   securities fraud by misleading investors and potential

25   investors about the process used to value certain assets in his

investment portfolio and/or the true value of those assets, and by concealing his fraudulent scheme from various company and government investigators.

Count Two charges Mr. Balboa with wire fraud conspiracy from in or about January 2008 through in or about March 2011, based on the same allegations as in Count One.

Both Counts One and Two are conspiracy counts. As I will explain in more detail shortly, a conspiracy is a criminal agreement to violate United States law. The other charges in the indictment allege what are called "substantive" violations. Unlike a conspiracy charge, which is a charge of agreeing to commit a criminal offense, the substantive counts allege the actual commission of criminal offenses.

Specifically, Count Three charges Mr. Balboa with a substantive count of securities fraud. Count Four charges a substantive count of wire fraud. Finally, Count Five charges a substantive count of investment adviser fraud.

This summarizes the five counts or charges in the Indictment. You must consider each count separately, and you must return a separate verdict of guilty or not guilty for each count separately. Whether you find Mr. Balboa guilty or not guilty as to one count should not affect your verdict as to any other count.

With that summary as background, I will now turn to the detailed instructions that concern the conspiracy charged

1    in Count One.

2            Count One of the Indictment charges Mr. Balboa with

3    participating in a securities fraud conspiracy, in violation of

4    Section 371 of Title 18 of the United States Code, which

5    provides:

6    "If two or more persons conspire either to commit any offense

7    against the United States, or to defraud the United States, or

8    any agency thereof in any manner or for any purpose, and one or

9    more of such persons do any act to effect the object of the

10   conspiracy, each" is guilty of a crime.

11           Mr. Balboa is charged in Count One with participating

12   in a conspiracy to violate the securities laws of the United

13   States. That is, Mr. Balboa had an understanding with others to

14   deceive investors, potential investors, and company and

15   government investigators about the process used to value

16   certain assets in Mr. Balboa's investment portfolio and/or the

17   value of those assets.  The Indictment also lists various overt

18   acts that are alleged to have been committed in furtherance of

19   the conspiracy.

20           What is a conspiracy?  A conspiracy is a kind of

21   criminal partnership -- a combination or agreement of two or

22   more persons to join together to accomplish some unlawful

23   purpose.  The essence of the crime is an agreement or

24   understanding to violate other laws.  The crime of conspiracy

25   to violate a federal law is a separate offense from the

DCHAABAL6                    Jury Charge

commission of the underlying crime itself.  If a conspiracy

exists, even if it should fail in its purpose or the underlying

crime is not actually committed, the conspiracy is still

punishable as a crime.

        To sustain its burden of proof with respect to the

allegation of conspiracy, the Government must prove the

following three elements beyond a reasonable doubt:

        First, the existence of the conspiracy charged in the

Indictment; that is, an agreement or understanding to violate

the securities laws of the United States, the object of the

crime charged in Count One.  The first question is: Did the

conspiracy exist?

        Second, that Mr. Balboa knowingly and willfully became

a member of the conspiracy.  The second question is: Did Mr.

Balboa knowingly, and willfully associate with and participate

in the conspiracy?

        Third, that any one of the conspirators -- not

necessarily Mr. Balboa, but any one of the parties involved in

the conspiracy -- knowingly committed at least one overt act in

furtherance of the conspiracy during the life of the

conspiracy.

        Now let us separately consider each of the three

elements:

        First, the existence of the conspiracy; second,

whether Mr. Balboa knowingly associated himself with and

1    participated in the conspiracy; and third, whether an overt act

2    was committed in furtherance of the conspiracy.

3           Starting with the first element, what is a conspiracy?

4    Simply defined, a conspiracy is an agreement or an

5    understanding of two or more persons to accomplish by joint

6    action a criminal or unlawful purpose.  The conspiracy alleged

7    here is an agreement to commit the crime of securities fraud.

8    It is an entirely distinct and separate offense from the actual

9    commission of the crime of securities fraud, and the Government

10   does not have to prove the actual commission of securities

11   fraud for you find Mr. Balboa guilty of conspiracy.

12          To establish a conspiracy, the Government does not

13   have to show that individuals sat around a table and entered

14   into a solemn pact, orally or in writing, stating that they

15   have formed a conspiracy to violate the law, and setting forth

16   details of the plans and the means by which the unlawful

17   project is to be carried out or the part to be played by each

18   conspirator.  Indeed, it is rare that a conspiracy can be

19   proved by direct evidence of an explicit agreement.

20   Common sense tells you that when people in fact undertake to

21   enter into a criminal conspiracy, much is left to unexpressed

22   understanding.  From its very nature, a conspiracy is almost

23   invariably secret in its origin and execution.

24          To show that a conspiracy existed, then, it is

25   sufficient if the evidence shows that two or more persons in

some way or manner, explicitly or implicitly, came to an

understanding to violate the law and to establish an unlawful

plan.

In determining whether there has been an unlawful

agreement, you may consider the acts and conduct of the alleged

co-conspirators which were done to carry out the apparent

criminal purpose.  The adage "actions speak louder than words"

may be applicable here.  At times, the only evidence available

with respect to the existence of a conspiracy is that of

disconnected acts on the part of the alleged individual

co-conspirators.  When taken together and considered as a

whole, however, such acts may show a conspiracy or agreement as

conclusively as would direct proof.

So, in considering the first element of the crime of

conspiracy as charged, whether the conspiracy actually existed,

you should consider all the evidence which has been admitted

with respect to the acts, conduct and declarations of the

alleged conspirators, and the reasonable inferences to be drawn

from such evidence.  It is sufficient to establish the

existence of the conspiracy if, after considering all of the

relevant evidence, you find beyond a reasonable doubt that the

minds of at least two alleged conspirators met in an

understanding way, and that they agreed, as I have explained,

to work together in furtherance of the unlawful scheme alleged

in the Indictment.

1          As I mentioned, the Indictment here charges that the

2    object of the conspiracy was to commit securities fraud.

3    Specifically, Mr. Balboa is alleged to have conspired to commit

4    securities fraud by agreeing with others to defraud investors

5    and potential investors in his hedge fund by (1) employing

6    devices, schemes, or artifices to defraud, or (2) making untrue

7    statements of material fact or omitting to state material facts

8    necessary to make other statements not misleading; or (3)

9    engaging in acts and practices and courses of business that

10   operated as a fraud and deceit.  Through these means, it is

11   alleged that Mr. Balboa and others would and did conceal from

12   investors, potential investors, and various investigators the

13   procedure used to value certain assets in Mr. Balboa's

14   investment portfolio and/or the true value of those assets.

15   The securities laws, the violation of which is alleged to have

16   been the object of the criminal conspiracy, are set forth in

17   Title 15 of the United States Code and Title 17 of the Code of

18   Federal Regulations.  I will provide more detailed instructions

19   on the laws of securities fraud when I instruct you on Count

20   Three.

21          If you conclude that the Government has proven beyond

22   a reasonable doubt that the conspiracy charged in Count One

23   existed and its object was securities fraud, you should proceed

24   to consider the second element: did Mr. Balboa participate in

25   the conspiracy with knowledge of its unlawful purpose or

purposes, and in furtherance of its unlawful objective or
objectives.

        The Government must prove beyond a reasonable doubt
that Mr. Balboa knowingly and willfully entered into the
conspiracy, the agreement, with a criminal intent, that is,
with a purpose to violate the law, and agreed to take part in
the conspiracy to further promote and cooperate in its unlawful
objectives.

        As to this element, the terms "knowingly" and
"willfully" mean that you must be satisfied beyond a reasonable
doubt that in joining the conspiracy, Mr. Balboa knew what he
was doing -- that he took the actions in question deliberately
and voluntarily, with the intent to do something that the law
forbids.  That is, Mr. Balboa's acts must have been the product
of his conscious objective and not the product of a mistake,
accident, negligence, or some other innocent reason.
"Unlawfully" simply means contrary to law.  Mr. Balboa need not
have known that he was breaking any particular law or any
particular rule.  He need only have been aware of the generally
unlawful nature of the acts he undertook.

        How do we know what another person knows?  Knowledge
is a matter of inference from the proven facts.  We cannot look
into a person's mind to know what someone is thinking.
Instead, you have before you evidence of certain acts and
conversations alleged to have taken place with Mr. Balboa or in

DCHAABAL6                         Jury Charge

his presence.  It is for you to determine whether the

Government has established beyond a reasonable doubt that these

acts and conversations show such knowledge and intent on the

part of Mr. Balboa.

It is not necessary that Mr. Balboa was fully informed

as to all the details of the conspiracy in order to justify an

inference of knowledge on his part.  To have guilty knowledge,

Mr. Balboa need not have known the full extent of the

conspiracy or all of its activities or all of its participants.

It is not even necessary that Mr. Balboa know every other

member of the conspiracy.  In fact, a defendant may know only

one other member of the conspiracy and still be a

co-conspirator.

The duration and extent of a defendant's participation

in the conspiracy has no bearing on the issue of a defendant's

guilt.  A defendant need not have joined the conspiracy at the

outset.  A defendant may have joined it for any purpose at any

time during its progress, and that defendant will still be held

responsible for all that was done before he or she joined and

all that was done during the conspiracy's existence while the

defendant was a member.  Each member of a conspiracy may

perform separate and distinct acts and may perform them at

different times.  Some conspirators play major roles, while

others play minor roles in the scheme.  An equal role is not

what the law requires.  In fact, even a single act may be

DCHAABAL6                        Jury Charge

sufficient to draw a defendant within the ambit of a

conspiracy.

        I want to caution you, however, that the mere

association by one person with another does not make that

person a member of the conspiracy, even when coupled with

knowledge that a conspiracy is taking place.  A person may

know, or be friendly with, a criminal, without being a criminal

himself.  Mere similarity of conduct or the fact that they may

have assembled together and discussed common aims and interests

does not necessarily establish membership in the conspiracy.

Mere presence at the scene of a crime, even coupled with

knowledge that a crime is taking place, is not sufficient to

support a conviction.  In other words, knowledge without

participation is not sufficient.  Conversely, the fact that

the acts of a defendant, without knowledge of the conspiracy

and its unlawful objectives, merely happen to further the

purpose or objectives of the conspiracy does not make him a

member of the conspiracy.  What is necessary is that Mr. Balboa

has participated in the conspiracy with knowledge of its

unlawful purpose and with an intent to aid in the

accomplishment of its unlawful objective.

        Since an essential element of the crime charged is

knowledge and willfulness it follows that good faith on the

part of Mr. Balboa is a complete defense to a charge of

conspiracy.  As I will instruct you, Mr. Balboa, however, has

DCHAABAL6                    Jury Charge

no burden to establish a defense of good faith.  The burden is
on the Government to prove fraudulent intent and Mr. Balboa's
consequent lack of good faith beyond a reasonable doubt.  I
will give you further instruction on the defense of good faith
later in my instructions.

        In sum, Mr. Balboa, with an understanding of the
unlawful character of the conspiracy, must have intentionally
engaged, advised or assisted in the conspiracy for the purpose
of furthering an illegal undertaking.  Mr. Balboa thereby
becomes a knowing and willing participant in the unlawful
agreement -- that is to say, a conspirator.

        A conspiracy, once formed, is presumed to continue
until either its objectives are accomplished or there is some
affirmative act of termination by its members.  So, too, once a
person is found to be a member of a conspiracy, he or she is
presumed to continue his membership in the venture until its
termination, unless it is shown by some affirmative proof that
he or she withdrew and disassociated himself or herself from
it.

        The first element of Count One requires that Mr.
Balboa had an agreement, and the second element requires that
Mr. Balboa knowingly participated.  The third element of the
conspiracy charge is the requirement of an overt act.  To
sustain its burden of proof, the Government must show beyond a
reasonable doubt that at least one overt act was committed in

DCHAABAL6                        Jury Charge

1    furtherance of the conspiracy by at least one of the

2    co-conspirators—but not necessarily Mr. Balboa.

3            The purpose of the overt act requirement is that there

4    must have been something more than mere agreement; some overt

5    step or action must have been taken by at least one of the

6    conspirators in furtherance of the conspiracy.

7            The Indictment sets forth numerous overt acts the

8    Government alleges were made by the conspirators in furtherance

9    of the conspiracy.  They are listed in the Indictment,

10   Paragraphs 28(a)-(m) on pages 10-12.  In order for the

11   Government to satisfy the overt act requirement, it is not

12   necessary for the Government to prove all of the overt acts

13   alleged in the Indictment or even any of the overt acts

14   contained in the Indictment.  Indeed, you may find that overt

15   acts were committed which were not alleged in the Indictment.

16   In short, it is sufficient for the Government to show that Mr.

17   Balboa or one of his alleged co-conspirators knowingly and

18   willfully committed any overt act in furtherance of the

19   conspiracy during the life of the conspiracy.  You are further

20   instructed that the overt act need not have been committed at

21   precisely the time alleged in the Indictment; it is sufficient

22   if you are convinced beyond a reasonable that that an overt act

23   occurred while the conspiracy was in existence.  But you must

24   be unanimous on what the overt act is.

25           You should bear in mind that the overt act, standing

1    alone, may be an innocent, lawful act. At times, however, an

2    apparently innocent act sheds its harmless character if it is a

3    step in carrying out or promoting the conspiratorial scheme.

4    You are therefore instructed that the overt act does not have

5    to be an act which in and of itself is criminal or constitutes

6    an objective of the conspiracy.

7           I admitted into evidence against Mr. Balboa the acts

8    and statements of others because these acts and statements were

9    committed by persons who, the Government charges, were Mr.

10   Balboa's co-conspirators.

11          I allowed this evidence to be received against Mr.

12   Balboa because of the nature of the crime of conspiracy.  A

13   conspiracy is often referred to as a partnership in crime.

14   Thus, as in other types of partnerships, when people enter into

15   a conspiracy to accomplish an unlawful end, each and every

16   member becomes an agent for the other conspirators in carrying

17   out the conspiracy.

18           Accordingly, the reasonably foreseeable acts,

19   declarations, statements and omissions of any member of the

20   conspiracy and in furtherance of the common purpose of the

21   conspiracy, are deemed, under the law, to be the acts of all of

22   the members, and all of the members are responsible for such

23   acts, declarations, statements and omissions.

24           If you find, beyond a reasonable doubt, that Mr.

25   Balboa was a member of the conspiracy charged in the

DCHAABAL6                    Jury Charge

Indictment, then, any acts done or statements made in

furtherance of the conspiracy by persons also found by you to

have been members of that conspiracy, may be considered against

him.  This is so even if such acts were done and statements

were made in Mr. Balboa's absence and without his knowledge.

However, before you may consider the statements or

acts of a co-conspirator in deciding the issue of Mr. Balboa's

guilt, you must first determine that the acts and statements

were made during the existence, and in furtherance, of the

unlawful scheme.  If the acts were done or the statements made

by someone whom you do not find to have been a member of the

conspiracy or if they were not done or said in furtherance of

the conspiracy, they may be considered by you as evidence only

against the member who did or said them.

The Indictment charges that the alleged conspiracy

existed from in or about January 2008 through in or about March

2011.  It is not essential that the Government prove that the

conspiracy started and ended in any specific month.  Indeed, it

is sufficient if you find beyond a reasonable doubt that the

charged conspiracy was formed and that it existed for some time

within the period set forth in the Indictment, and that at

least one overt act was committed by any conspirator in

furtherance of the charged conspiracy within that period.

Count Two of the Indictment charges Mr. Balboa with

participating in a conspiracy to violate the wire fraud

1   statute.  It re-alleges the same list of overt acts as in Count

2   One.

3            In considering Count Two, you should apply the legal

4   principles on conspiracy that I have just explained to you.

5   Briefly, to remind you, a conspiracy has three elements, each

6   of which must be established beyond a reasonable doubt.

7   First, the existence of an agreement to violate the laws of the

8   United States, here the wire fraud statutes.  The wire fraud

9   statute is codified at Title 18, Section 1343 of the United

10  States Code.  I will provide more detailed instructions on this

11  when I instruct you on Count Four, which pertains to the

12  substantive crime of wire fraud.

13           Second, that Mr. Balboa knowingly and willfully became

14  a member of the conspiracy.

15  Third, that any one of the conspirators knowingly committed at

16  least one overt act in furtherance of the conspiracy during the

17  life of the conspiracy.

18           Count Three of the Indictment charges Mr. Balboa with

19  committing securities fraud.  As I have just told you, a

20  conspiracy is the separate crime of agreeing to violate the law

21  of the United States.  Here, the Government contends that the

22  substantive violation of securities fraud occurred.  Whereas

23  Count One charges a conspiracy to violate the securities laws,

24  Count Three charges an actual violation of those laws.

25  Count Three alleges as follows: from at least in or about

DCHAABAL6                    Jury Charge

January 2008 through in or about October 2008, Michael Balboa

willfully and knowingly, directly and indirectly, by use of the

means and instrumentalities of interstate commerce and of the

mails, did use and employ manipulative and deceptive devices

and contrivances in connection with the purchase and sale of

securities, in violation of Title 17, Section 240.10b-5, of the

Code of Federal regulations, by (a) employing devices, schemes,

and artifices to defraud; (b) making untrue statements of

material facts and omitting to state material facts necessary

in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and

(c) engaging in acts, practices and courses of business which

operated and would operate as a fraud and deceit upon other

persons, to wit, Mr. Balboa made and caused to be made false

representations to investors regarding the monthly net asset

value of his hedge fund and the manner in which his hedge

fund's assets were valued.

        The relevant statute is Section 10(b) of the

Securities Exchange Act of 1934.  That law provides in relevant

part that:

        It shall be unlawful for any person, directly or

indirectly, by the use of any means or instrumentality of

interstate commerce or of the mails, or any facility of any

national securities exchange.

        (b) To use or employ, in connection with the purchase

DCHAABAL6                        Jury Charge

1    or sale of any security registered on a national securities

2    exchange or any security not so registered, any manipulative or

3    deceptive device or contrivance in contravention of such rules

4    and regulations as the SEC may  prescribe as necessary or

5    appropriate in the public interest or for the protection of

6    investors.

7           Based on its authority under this statute, the SEC

8    enacted Rule 10b-5, which provides:

9           It shall be unlawful for any person, directly or

10   indirectly, by the use of any means or instrumentality of

11   interstate commerce, or of the mails or of any facility of any

12   national securities exchange,

13          (a) To employ any device, scheme, or artifice to

14   defraud,

15          (b) To make any untrue statement of a material fact or

16   to omit to state a material fact necessary in order to make the

17   statements made, in the light of the circumstances under which

18   they were made, not misleading, or

19          (c) To engage in any act, practice, or course of

20   business which operates or would operate as a fraud or deceit

21   upon any person, in connection with the purchase or sale of any

22   security.

23          To establish a violation of Section 10(b), as charged

24   in Count Three, the Government must prove each of the following

25   elements beyond a reasonable doubt:

DCHAABAL6                    Jury Charge

First, that in connection with the purchase or sale
securities, Mr. Balboa did any one or more of the following:

(a) employed a device, scheme or artifice to defraud;
or

(b) made an untrue statement of a material fact or
omit to state a material fact which made what was said, under
the circumstances, misleading; or

(c) engaged in an act, practice or course of business
that operated, or would operate, as a fraud or deceit upon a
purchaser or seller.

With respect to this element, it is not necessary that
the Government establish all three.  Any one is sufficient, but
you have to be unanimous on which means or instrument were
used.

Second, that Mr. Balboa acted knowingly, willfully,
and with the intent to defraud; and

Third, that Mr. Balboa used or caused to be used any
means or instrument of transportation or communication in
interstate commerce or the use of the mails in furtherance of
the fraudulent conduct.
Let's discuss each element.

The first element that the Government must prove
beyond a reasonable doubt is that, in connection with the

purchase or sale of shares in Mr. Balboa's hedge fund or any of
its affiliated entities, Mr. Balboa did any of the following:

       1)  Employed a device, scheme, or artifice to defraud,
or

       2)  Made an untrue statement of a material fact or
omitted to state a material fact which made what was said,
under the circumstances, misleading, or

       3)  Engaged in an act, practice, or course of business
that operated or would operate as a fraud or deceit upon the
purchaser or seller.

     The Government does not have to prove all three types
of unlawful conduct in connection with the purchase or sale of
securities.  Any one is enough; but you must be unanimous as to
which type of unlawful conduct Mr. Balboa committed.  I will
now define some of these terms.

     A device, scheme or artifice to defraud is a plan to
accomplish any fraudulent objective.  Fraud is a general term
that embraces all the various means individuals employ to take
advantage of others by manipulative and deceptive acts.  The
fraudulent or deceitful conduct alleged need not relate to the
investment value of the securities involved in this case.

     A statement, representation, claim or document is
false if it is untrue when made and was then known to be untrue
by the person making it or causing it to be made.  A
representation or statement is fraudulent if it was made with

DCHAABAL6                    Jury Charge

the intent to deceive.  The concealment of material facts in a

manner that makes what is said or represented deliberately

misleading may also constitute false or fraudulent statements

under the statute.

        The deception need not be based upon spoken or written

words alone.  The arrangement of the words or the circumstances

in which they are used may convey the false and deceptive

practice.  If there is deception, the manner in which it is

accomplished does not matter.

        The requirement that the fraudulent conduct be "in

connection with" a securities transaction is satisfied so long

as there was some nexus or relationship between the allegedly

fraudulent conduct and the sale or purchase of securities.

Fraudulent conduct may be "in connection with" the purchase or

sale of securities if you find that the alleged fraudulent

conduct "touched upon" a securities transaction.  You need not

find that Mr. Balboa agreed to actually participate in any

securities transaction, if Mr. Balboa agreed to engage in

fraudulent conduct that was "in connection with" a purchase or

sale.  The "in connection with" aspect of this element is

satisfied if you find that there was some nexus or relation

between the allegedly fraudulent conduct and the sale or

purchase of securities.

        It is no defense to an overall scheme to defraud that

Mr. Balboa was not involved in the scheme from its inception or

played only a minor role with no contact with the investors and

purchasers of the securities in question.  Nor is it necessary

for you to find that Mr. Balboa was the actual seller or

offeror of the securities.  It is sufficient if Mr. Balboa

participated in the scheme or fraudulent conduct that involved

the purchase or sale of stock.  By the same token, the

Government need not prove that Mr. Balboa personally made the

misrepresentation. It is sufficient if the Government

establishes that Mr. Balboa caused the statement to be made.

With regard to the alleged misrepresentations, you must

determine whether the statement was true or false when it was

made.

          Next, if you find that there was a false statement or

an omitted statement, you must determine whether the

misrepresentation or omission was material under the

circumstances.  A material fact is one that would have been

important to a reasonable investor in making an investment

decision.  In other words, the misstated or omitted fact must

have altered the total mix of information available and was of

such importance that it could reasonably be expected to cause

or to induce a person to invest or not to invest.  The

securities fraud statute does not prohibit misstatements or

omissions that would not be important to a reasonable investor.

We use the word "material" to distinguish between the kinds of

statements that reasonable investors care about and those that

1    are of no real importance.

2              It is not a defense to say that the misrepresentation

3    or omission would not have deceived a person of ordinary

4    intelligence.  If you find that there was a misrepresentation

5    of material fact, it does not matter whether the intended

6    victims were gullible buyers or sophisticated investors.  The

7    securities laws protect the gullible and unsophisticated as

8    well as the experienced investor.

9              Nor does it matter whether the alleged unlawful scheme

10   was successful, profitable or otherwise beneficial to Mr.

11   Balboa.  Success is not an element of the crime charged.  If

12   you find that Mr. Balboa expected to or did profit from the

13   alleged scheme, however, you may consider that in relation to

14   the element of intent, which I will now explain.

15             The second element of securities fraud is that Mr.

16   Balboa acted knowingly, willfully, and with intent to defraud.

17   To act "knowingly" means to act voluntarily and deliberately,

18   rather than mistakenly or inadvertently.

19             To act "willfully" means to act knowingly and

20   purposely, with intent to do something the law forbids, that is

21   to say, with bad purpose either to disobey or to disregard the

22   law.

23             "Intent to defraud" means to act knowingly and with

24   the specific intent to deceive.

25             The question of whether a person acted knowingly,

willfully and with intent to defraud is a question of fact for
you to determine, like any other fact question. This question
involves one's state of mind.

As I also stated before, we cannot examine what is
going on in a person's brain; so direct proof of knowledge and
fraudulent intent is not required. Rather, knowledge and
fraudulent intent may be established by circumstantial
evidence, based upon a person's outward manifestations, words,
conduct, and all the surrounding circumstances disclosed by the
evidence and the rational or logical inferences that may be
drawn therefrom. Remember what I told you before—use your
common sense.

The third element of securities fraud is that Mr.
Balboa used or caused to be used an instrumentality of
interstate commerce or the mails in furtherance of the scheme
to defraud or fraudulent conduct.

It is not necessary that Mr. Balboa be directly or
personally involved in any contemplated mailing or use of an
instrumentality of interstate commerce. If the conduct alleged
to be an object of the scheme would naturally and probably
result in the use of the mails or an instrumentality of
interstate commerce, this element is satisfied.
Nor is it necessary that the items sent through the mails or
communicated through an instrumentality of interstate commerce
contain the fraudulent material, or anything criminal or

objectionable.  The matter mailed or communicated may be

entirely innocent, so long as it is in furtherance of the

scheme to defraud or fraudulent conduct.

         The use of the mails or instrumentalities of

interstate commerce need not be central to the execution of the

scheme or even be incidental to it.  All that is required is

that the use of the mails or instrumentality of interstate

commerce bear some relation to the object of the scheme or

fraudulent conduct.

         The actual purchase or sale of a security need not be

accompanied by the use of the mails or instrumentality of

interstate commerce, so long as the mails or instrumentality of

interstate commerce are used in furtherance of the scheme and

Mr. Balboa is still engaged in actions that are a part of a

fraudulent scheme.

         The term "mails" is self-explanatory, and includes

both the U.S. Mail and Federal Express.  The term "interstate

commerce" means trade, commerce, transportation, or

communication between any two states or between any foreign

country and any state.  This term includes the use of a

telephone, email, or other interstate means of communication.

         Count Four charges Mr. Balboa with a substantive count

of wire fraud, i.e. using an interstate wire facility in

furtherance of a fraud.  In order to prove Mr. Balboa guilty of

wire fraud, the Government must separately establish beyond a

reasonable doubt the following three essential elements:

First, that in or about the times alleged in the Indictment, there was a scheme or artifice to defraud others of money or property by false or fraudulent pretenses, representations, or promises;

Second, that Mr. Balboa knowingly and willfully devised or participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

Third, that in the execution of that scheme, Mr. Balboa used, or caused the use by others, of interstate or foreign wires, as specified in the Indictment.

The first element of wire fraud is the existence of a scheme or artifice to defraud others of money or property by means of false or fraudulent pretenses, representations, or promises.

A "scheme or artifice" is simply a plan for the accomplishment of an object.  A "scheme to defraud" is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

"Fraud" is a general term that includes all the possible means by which a person seeks to gain some unfair advantage over another person by intentional misrepresentation, false suggestion or concealing of the truth.  That unfair

advantage can involve money, property, or any other thing of value.

Thus, a "scheme or artifice to defraud" is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.  It is a plan to deprive another of money or property by trick, deceit or deception.

In order to establish a scheme to defraud, the Government need not show that Mr. Balboa made a misrepresentation.  A scheme to defraud can exist even if the scheme did not progress to the point where misrepresentations would be made.  In addition, even if you find that the statements the Government contends were made or contemplated by Mr. Balboa in furtherance of the scheme were literally true, you can still find that the first element of the wire fraud statute has been satisfied if the statements and/or conduct of Mr. Balboa were intended to deceive.

A scheme to defraud need not be shown by direct evidence, but may be established by all the circumstances and facts in the case.

A statement, representation, or document is fraudulent if it was made falsely and with intent to deceive.  A representation, statement, claim, or document may also be fraudulent if it contains half-truths or if it conceals material facts in a manner which makes what is said or

DCHAABAL6                    Jury Charge

represented deliberately misleading or deceptive.

          The false or fraudulent representation must relate to
a material fact or matter.  A material fact is one which would
reasonably be expected to be of concern to a reasonable and
prudent person in relying upon the representation or statement
in making a decision, based on the total mix of information
available.  This means that if you find a particular statement
was false or that it concealed facts that made what was said
deliberately misleading, you must determine whether that
statement was one that a reasonable individual or entity would
have considered important in making decisions regarding, for
example, whether to invest money.

          In addition to proving that a statement was false or
fraudulent and related to a material fact, in order to
establish a scheme to defraud, the Government must prove that
the alleged scheme contemplated depriving another of money or
property.  It is not necessary for the Government to establish
that any particular person actually relied on, or actually
suffered damages, as a consequence of any fraudulent
representation or concealment of facts by Mr. Balboa.  Nor is
it necessary for the Government to establish that the scheme
actually succeeded; that is, that Mr. Balboa-or any other
participant in the scheme-actually realized any gain from the
scheme or that the intended victim suffered any loss.  You must
concentrate on whether there was such a scheme, not on the

1    consequences of the scheme.

2           In this regard, a person is not deprived of money or

3    property only when someone directly takes money or property

4    from them.  Rather, a person is also deprived of money or

5    property when that person is provided false or fraudulent

6    information that, if believed, would prevent them from being

7    able to make informed decisions about what to do with their

8    money or property.  In other words, a person is deprived of

9    money or property when they are deprived of the right to

10   control that money or property, which occurs when they receive

11   false or fraudulent statements that affect their ability to

12   make discretionary economic decisions about what to do with

13   that money or property.

14          With regard to the first element of wire fraud, if you

15   find that the Government has sustained its burden of proof that

16   a scheme to defraud, as charged, did exist then you should next

17   consider the second element of wire fraud.

18           The second element of the crime of wire fraud is that

19   a defendant devised or participated in a fraudulent scheme

20   knowingly, willfully, and with specific intent to defraud.

21          The words "devise" and "participate" are words that

22   you are familiar with and, therefore, I do not need to spend

23   much time defining them for you.  To "devise" a scheme to

24   defraud is to concoct or plan it.  To "participate" in a scheme

25   to defraud means to associate oneself with it with a view and

DCHAABAL6                    Jury Charge

intent toward making it succeed.  While a mere onlooker is not
a participant in a scheme to defraud, it is not necessary that
a participant be someone who personally and visibly executes
the scheme to defraud.

        In order to satisfy this element, it is not necessary
for the Government to establish that Mr. Balboa originated the
scheme to defraud.  It is sufficient if you find that a scheme
to defraud existed, even if originated by another, and that Mr.
Balboa, while aware of the scheme's existence, knowingly
participated in it.

        A person can be found to be a participant in a scheme
even if he or she does not have knowledge of all of the
operations of such a scheme, and even if he or she does not
participate in all of the scheme's operations.  The guilt of
Mr. Balboa is not governed by the extent of his participation.

        A person can be found to be a participant in a scheme
even if he or she did not participate in such a scheme from the
beginning.  A person who comes in at a later point with
knowledge of the scheme's general operation, although not
necessarily all of its details, and intentionally acts in a way
to further the unlawful goals, becomes a member of the scheme
and is legally responsible for all that may have been done in
the past in furtherance of the criminal objective and all that
is done thereafter.

        "Intent to defraud" means that Mr. Balboa had some

realization of the fraudulent or deceptive character of the

scheme and had an intention to be involved in the scheme to

defraud and to help it succeed with a purpose of causing some

harm or injury to the victim.  The Government need not prove

that the intended victim was actually harmed; only that such

harm was contemplated.

        The question of whether a person acted knowingly,

willfully, and with intent to defraud is a question of fact.

This question involves one's state of mind.  As I explained to

you earlier, direct proof of knowledge and fraudulent intent is

almost never available, and such direct proof is not required.

The ultimate facts of knowledge and criminal intent, though

subjective, may be established by circumstantial evidence,

based upon a person's outward manifestations, words, conduct,

acts and all the surrounding circumstances disclosed by the

evidence and the rational or logical inferences that may be

drawn therefrom.

        The third and final element that the Government must

establish beyond a reasonable doubt is the use of an interstate

or international wire communication in furtherance of the

scheme to defraud. Wire communications include telephone calls,

faxes and electronic mail.  "Interstate" means that the wire

communication must pass between two or more states as, for

example, a telephone call or wire transmission of computer

signals or funds between New York and another state.

1   "International" means that the wire communication must pass

2   between the United States and another country.

3           The use of the wire need not itself be fraudulent.

4   Stated another way, the material wired need not contain any

5   fraudulent representation.  It is sufficient if one or more

6   wires were used to further or assist in carrying out the scheme

7   to defraud.

8           It is not necessary for Mr. Balboa to be directly or

9   personally involved in any wire communication, as long as the

10  communication is reasonably foreseeable in the execution of the

11  alleged scheme to defraud in which Mr. Balboa is accused of

12  participating.  In this regard, it would be sufficient to

13  establish this element of the crime if the evidence justifies a

14  finding that Mr. Balboa caused the wires to be used by others.

15  This does not mean that Mr. Balboa must have specifically

16  authorized others to execute a wire communication.  When a

17  person does an act with knowledge that the use of the wire will

18  follow in the ordinary course of business, or where such use of

19  the wires can reasonably be foreseen, even though not actually

20  intended, then he or she causes the wires to be used.

21          The Government must establish beyond reasonable doubt

22  the particular use charged in the Indictment.  However, the

23  Government does not have to prove that an interstate or foreign

24  wire was used on any exact dates charged in the Indictment.  It

25  is sufficient if the evidence establishes that a wire was used

on a date reasonably near the time period alleged in the

Indictment.

        Finally, if you find that the wire communication was

reasonably foreseeable and that the interstate or international

wire communications took place, then this element is satisfied

even if it was not foreseeable that the wire communication

would cross state or country lines.  However, if you find that

wire communications were used in furtherance of the scheme to

defraud, you must be unanimous as to the particular wire

communications that occurred.

        Specifically, Count Five of the Indictment charges Mr.

Balboa, in his capacity as an investment advisor, with engaging

in fraudulent conduct toward investors and potential investors

in the Hedge Fund or any of its affiliated entities.

Specifically, it alleges that:

        From in or about January 2008 to October 2008, Michael

Balboa, acting as an investment adviser with respect to

investors and potential investors in his hedge fund, willfully

and knowingly, by use of the mails and means and

instrumentalities of interstate commerce, directly and

indirectly, did (a) employ devices, schemes, and artifices to

defraud clients and prospective clients; (b) engaged in

transactions, practices, and courses of business which operated

as a fraud and deceit upon clients and prospective clients; and

(c) engaged in acts, practices and courses of business that

1    were fraudulent, deceptive, and manipulative: to wit, Mr.

2    Balboa provided the independent valuation agent with

3    artificially inflated month-end prices for the Nigerian

4    Warrants in order to falsely overstate the monthly net asset

5    value of the hedge fund.

6           The relevant investment advisor fraud statutes and

7    regulations are found at Title 15 of the United States Code,

8    Sections 80b-6 and 80b-17.  Section 80b-6 provides that:  "It

9    shall be unlawful for any investment advisor by use of the

10   mails or any means or instrumentality of interstate commerce,

11   directly or indirectly (a) to employ any devise, scheme or

12   artifice to defraud any client or prospective client; (b) to

13   engage in any transaction, practice or course of business which

14   operates as a fraud or deceit upon any client or prospective

15   client; or (c) to engage in any act, practice, or course of

16   business that was fraudulent, deceptive or manipulative."

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          Section 80b-17 is a general penalty provision of the

2    Investment Advisor Act which makes it unlawful to willfully

3    violate its provisions or any rule or regulation thereunder,

4    and it provides in pertinent part as follows:  "Any person who

5    willfully violates any provision of this subchapter or any

6    rule, regulation or order promulgated by the SEC under

7    authority thereof, shall be guilty of an offense against the

8    United States."

9          I will now turn to an explanation of the investment

10   advisor fraud charge.  In order to prove a defendant guilty of

11   this crime, the Government must prove all four of the following

12   elements:

13          First, Mr. Balboa was an investment advisor;

14          Second, Mr. Balboa did one of the following:  (a)

15   employed a device, scheme, or artifice to defraud an actual or

16   prospective investor in the Hedge Fund or its affiliated

17   entities; or (b) engaged in a transaction, practice, or course

18   of business which operated as a fraud and deceit upon those

19   investors or prospective investors; or (c) engaged in an act,

20   practice, and course of business that was fraudulent,

21   deceptive, and manipulative;

22          The third element is that Mr. Balboa devised or

23   participated in such alleged device, scheme or artifice to

24   defraud, or engaged in such alleged transaction, practice, or

25   course of business, knowingly, willfully, and with the intent

DCHUBAL7                         Charge

to defraud;

Finally, fourth, Mr. Balboa employed such alleged device, scheme, or artifice to defraud, or engaged in such alleged transaction, practice, or course of business, by the use of the mails or an instrumentality of interstate commerce.

Now, the first element the Government must prove is that Mr. Balboa was an investment advisor at the time he is alleged to have committed investment advisor fraud.  Title 15, United States Code, Section 80(b)(2) defines the term "investment advisor" as applied to this Act.  It provides, in pertinent part, as follows:  "Investment advisor means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities, but does not include any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."

Thus, to determine whether Mr. Balboa is an investment advisor under the Act, you have to consider three factors:

First, whether Mr. Balboa provided advice or advisor issued reports or analyses regarding the securities;

1          Second, whether Mr. Balboa was in the business of

2   providing such advice; and

3          Third, whether Mr. Balboa was provided compensation

4   for such advice.

5          These factors pertain to your consideration of the

6   first element of Count Five of the Indictment.

7          Now, the second element that the Government must prove

8   is that Mr. Balboa did any one or more of the following things:

9   (A) employed a devise, scheme, or artifice to defraud actual or

10  prospective investors in the Hedge Fund or its affiliated

11  entities; or (B) engaged in a transaction, practice, or course

12  of business which operated as a fraud and deceit upon those

13  actual or prospective investors; or (C) engaged in an act,

14  practice, or course of business that was fraudulent, deceptive,

15  and manipulative.

16         Any one of these types of alleged fraudulent conduct,

17  if proven by the Government beyond a reasonable doubt, is

18  sufficient.  However, you must be in unanimous in your

19  agreement as to which type of unlawful conduct, if any, has

20  been proven by the Government.

21         I have previously defined the terms and phrases I

22  used -- such as what constitutes a scheme to defraud, what is

23  fraud, what is considered deceptive conduct and so forth -- and

24  you are to follow those instructions here.

25         The third element the Government must prove beyond a

DCHUBAL7                          Charge

reasonable doubt is that Mr. Balboa devised or participated in

the alleged device, scheme, or artifice to defraud, or engaged

in the allegedly fraudulent transaction, practice, or course of

business, knowingly and willfully, and with a specific intent

to defraud.  I have already explained these terms to you and

you are to apply those instructions here.

        The fourth and final element the Government must prove

is that Mr. Balboa knowingly caused or caused to be used the

mails or an instrumentality of interstate commerce, such as

interstate telephone or wire communications in furtherance of

the alleged scheme to defraud, or the allegedly fraudulent

conduct specified in the indictment. As I have told you, the

term instrumentality of interstate commerce means instruments,

devices and means of conducting trade, commerce,

transportation, or communication among any two states, or

between this country and a foreign country.  It is not

necessary that Mr. Balboa be directly or personally involved in

mailing or use of the interstate instrumentality.  If Mr.

Balboa was an active participant in the scheme and took steps

or engaged in conduct which he knew or could reasonably foresee

would naturally and probably result in the use of mails or

interstate wires, then you may find that he caused them to be

used.  The items allegedly sent through the mails or

communicated through the instrumentality of interstate

commerce, need not have contained fraudulent material or

DCHUBAL7                              Charge

anything criminal or objectionable, nor need they be central to
the execution of the alleged scheme to defraud or allegedly
fraudulent conduct and may even be incidental to it.  All that
is required is that the use of the mails or instrumentalities
must bear some relation to the object of the alleged scheme or
conduct.

          That concludes my instructions to you on Count Five,
the last count of the Indictment.

          Now I want to say something about good faith.

          Since an essential element of the crimes charged is
intent to defraud, it follows that good faith on the part of
Mr. Balboa is a complete defense to all of the charges against
him.  Under the antifraud statutes, even false representations
or statements or omissions of material facts do not amount to a
fraud unless done with fraudulent intent.  However misleading
or deceptive a plan may be, it is not fraudulent if it was
carried out in good faith.  An honest belief in the truth of
the representations made by the defendant is a complete
defense, however inaccurate the statements may turn out to be.
Mr. Balboa has no burden to establish a defense of good faith.
An honest mistake in judgment or an honest error in management
does not rise to the level of criminal conduct.  The burden is
on the Government to prove beyond a reasonable doubt the
fraudulent intent and consequent lack of good faith beyond a
reasonable doubt.

1          A defendant does not act in good faith if, even though

2     he or she honestly holds a certain opinion or belief, that

3     defendant also knowingly makes false or fraudulent statements,

4     representations or promises to others.  The law is written to

5     subject to criminal punishment only those people who knowingly

6     attempt to defraud by means of false or fraudulent pretenses,

7     representations, or promises.

8          Now, in considering whether or not Mr. Balboa acted in

9     good faith, you are instructed that a belief by Mr. Balboa, if

10    such belief existed, that ultimately everything would work out

11    so that no investor would lose any money does not require a

12    finding by you that he acted in good faith.  No amount of

13    honest belief his part that the scheme will ultimately make a

14    profit for the investors will excuse fraudulent actions or

15    false representations by him.

16         As a practical matter, then, in order to sustain the

17    charges against Mr. Balboa, the Government must establish

18    beyond a reasonable doubt that Mr. Balboa knew that his conduct

19    was calculated to deceive and, nonetheless, associated himself

20    with the alleged fraudulent scheme.

21         The Government may prove that Mr. Balboa acted

22    knowingly and willfully in either of two ways.  First, it is

23    sufficient if the evidence satisfies you beyond a reasonable

24    doubt that Mr. Balboa was actually aware that he was making or

25    causing a false statement to be made, or omitting, or causing

to be omitted, a material fact.  Second, Mr. Balboa's knowledge

may be established by proof that he was aware of a high

probability the statement was false, or that a material

statement was omitted, unless, despite this high probability,

the facts show that he believed the statement to be true or

that the material fact was not omitted.  This concept is known

as conscious avoidance.  However, if you find that Mr. Balboa

acted in good faith, then there can be no conscious avoidance.

        About conscious avoidance.  As I have explained, the

Indictment requires the Government to prove that Mr. Balboa

acted knowingly.  The Government can also meet its burden by

showing beyond a reasonable doubt that Mr. Balboa acted with

deliberate disregard for whether the statements at issue were

true or false or contained material omissions, or with

deliberate disregard for whether the information was disclosed

by those who had a duty to disclose it, with the conscious

purpose of avoiding learning the truth

        In determining whether Mr. Balboa acted knowingly, you

may consider whether he deliberately closed his eyes to what

would otherwise have been obvious.  Although the necessary

knowledge on the part of Mr. Balboa with respect to each of the

charges cannot be established by showing that he was careless,

negligent, or foolish, Mr. Balboa may not willfully and

intentionally remain ignorant of a fact material and important

to his conduct in order to escape the consequences of criminal

DCHUBAL7                          Charge

law.

Thus, knowledge of the existence of a particular fact is established if a person is aware of a high probability of its existence, unless you find that the person actually believed that the fact did not exist.  In other words, Mr. Balboa cannot avoid criminal responsibility for his own conduct by "deliberately closing his eyes," or remaining purposefully ignorant of facts which would confirm to him that he was engaged in criminal conduct.

With respect to the substantive counts -- I am almost finished, just a few more pages -- Counts Three, Four and Five -- each of these counts also charges Mr. Balboa with violating Section 2, Title 18 of the United States Code, the "aiding and abetting" statute.  That is, Mr. Balboa is charged not only as a principal who committed the crime, but also as an aider and abettor and with having willfully caused the crime. As a result, there are two additional ways that the Government may establish Mr. Balboa's guilt on these counts -- Counts 3, 4, and 5:  One way is called "aiding and abetting," and the other is called "willfully causing a crime."

"Aiding and abetting" is set forth in Section 2(a) of Title 18, which provides:

"Whoever commits an offense against the United States or aids or abets or counsels, commands or induces, or procures its commission, is punishable as a principal."

1           Under the aiding and abetting statute, it is not

2    necessary for the Government to show that Mr. Balboa himself

3    physically committed the crime with which he is charged in

4    order for you to find him guilty.  Thus, even if you do not

5    find Mr. Balboa himself committed the crime charged, you may,

6    under certain circumstances, still find him guilty of that

7    crime as an aider or abettor.

8           A person who aids or abets another to commit an

9    offense is just as guilty of that offense as if he or she

10   committed it himself or herself.  Accordingly, you may find

11   that Mr. Balboa guilty of the substantive crime if you find

12   that the Government has proved that another person actually

13   committed the crime, and that Mr. Balboa aided and abetted that

14   person in the commission of the offense.

15          As you can see, the first requirement is that another

16   person has committed the crime charged.  Obviously, no one can

17   be convicted of aiding and abetting the criminal act of another

18   if no crime was committed by the other person in the first

19   place.  But if you find that a crime was committed, then you

20   must consider whether Mr. Balboa aided or abetted the

21   commission of the crime.

22          In order to aid and abet another to commit a crime, it

23   is necessary that a defendant willfully and knowingly associate

24   himself or herself in some way with the crime, and that he or

25   she willfully and knowingly seek by some act to help make the

DCHUBAL7                         Charge

crime succeed.

Participation in a crime is willful if the action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law.

The mere presence of Mr. Balboa where a crime is being committed, even coupled with the knowledge by Mr. Balboa that a crime is being committed, or the mere acquiescence by Mr. Balboa in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

To determine whether Mr. Balboa aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

-- Did he participate in the crime charged as something he wished to bring about?

-- Did he associate himself with the criminal venture knowingly and willfully?  .

-- And, three, did he seek by his actions to make the criminal venture succeed?

If he did, then Mr. Balboa is an aider and abettor, and therefore guilty of the offense.  If he did not, then he is not an aider and abettor, and he is not guilty as an aider and

1   abettor of that offense

2           The second way in which the Government can prove a

3   defendant's guilt under Section 2, Title 18 of the United

4   States Code on Counts Three, Four and Five is if you find that

5   the Defendant willfully caused a crime.  Section 2(b) of the

6   aiding and abetting statute relates to willfully causing a

7   crime, reads as follows:

8           "Whoever willfully causes an act to be done which if

9   directly performed by him or another would be an offense

10  against the United States [shall be guilty of a federal crime].

11          The term "willfully caused" does not mean that a

12  defendant himself need have physically committed the crime or

13  supervised or participated in the actual criminal conduct

14  charged in the Indictment.  Rather, the meaning of the term

15  "willfully caused" can be found in the answers to the following

16  questions:

17          -- First, did Mr. Balboa take some action without

18  which the crime would not have occurred?

19          -- Second, did Mr. Balboa intend that the crime would

20  be actually committed by others?

21          If you are persuaded beyond a reasonable doubt that

22  the answer to both questions is "yes" then Mr. Balboa is guilty

23  of the crime just as if he had actually committed it.

24          In addition to the elements of each of the crimes

25  charged in Counts One, Two, Three, Four, and Five, you must

1    decide whether any act in furtherance of the unlawful activity

2    charged occurred within the Southern District of New York.  The

3    Southern District of New York includes Manhattan, the Bronx,

4    Westchester, Putnam and Rockland, but does not include Queens,

5    Brooklyn, Nassau, and Suffolk.  It is sufficient to satisfy the

6    venue requirement if any act by anyone in furtherance of the

7    crime charged occurred within the Southern District of New

8    York.

9            I should note that on this issue -- and this issue

10   alone -- the Government need not prove venue beyond a

11   reasonable doubt, but only by a mere preponderance of the

12   evidence.  A "preponderance of the evidence" means that

13   something is more likely so than not.  Thus, the Government has

14   satisfied its venue obligations if you conclude that it is more

15   likely than not that any act in furtherance of the crime

16   charged occurred within this District.  If you find that the

17   Government has failed to prove this venue requirement, then you

18   must find Mr. Balboa not guilty of the count that you are

19   considering.

20           Now, concluding instructions.

21           You are about to go into the jury room and begin your

22   deliberations.  Your function now is to weigh the evidence in

23   this case and to determine whether the Government has proven

24   beyond a reasonable doubt that Mr. Balboa is guilty of the

25   offenses charged in the Indictment.  Remember, you have to

DCHUBAL7                          Charge

1    consider each count separately.

2              You must base your verdict solely on the evidence and

3    these instructions as to the law, and you are obliged under

4    your oath as jurors to follow the law as I have instructed you,

5    whether you agree or disagree with the particular law in

6    question.

7              The verdict must represent the considered judgment of

8    each juror.  In order to return a verdict, it is necessary that

9    each juror agree to it.  Your verdict must be unanimous.  If

10   you are divided, do not report how the vote stands, and if you

11   have reached a verdict do not report what it is until you are

12   asked in open court.

13             When you retire to the jury room, you must have a

14   foreperson.  That person will preside over your deliberations

15   and speak for you here in open court.  Other than those

16   functions, the foreperson will have no greater or lesser

17   authority than any other juror.

18             It is my custom to select Juror Number One in every

19   case to be the foreperson of the jury.  Accordingly, I am now

20   selecting Juror Number One, Mr. Albstein, as your foreperson.

21             It is your duty as jurors to consult with one another

22   and to deliberate with a view to reaching an agreement.  You

23   must each decide the case for yourself, but you should do so

24   only after discussing the case with your fellow jurors, and you

25   should not hesitate to change your opinion when you are

DCHUBAL7                              Charge

1    convinced that it is erroneous.  Because it is essential that

2    every juror considers all the facts and arguments before

3    reaching a decision, all of you must be present in order to

4    deliberate.  If any juror takes a break during the course of

5    your deliberations, you must stop discussing the case until he

6    or she returns.  Similarly, if any juror arrives late in the

7    morning, you cannot commence your deliberations until all

8    twelve of you are present.

9           For your deliberations, you will be provided with

10   copies of these instructions, as I have already told you, and

11   copies of the indictment.  You will be provided with one

12   verdict sheet on which you will record your verdict.

13          I am going to send the exhibits received in evidence

14   into the jury room.  If you want any of the testimony read, you

15   can also request that.  Please remember that it is not always

16   easy to locate what you might want, so be as specific as you

17   possibly can in requesting the testimony or portions of the

18   testimony.  If you want further explanation of the law as I

19   have explained it to you, you may also request that from the

20   Court.  If there is any doubt or question about the meaning of

21   any part of the charge, you can ask for clarification or

22   further explanation.

23          Your requests -- or any other communication you wish

24   to make with the Court -- should be made to me in writing,

25   signed by your foreperson, and given to one of the marshals who

DCHUBAL7                        Charge

will be protecting you.  Bear in mind that you are never to

reveal to any person – not even to the Court – how you, the

jury, stand, numerically or otherwise, on the questions before

you, until after you have reached a unanimous verdict.

        Your decision, as I said, must be unanimous, but you

are not bound to surrender your honest beliefs concerning the

effect or weight of the evidence for the mere purpose of

returning a verdict or solely because of the opinion of other

jurors.  Discuss and weigh your respective opinions

dispassionately, without regard to sympathy, prejudice or favor

for either party, and adopt that conclusion that in your good

conscience appears to be in accordance with the truth.

        Some of you have taken notes during the trial.  As I

told you at the beginning of the trial, this is permitted

because some people, including myself, find that taking notes

helps them focus on the testimony being given.  Your notes are

for your private use only, as a way to help you recall the

testimony as you begin your deliberations.  A juror's notes are

not entitled to any greater weight than the recollection of a

juror who did not take notes.

        Again, each of you must make your own decision about

the proper outcome of this case based on your consideration of

the evidence and your discussions with your fellow jurors.  No

juror should surrender his conscientious beliefs solely for the

purpose of reaching a unanimous verdict.  Your verdict must be

1    based solely upon the evidence introduced at trial or the lack

2    of evidence.  It is improper for you to consider any personal

3    feelings you may have about the defendant's race, religion,

4    national origin, gender, or age.  The parties in this case are

5    entitled to a trial free from prejudice and our judicial system

6    cannot work unless you reach your verdict through a fair and

7    impartial consideration of the evidence before you.

8            Your function now is to weigh the evidence in this

9    case and to determine whether the Government has or has not

10   established Mr. Balboa's guilt beyond a reasonable doubt with

11   respect to each count of the Indictment.  You must base your

12   verdict solely on the basis of the evidence and these

13   instructions as to the law.

14           You are obliged by your oath as jurors to follow the

15   law as I instruct you, regardless of whether you agree or

16   disagree with the particular law in question.  Remember at all

17   times that you are not partisans.  You are judges – judges of

18   the facts.  Your sole interest is to seek the truth from the

19   evidence in this case.

20           The verdict must represent the considered judgment of

21   each juror.  In order to return a verdict, it is necessary for

22   each juror to agree.  That means that your verdict has to be

23   unanimous.  You should consult with one another and deliberate

24   with a view towards reaching an agreement.  Each of you must

25   decide the case for himself or herself, but only after

DCHUBAL7                       Charge

impartial discussion and consideration of all the evidence in
the case with your fellow jurors.  In the course of your
deliberations, do not hesitate to re-examine your own views and
change your opinion if you become convinced it is erroneous.
Do not surrender your honest convictions as to the weight or
effect of evidence solely because of the opinions of your
fellow jurors.

             I will see counsel at the sidebar.


             (Continued on next page)

DCHUBAL7                    Charge

1              (At the sidebar)

2              MR. MILLER:  Nothing from us.

3              THE COURT:  Any objections?

4              MR. TACOPINA:  Your Honor, we have a couple of issues,

5    Mr. Seigel can do it.

6              MR. SEIGEL:  Your Honor, on page 15 with regard to

7    regulatory witnesses, you omitted reference -- I will wait for

8    your Honor to get there.

9              THE COURT:  Page 15?

10             MR. SEIGEL:  Yes, the last sentence dealing with

11   regulatory witnesses, your Honor stated:  "It is your decision,

12   after reviewing all the evidence, whether to accept the

13   testimony of Mr. Howard and to give that testimony whatever

14   weight."  You omitted the next two words "if any" -- "you find

15   it deserves."  "If any" is a standard and required qualifier in

16   the jury instructions so the jury does not impermissibly --

17             THE COURT:  What did I omit?

18             MR. SEIGEL:  "If any."

19             THE COURT:  All right.  I will reread that.

20             MR. SEIGEL:  Thank you.

21             Likewise.

22             THE COURT:  Yes, Mr. Seigel.

23             MR. SEIGEL:  On page 29.

24             THE COURT:  Yes, sir.

25             MR. SEIGEL:  The Court, dealing with the first

1    element, fraudulent act, in the last sentence of that first

2    section read:  "Anyone is enough" -- I will just read the whole

3    thing:  "The government does not have to prove all three types

4    of unlawful conduct in connection with the purchase or sale or

5    securities.  Any one is enough; but you must be unanimous as to

6    which type of unlawful conduct the defendant committed."  To

7    highlight here, "if any."  In the absence of "if any" here

8    suggests that the defendant committed some type of unlawful

9    conduct.

10          MR. MILLER:  That is throughout the instructions, your

11   Honor.  I don't think that there is ambiguity, that your Honor

12   is not suggesting that the defendant committed some type of

13   unlawful conduct.

14          MR. SEIGEL:  It refers to multiple --

15          THE COURT:  OK.  I will give it.

16          What else do you have?

17          MR. SEIGEL:  Your Honor, when your Honor just referred

18   to the marshal going, your Honor said that the marshal will be

19   protecting you, protecting the jury.  In this instance, we

20   think it is inappropriate, incredibly prejudicial.

21          THE COURT:  That is ridiculous, Mr. Seigel.

22          MR. SEIGEL:  Let me finish.  The jury is going to

23   construe that there is some need for protection, and the need

24   for protection certainly wouldn't be the government, it would

25   be the defendant.  That comment is essentially telegraphing --

DCHUBAL7                    Charge

1          THE COURT:  It is ridiculous.

2          MR. SEIGEL:  I would just point out, your Honor, it is

3   not in the written charge that your Honor gave us.

4          THE COURT:  He is sworn to maintain them in privacy

5   and custody --

6          MR. SEIGEL:  That is different from protecting them.

7   Your Honor.  With that, I don't know of a curative instruction

8   that wouldn't highlight this so at this time I am asking for a

9   mistrial.

10         THE COURT:  Asking for a mistrial?  That is

11  ridiculous.  I swear the marshal right in front of the jury.

12         MR. MILLER:  We object and obviously that something

13  that every judge in this courthouse says and there is nothing

14  prejudicial about it.

15         THE COURT:  Anything else, Mr. Tacopina?

16         MR. TACOPINA:  No, your Honor.

17         MR. COWLEY:  Regulatory --

18         THE COURT:  Page 15.

19         MR. TACOPINA:  Your Honor, I think at this point it is

20  two words in a relatively long charge --

21         THE COURT:  If you want me to reread it.

22         MR. TACOPINA:  No.  You don't have to read it.  You

23  went over the allotted time --

24         THE COURT:  It was less than two hours.

25              (Continued on next page)

DCHUBAL7                        Charge

```
 1              (In open court)

 2              THE COURT:  I don't have any further instructions.

 3          I do have to say that with respect to two alternate

 4    jurors, Ms. Torres and Ms. Baris, only 12 jurors can

 5    deliberate, so I am going to excuse you as alternate jurors

 6    now.  Notice that I say "excuse."  I am not dismissing you.

 7    There may be circumstances where either one of you or both of

 8    you may have to be recalled if one of the 12 jurors becomes

 9    unexpectedly unavailable.

10          So I want to thank you for your punctuality, your

11    faithful attendance and the close attention that you paid.

12          Please don't discuss the case with anyone.  Don't read

13    of listen to any news reports.  Don't do any research until

14    this case is over.  We have your contact information, so we

15    will keep you posted.  If we need your services, we will call

16    you back.

17          You are excused.

18              JURORS:  Thank you, your Honor.

19              THE COURT:  Marlon, will you please swear the marshal.

20              (Marshal sworn)

21              THE COURT:  Now, you are free to deliberate.  You set

22    the schedule for your deliberations.  You can deliberate as

23    long as you want.  We would ask, so that we are aware of what

24    your schedule is, let us know by dropping us a short note after

25    you have considered this so that we can be available here to
```

DCHUBAL7                         Charge

1    respond to any questions you have.

2              Anything else?

3              MR. COWLEY:  Not from the government, your Honor.

4              MR. TACOPINA:  Not from the defense.

5              THE COURT:  Thank you very much.  Marlon.

6              THE DEPUTY CLERK:  All rise.

7              THE COURT:  We will be sending in the jury charge, the

8    verdict sheet and the indictment promptly.

9              Are you ready with the exhibits?

10             MR. COWLEY:  We will do one last check and send those

11   in.

12             (At 4 p.m., the jury exited the courtroom to begin

13   their deliberations)

14             (Proceedings adjourned until 9 a.m., December 18,

15   2013)

16

17

18

19

20

21

22

23

24

25